**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **ERIC MCARTHUR and JENNY MCARTHUR,** proceeding on their own behalf and on behalf of their minor child, M.M., | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | **Civil Case No. _____** |
| v. | ) ) ) | **COMPLAINT** |
| **SCOTT BRABRAND, Superintendent** of Fairfax County Public Schools, **STELLA PEKARSKY, Chair of the Fairfax County School Board,** and **GLORIA ADDO AYENSU, Director of Department of Health for Fairfax County,** | ) ) ) ) ) ) ) ) ) ) | **FOR DECLARATORY AND INJUNCTIVE, AND OTHER RELIEF** JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

## INTRODUCTORY STATEMENT

1.     This is a lawsuit on behalf of M.M. and her parents.  M.M. is a minor child who has been arbitrarily and unlawfully prevented from attending public school in Fairfax County, Virginia, in violation of her rights to Equal Protection and Due Process of the law under the Fourteenth Amendment of the U.S. Constitution and the Virginia State Constitution, to receive an education under the Virginia State Constitution, to not be subject to unconstitutional conditions under the United States Constitution, and to not be coerced or pressured into relinquishing her statutory right to informed consent as to whether to receive a vaccine authorized only for emergency use under federal law.  M.M.'s parents have been deprived of their fundamental right, under the Virginia State Code and the Fourteenth Amendment of the United States Constitution, to make decisions concerning her upbringing.

1

2.      M.M. is a second-grade student at Sunrise Valley Elementary School in Fairfax County, Virginia. M.M. contracted COVID-19 in late October 2021 and completed a two-week home quarantine, returning to school on November 13, 2021.

3.      According to the Centers for Disease Control and Prevention ("CDC"), "[p]eople who had COVID-19, recovered, and completed 10 days of isolation and then during the 90 days following the end of isolation come into close contact with someone with COVID-19 *do not have to quarantine* or get tested if they do not have symptoms." (emphasis added).

4.      Nonetheless, on December 2, 2021—less than three weeks after M.M. completed her 14-day quarantine following her infection—the school placed her on another 10-day quarantine because she had been identified as a "potential close contact" of a student or staff member who had tested positive for COVID-19.

5.      Under the school's quarantine policy, students who have been fully vaccinated against COVID-19 and identified as "potential close contacts" are exempt from quarantining and may return to school immediately upon confirmation of their vaccinated status and lack of symptoms. This exemption applies regardless of how long ago the student was vaccinated, despite scientific evidence showing that vaccine-induced immunity declines dramatically over time.

6.      The school's quarantine policy provides no such exemption for students who have previously been infected with COVID-19. The school thus refused to release M.M. from quarantine and allow her to return to school even after being informed that she had been infected with COVID-19 just weeks ago and was experiencing no symptoms.

7.      The school's quarantine policy lacks any legitimate public health justification or any other rational basis. Having recently been infected with COVID-19, M.M. presents no greater risk—indeed, she likely presents a significantly *lower* risk—of contracting the virus and

transmitting it to others than do most if not all students who are vaccinated but not COVID-19 recovered, especially students who were vaccinated many months ago and thus have little, if any, remaining protection against becoming infected and transmitting the virus to others.

8.    This discriminatory treatment of students with natural immunity against COVID-19 is arbitrary and irrational.

9.    M.M. should not—and under the Equal Protection Clause of the United States Constitution, may not—be excluded from school and required to quarantine when she presents no greater risk of transmitting the virus to those around her than other students whom the school permits to return to school immediately without quarantining.

10.    Likewise, the school's policy deprives M.M. of her right to an education, guaranteed by the Virginia State Constitution.

11.    By arbitrarily and capriciously depriving her of this right—and doing so without a hearing—the school's policy violates M.M.'s Due Process rights under the Federal and State Constitutions.

12.    By putting M.M. (and her parents) in the position of having to choose between her right to an uninterrupted public education and a medically unnecessary and potentially harmful vaccine (for her), the policy creates an unconstitutional condition.

13.    For the same reasons, the quarantine policy deprives M.M.'s parents of their fundamental right to make decisions concerning her upbringing, recognized by the Virginia State Code and the Fourteenth Amendment of the United States Constitution.

14.    For similar reasons, the policy coerces M.M. into receiving a vaccine approved for her age group only under the Emergency Use Authorization (EUA) statute, violating her right to free and informed consent.

15.     The court should accordingly declare Defendants' quarantine policy unconstitutional and unlawful, enjoin its application, and award all other just and proper relief.

## JURISDICTION AND VENUE

16.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this District.

18.     This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

## PARTIES

19.     M.M. is a 7-year-old elementary school student who resides in Vienna, Virginia and attends school in Reston, Virginia, at Sunrise Valley Elementary School, which is part of the Fairfax County School District.

20.     Eric and Jenny McArthur are M.M.'s parents. They reside in Vienna, Virginia.

21.     Collectively, M.M. and her parents will be referred to as "Plaintiffs."

22.     Scott Brabrand is Superintendent of Fairfax County Public Schools ("FCPS"). According to FCPS's website, Mr. Brabrand "oversees day to day operations" of the school district.  He is sued in his official capacity.

23.     Stella Pekarsky is Chair of the Fairfax County Public School Board ("the Board"). According to FCPS's website, the Board "is charged by the statutes of Virginia and the regulations of the Virginia Board of Education to operate the public schools of Fairfax County by setting

general school policy and establishing guidelines that will ensure the proper administration of the [FCPS] programs."  Ms. Pekarsky is sued in her official capacity.

24.     Gloria Addo-Ayensu is Director of the Department of Health for Fairfax County ("FCHD").  She is sued in her official capacity.

25.     Collectively, they will be referred to as "Defendants."

## STATEMENT OF FACTS

### I.    BACKGROUND

26.     In late October 2021, M.M. contracted COVID-19, as did several of her family members.  Her diagnosis was confirmed through an antibody test on December 3, 2021.

27.     M.M.'s parents decided not to have her tested after she began displaying symptoms in late October because her symptoms were mild and because, by that time, her father and brother had already tested positive for COVID-19, her mother was displaying symptoms, and M.M. had already been placed on quarantine from school as a "close contact" of her brother. To get M.M. tested, her parents would have had to go out into the community while sick with COVID-19, which they believed would be irresponsible. They also did not see a need to get her tested because the school's quarantine policy provided no indication that a prior positive test would be relevant to M.M.'s ability to avoid quarantining if she were later identified as a "potential close contact."

28.     M.M. quarantined at home and was absent from in-person instruction from Monday, November 1, 2021, through Friday, November 12, 2021, missing two full weeks of school.

29.     Less than three weeks later, on the evening of Thursday, December 2, 2021, Sunrise Valley notified M.M.'s parents by email that M.M. had been identified as a "potential close contact" of another student or staff member who had tested positive for COVID-19.

30.     Pursuant to FCPS's quarantine policy, which is based on guidance from FCHD, the notification explained that M.M. was being placed on a 10-day quarantine during which she could not attend school. The notification stated that "[y]our child may return to school and resume school activities on: December 13."

31.     Under the heading "How to Return to In-Person Learning and Activities," the notification provided a link to a "COVID Contact Vaccination Verification survey," which parents were requested to complete only "[i]f your child is fully vaccinated." The notification said nothing about students who had previously recovered from COVID-19.

32.     Under FCPS's quarantine policy, a fully vaccinated student who is identified as a "potential close contact" may return to school immediately upon verification by FCHD that the student is vaccinated and asymptomatic.

33.     This exemption from the quarantine policy applies to all students who have been fully vaccinated against COVID-19 at any point in time.

34.     The policy provides no similar exemption for students who have previously been infected and recovered from COVID-19.

35.     FCPS's webpage entitled "Pause, Quarantine, and Contact Tracing" contains a section at the bottom labeled "Do Your Part." It instructs families to "do their part," *inter alia* by "getting vaccinated."

36.     When FCPS originally issued its quarantine requirement, it applied to all students identified as "potential close contacts," regardless of vaccination status. After parents of vaccinated students complained, the policy was changed to exempt vaccinated students and allow them to return to school immediately, without quarantining.

37.     On December 3, 2021, M.M.'s mother filled out the FCHD verification survey, indicating that M.M. had not been vaccinated against COVID-19, but that she had been infected with COVID-19 within the last 90 days and was experiencing no symptoms.

38.     Later that afternoon, M.M.'s mother received an email notification from FCHD stating that "we are unable to clear your child to go back to school because they are not vaccinated for COVID-19."

39.     The same day, M.M.'s mother spoke to the principal of Sunrise Valley and explained that M.M. had recently been infected with COVID-19 and completed a 14-day quarantine just a few weeks ago. The principal responded that neither proof of prior infection nor a negative COVID-19 test would release M.M. from quarantine and allow her to return to school.

40.     On December 7, M.M.'s mother spoke to an individual at FCHD who stated that a positive test for M.M. within the last 90 days would allow her to be released from quarantine.  An antibody test would not suffice, however, because it would not prove the infection occurred within the last 90 days. The representations of M.M.'s parents regarding the circumstances of her infection were not accepted as adequate to establish the fact of timing.

41.     Later the same day, M.M.'s father called FCHD back and spoke to another person. This second individual stated that he had never heard that a positive test within the last 90 days would allow release from quarantine, but rather only vaccination would.

42.     This person also told M.M.'s father that if she were to receive a COVID-19 test on that day (notwithstanding her naturally acquired immunity) she would likely test positive because of her previous infection, and could be treated as a current positive case because FCHD did not have a record of a prior positive COVID-19 test for M.M.

43.     That would entail subjecting her to an additional 10-day quarantine.

44.     Fearing this scenario, M.M.'s parents declined to get her tested.

45.     M.M. returned to school on December 13, 2021. She missed six full days of school, having already missed two weeks of school only a few weeks earlier. Of the 25 school days between November 1 and December 13, M.M. was quarantined for 14 of them.[1]

46.     M.M. suffered mental and emotional distress, as well as learning loss, as a result of being excluded from in-person school.

47.     After returning to school, M.M. will again be subject to quarantine whenever the school identifies her as a "potential close contact" of an infected student or staff member.

48.     Cases have been rising in the D.C.-Virginia-Maryland region.

49.     In light of this reality, in all likelihood M.M. may soon have another "potential close contact" and again be forced to quarantine differently from vaccinated students.

## II.     THE COVID-19 VACCINES

50.     The Pfizer BioNTech is the only vaccine that has been approved for use in the 5-11 age group.  It was authorized for use under the federal Emergency Use Authorization statute on October 29, 2021.  It has not been granted full FDA approval.

51.     The standard for EUA review and authorization is lower than that required for full FDA approval.

52.     Typically, vaccine development includes six stages: (1) exploratory; (2) preclinical (animal testing); (3) clinical (human trials); (4) regulatory review and approval; (5) manufacturing;

---

[1] On December 6, 2021, FCPS announced a change to its quarantine policy. Whereas previously unvaccinated students could not be released from quarantine even if they provided a negative test, they now will be permitted to return to school after seven days of quarantining if they remain symptom free and provide a negative test. As under the prior policy, vaccinated students may return to school immediately without testing, regardless of how much time has passed since they were vaccinated.  Under this new policy, if M.M. had provided a negative test taken on or after her fifth day of quarantine, she could have returned to school on Friday, December 10—one school day sooner than under the policy that was in effect when she was quarantined. As explained above, M.M.'s parents decided not to have her tested out of concern that she would test positive due to her very recent prior infection. *See supra*, ¶¶ 42-44.

and (6) quality control.  *See* CDC, *Vaccine Testing and the Approval Process* (May 1, 2014), *available at* https://bit.ly/3rGkG2s (last visited Dec. 16, 2021).

53.     The third phase generally takes place over years, because it can take that long for a new vaccine's side effects to manifest.  *Id.*

54.     The third phase must be followed by a period of regulatory review and approval, during which data and outcomes are peer-reviewed and evaluated by FDA.  *Id.*

55.     Finally, to achieve full approval, the manufacturer must demonstrate that it can produce the vaccine under conditions that assure adequate quality control.

56.     FDA must then determine, based on "substantial evidence," that the medical product is effective and that the benefits outweigh its risks when used in accordance with the product's approved labeling.  *See* CDC, *Understanding the Regulatory Terminology of Potential Preventions and Treatments for COVID-19* (Oct. 22, 2020), *available at* bit.ly/3x4vN6s (last visited Dec. 16, 2021).

57.     In contrast to this rigorous, six-step approval process that includes long-term data review, FDA grants EUAs in emergencies to "facilitate the availability and use of medical countermeasures, including vaccines, during public health emergencies, such as the current COVID-19 pandemic."  FDA, *Emergency Use Authorization for Vaccines Explained* (Nov. 20, 2020), *available at* bit.ly/3x8wImn (last visited Dec. 16, 2021).

58.     EUAs allow FDA to make a product accessible to the public based on the best available data, without waiting for all the evidence needed for full approval.  *See id.*

59.     The EUA statute lays out the: "appropriate conditions designed to ensure that individuals to whom the product is administered are informed."  They must be told:

> that the Secretary has authorized the *emergency use* of the product;

of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
*of the option to accept or refuse administration of the product*, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks (emphasis added).

21 U.S.C. § 360bbb-3(e)(1)(A)(i).

60.     The Pfizer BioNTech vaccine received emergency use authorization for 5-11-year-olds on October 29, 2021.[2]

61.     To date, no study has been conducted that focused upon the safety and efficacy of any of the COVID-19 vaccines for COVID-recovered children. *See* Dr. Mahesh Shenai, "The Most Neglected Subgroup:  Vaccination in COVID-recovered Children," *Substack* (October 22, 2021), *available at* https://maheshshenai.substack.com/p/the-most-neglected-subgroup-vaccination (last visited Dec. 15, 2021).

## III.   PRIOR INFECTION LEADS TO NATURALLY ACQUIRED IMMUNITY TO COVID-19 AT LEAST AS ROBUST AS VACCINE-ACQUIRED IMMUNITY

62.     Naturally acquired immunity developed after recovery from COVID-19 provides robust protection from subsequent SARS-CoV-2 infection. Declaration of Drs. Jayanta Bhattacharya and Martin Kulldorff, ("Joint Decl.") ¶¶ 15-24, attached as Exhibit A; 12/20/2021 Declaration of Dr. Jayanta Bhattacharya ("Bhattacharya Decl.") ¶¶ 12-31, attached as Exhibit B.

63.     Multiple extensive, peer-reviewed studies comparing naturally acquired and vaccine-induced immunity have concluded overwhelmingly that the former provides equivalent or greater protection against reinfection from COVID-19 than immunity generated by mRNA vaccines (BioNTech and Moderna). Joint Decl. ¶¶ 18-24; Bhattacharya Decl. ¶¶ 15-18.

---

[2] Notably, the Johnson and Johnson (Janssen) vaccine, which had been in distribution under an EUA for adults, was just restricted by the CDC due to blood clotting side effects, and the CDC has recommended receiving the Moderna or Pfizer BioNTech instead.

64.     A study from Israel released several months ago found that *vaccinated* individuals had 13.1 times greater risk of testing positive, 27 times greater risk of symptomatic disease, and around 8.1 times greater risk of hospitalization than unvaccinated individuals who possess naturally acquired immunity.  Joint Decl. ¶ 20.

65.     The authors concluded that the "study demonstrated that natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 [BioNTech's research name] two-dose vaccine-induced immunity."  Joint Decl. ¶ 20.

66.     Recent Israeli data found that those who had received the BioNTech vaccine were 6.72 times *more likely* to suffer a subsequent infection than those with natural immunity. David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection*? ISRAELNATIONALNEWS.COM (Jul. 13, 2021), *available at* https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Dec. 16, 2021).

67.     Israeli data also indicates that the protection BioNTech grants against infection is short-lived compared to naturally acquired immunity and degrades significantly faster. *See* Nathan Jeffay, *Israeli, UK Data Offer Mixed Signals on Vaccine's Potency Against Delta Strain*, THE TIMES OF ISRAEL (July 22, 2021), *available at* bit.ly/3xg3uCg (last visited Dec. 16, 2021).

68.     A recent study from Qatar tracked nearly a million individuals for six months after vaccination.  The study's authors concluded that the Pfizer vaccine's "induced protection against infection appears to wane rapidly after its peak right after the second dose, but it persists at a robust level against hospitalization and death for at least six months following the second dose." Bhattacharya Decl. ¶¶ 22-23.

69.     The "Qatari study is no outlier."  Bhattacharya Decl. ¶ 25.  Several United States studies, as well as one conducted in the United Kingdom, yielded similar results.  *Id.* at 26-28.

70.     These findings of highly durable natural immunity should not be surprising, as they hold for SARS-CoV-1 and other respiratory viruses. According to a paper published in *Nature* in August 2020, 23 patients who had recovered from SARS-CoV-1 still possess CD4 and CD8 T cells, 17 years after infection during the 2003 epidemic.[3] A *Nature* paper from 2008 found that 32 people born in 1915 or earlier still retained some level of immunity against the 1918 flu strain— some 90 years later.[4]  Bhattacharya Decl. ¶ 20.

71.     A CDC/IDSA clinician call on July 17, 2021, summarized the then-current state of the knowledge regarding the comparative efficacy of natural and vaccine immunity. The presentation reviewed three studies that directly compared the efficacy of prior infection versus mRNA vaccine treatment and concluded "the protective effect of prior infection was similar to 2 doses of a COVID-19 vaccine."

72.     Given that there is currently *more* data on the durability of naturally acquired immunity than there is for vaccine immunity, researchers rely on the expected durability of naturally acquired immunity to predict that of vaccine immunity.  Joint Decl. ¶ 23; Bhattacharya Decl. ¶ 12.

---

[3] Le Bert, N., Tan, A. T., Kunasegaran, K., Tham, C. Y. L., Hafezi, M., Chia, A., Chng, M. H. Y., Lin, M., Tan, N., Linster, M., Chia, W. N., Chen, M. I. C., Wang, L. F., Ooi, E. E., Kalimuddin, S., Tambyah, P. A., Low, J. G. H., Tan, Y. J. & Bertoletti, A. (2020). SARS-CoV-2-specific T cell immunity in cases of COVID-19 and SARS, and uninfected control. *Nature*, 584, 457-462. doi: 10.1038/s41586-020-2550-z

[4] Yu, X., Tsibane, T., McGraw, P. A., House, F. S., Keefer, C. J., Hicar, M. D., Tumpey, T. M., Pappas, C., Perrone, L. A., Martinez, O., Stevens, J., Wilson, I. A., Aguilar, P. V., Altschuler, E. L., Basler, C. F., & Crowe Jr., J. E. (2008). Neutralizing antibodies derived from the B cells of 1918 influenza pandemic survivors. *Nature*, 455, 532-536. doi: 10.1038/nature07231

73.    Indeed, naturally and vaccine-acquired immunity utilize the same basic immunological mechanism—stimulating the immune system to generate an antibody response. Joint Decl. ¶ 16; Bhattacharya Decl. ¶ 13.

74.    The level of antibodies in the blood of those who have natural immunity was initially the benchmark in clinical trials for determining the efficacy of vaccines.  Joint Decl. ¶ 16.

75.    Studies have demonstrated prolonged immunity with respect to memory T and B cells, bone marrow plasma cells, spike-specific neutralizing antibodies, and IgG+ memory B cells following a COVID-19 infection.  Joint Decl. ¶ 17; Bhattacharya Decl. ¶ 14.

76.    New variants of COVID-19 resulting from the virus's mutation do not escape the natural immunity developed by prior infection from the original strain of the virus. Joint Decl. ¶¶ 29-33; Bhattacharya Decl. ¶ 17.

77.    While the CDC and the news media have touted a study from Kentucky as proof that those with naturally acquired immunity should get vaccinated, that conclusion is unwarranted. As Drs. Bhattacharya and Kulldorff explain, although individuals with naturally acquired immunity who received a vaccine showed somewhat increased antibody levels, "[t]his does not mean that the vaccine increases protection against symptomatic disease, hospitalizations or deaths." Joint Decl. ¶ 37.   In other words, higher antibody levels do not necessarily translate into a clinical benefit.  Nor does any study demonstrate that boosting a naturally immune person's antibody levels via vaccination reduces transmission.

78.    The Kentucky study is also problematic because it appears to be cherry-picked. The CDC gathered data on this subject from all 50 states but seems to have chosen to draw attention to the one state that yielded data that it could represent as supporting its position.  *See* Marty Makary, "Covid Confusion at the CDC," *The Wall Street Journal* (Sept. 13, 2021), *available at*

https://www.wsj.com/articles/covid-19-coronavirus-breakthrough-vaccine-natural-immunity-cdc-fauci-biden-failure-11631548306 (last visited Dec. 16, 2021).

79.     CDC has also claimed that another study, of several thousand patients hospitalized with "covid-like illness," demonstrates the superiority of vaccine-achieved immunity. "Laboratory-Confirmed COVID-19 Among Adults Hospitalized with COVID-19 Like Illness," *CDC* (Oct. 29, 2021), *available at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7044e1.htm (last visited Nov. 3, 2021).

80.     This study is highly problematic for many reasons experts have pointed out, chief among them that its design meant that it did not actually address the question of whether the covid-recovered benefit from being vaccinated. Bhattacharya Decl. ¶ 30. *See* Martin Kulldorff, "A Review and Autopsy of Two COVID Immunity Studies," *Brownstone Institute* (Nov. 2, 2021), *available at* https://brownstone.org/articles/a-review-and-autopsy-of-two-covid-immunity-studies/ (last visited Dec. 20, 2021).

81.     Rather, "the CDC study answers neither the direct question of whether vaccination or Covid recovery is better at decreasing the risk of subsequent Covid disease, or whether the vaccine rollout successfully reached the frail.  Instead, it asks which of these two has the greater effect size.  It answers whether vaccination or Covid recovery is more related to Covid hospitalization or if it is more related to other respiratory type hospitalizations."  Kulldorff, "A Review and Autopsy."  *See* Bhattacharya Decl.  ¶ 32-33.

82.     Dr. Kulldorff explains that the Israeli study discussed above, indicating that naturally acquired immunity provides significantly better protection against reinfection, produced far more reliable results due to its design.  *See* Kulldorff, "A Review and Autopsy."

83.     Indeed, shortly after publishing the results of the study, CDC (much more quietly) conceded that: "[a] systematic review and meta-analysis including data from three vaccine efficacy trials and four observational studies from the US, Israel, and the United Kingdom, found no significant difference in the overall level of protection provided by infection as compared with protection provided by vaccination; this included studies from both prior to and during the period in which Delta was the predominant variant." "Science Brief: SARS-CoV-2 Infection-induced and Vaccine-induced Immunity," *CDC* (Oct. 29, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/vaccine-induced-immunity.html (last visited Dec. 16, 2021).

84.     In short, contrary to the claims of the CDC and the news media, this study did *not* establish a valid reason to vaccinate individuals with naturally acquired immunity. *See* Joint Decl. ¶ 37; Bhattacharya Decl. ¶¶ 32-33.

85.     As further evidence that naturally acquired immunity is robust and durable, the CDC recently acknowledged that it was unable to provide documentation of even a single case of a COVID-19-recovered, unvaccinated individual spreading the virus to another person. *See* 11/5/21 Letter of Roger Andoh in Response to FOIA Request, attached as Exhibit C.

86.     The Commonwealth of Virginia's public policy has traditionally recognized naturally acquired immunity, as it does not require school children to be vaccinated for diseases from which they have recovered.

87.     For instance, the law mandating vaccination of school children for measles, mumps, rubella, and varicella (chickenpox) *explicitly exempts* from the requirements those who can demonstrate existing immunity through serological testing that measures protective antibodies. 12 Va. Admin. Code § 5-110-80 (2021).

88.     The refusal to recognize naturally acquired immunity is thus at odds with Virginia's historical approach.

## IV.   PRIOR INFECTION LEADS TO HEIGHTENED RISK OF ADVERSE EVENTS FROM THE VACCINE

89.     Though the COVID-19 vaccines appear to be relatively safe at a population level, as with all medical interventions, some individuals will suffer adverse consequences, even severe ones.  Such side effects may include common, temporary reactions such as pain and swelling at the vaccination site, fatigue, headache, muscle pain, fever, and nausea.  While rarer, they can also cause serious side effects that result in hospitalization or death.  Joint Decl. ¶¶ 25-26.

90.     The vaccines may very well cause long-term side effects that remain unknown at this time due to their relatively recent development.  Joint Decl.¶¶ 26-27.

91.     There is "little doubt that the mRNA vaccines are associated with myocarditis." 12/20/21 Declaration of Dr. Anish Koka ("Koka Decl."), ¶ 7, attached as Exhibit D.

92.     Vaccine-related myocarditis is associated with a significant leak of cardiac enzymes from the heart and thus can result in permanent heart damage.  Koka Decl. ¶ 11.

93.     Although vaccine myocarditis is associated with reduction of heart function that appears to normalize quickly, cardiac magnetic resonance imaging ("MRI") has been finding the formation of scar tissue after vaccine myocarditis that is similar to findings in non-vaccine myocarditis. Koka Decl. ¶ 12.

94.     Early evidence suggests that about one-third of patients who suffer an episode of vaccine myocarditis have evidence of scar/fibrosis, seen in a 3-month follow up. Koka Decl. ¶ 13.

95.     This could have long-term consequences. A systemic review of literature found that the presence of scar tissue detected by cardiac MRI is associated with an increased risk of death, heart failure, need for cardiac transplantation, and serious cardiac arrhythmias. Koka Decl. ¶ 14.

96.     While some have argued that the risk of myocarditis from contracting COVID-19 is higher than that from vaccines, a study in the Journal of the American Medical Association demonstrated that diagnosis of myocarditis peaked only after widespread vaccine administration. Koka Decl. ¶ 15.

97.     Moreover, this risk/benefit calculus does not account for those with naturally acquired immunity.

98.     In sum:

> vaccine related myocarditis is a *potentially serious* medical condition that can lead to fibrosis in heart muscle.  Fibrosis and scarring found within the heart muscle has been associated with *long term complications* related to cardiac arrhythmias and even sudden cardiac death.  It is not yet known what the long-term sequelae will be for those patients who have developed scarring and fibrosis related to vaccine myocarditis.  Rates of vaccine myocarditis in certain sub-populations may exceed the risks from SARS-Cov2 associated myocarditis (emphasis added).

Koka Decl.  ¶ 17.

99.     That the Johnson and Johnson vaccine has just been sidelined due to safety concerns, after nearly a year, illustrates the fact that there are many unknowns with respect to adverse consequences of the vaccine.

100.     Recent research indicates that vaccination presents a heightened risk of adverse effects—including serious ones—to those who have previously contracted and recovered from COVID-19.  Joint Decl. ¶ 28.

101.     The heightened risk of adverse effects results from "preexisting immunity to SARS-Cov-2 [that] may trigger unexpectedly intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals." Angeli, *et al*., *SARS-CoV-2 Vaccines: Lights and Shadows*, 88 EUR. J. INTERNAL MED. 1, 8 (2021).  *See also* Jennifer Block, "Vaccinating people who have had covid-19: why doesn't natural immunity count in the US?"

BRITISH   MEDICAL   JOURNAL   (Sept.   13,   2021),   *available   at* https://www.bmj.com/content/374/bmj.n2101 (last viewed Dec. 13, 2021) (citing several experts and studies establishing that those who have previously been infected are more likely to experience adverse side effects from the vaccines).

102.     Vaccination of the naturally immune may increase their chances of reinfection. Some experts believe that subsequent vaccination (especially a two-dose regimen) for those who have been previously infected may cause "'exhaustion,' and in some cases even a deletion, of T-cells," leading to a depleted immune response.  Block, "Vaccinating people who have had covid-19."

## CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF THE EQUAL PROTECTION CLAUSE

103.     Plaintiffs reallege and incorporate by reference the foregoing allegations as though fully set forth herein.

104.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of the laws."

105.     Under the Equal Protection Clause, state and local governments and government officials may not arbitrarily discriminate among citizens, denying to some rights or benefits that are made available to other similarly situated citizens, without justification. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 472 U.S. 432 (1985).

106.     Defendants have violated and are violating M.M.'s rights under the Equal Protection Clause by not extending to her the same exemption from the quarantine policy given to students who have been vaccinated against COVID-19.

107.    M.M., who has recently been infected with COVID-19, presents an extremely low risk of being reinfected and transmitting the virus to others.

108.    For this reason, CDC guidance states that "[p]eople who had COVID-19, recovered, and completed 10 days of isolation and then during the 90 days following the end of isolation come into close contact with someone with COVID-19 do not have to quarantine or get tested if they do not have symptoms."

109.    The natural immunity arising from infection with COVID-19 provides at least as much—if not significantly more—protection against becoming infected and transmitting the virus to others than the protection afforded by vaccination. *See supra*, ¶¶ 64-87.

110.    This is particularly true when comparing a person who was recently infected with COVID-19 to a person who was vaccinated many months ago, as the protection vaccination affords against infection and transmission declines significantly within just a few months, and it may drop to negligible levels within six months. *See supra*, ¶¶ 68-71.

111.    Having recovered from COVID-19 just a few weeks before being identified as a "potential close contact," M.M. presents no greater risk—and very likely a much *lower* risk—of contracting and transmitting the virus than most if not all vaccinated students.

112.    Yet all vaccinated students are exempt from FCPS' quarantine requirement and are entitled to return to school immediately upon FCHD's confirmation of their vaccinated status and lack of symptoms, even if they were vaccinated many months ago and lack significant current protection against being infected and transmitting the virus to others. This differential treatment smacks of politics and social engineering rather than a valid safety measure.

113.    There is no legitimate public health justification, or any other rational basis, for requiring M.M. to quarantine and excluding her from school when she presents no greater risk to

those around her than vaccinated students who are not required to quarantine. *See Louisiana v. Becerra*, No. 3:21-cv-03970 (W.D. La. Nov. 30, 2021) ("the rejection of natural immunity as an alternative is puzzling"); *Missouri v. Biden*, 2021 WL 5564501 (E.D. Mo. Nov. 29, 2021) at p. 17 and fn. 20, *aff'd Missouri v. Biden*, No. 21-3725 (8th Cir. Dec. 13, 2021) (finding that CMS' changing its posture with respect to natural immunity constituted evidence of unlawful agency action, and noting that "CMS also rejected natural immunity, despite an intense public debate and a trove of scientific data on the strength and durability of natural immunity from COVID-19– alone and compared to vaccine-induced immunity.").

114.    This arbitrary, irrational, and discriminatory treatment violates M.M.'s fundamental right to equal protection of the laws under the Fourteenth Amendment of the Constitution.

115.    The arbitrariness is underscored by the fact that up until 2021, Virginia recognized naturally acquired immunity, exempting from vaccine requirements children who had recovered from the disease in question.

116.    Equal protection problems are compounded because individuals with naturally acquired immunity are at a disadvantage when it comes to vaccination, since immunization poses a greater risk of harm to them than to those who are unvaccinated and have not acquired immunity naturally, and immunization may in fact deplete their immune response.

117.    Thus, through no fault of her own, M.M. (and her parents) must choose between the uninterrupted education enjoyed by her vaccinated peers and a heightened risk of adverse side effects and even possible depletion of her naturally acquired immunity.

## COUNT II:  VIOLATION OF STATE RIGHT TO AN EDUCATION

118.    Plaintiffs reallege and incorporate by reference the foregoing allegations as though fully set forth herein.

119.    The ability to receive in-person public elementary and secondary school instruction is a significant public benefit, and a fundamental right, protected by Article I, § 15, and Article VIII §§ 1, 3 of the Virginia State Constitution.

120.    Article I, § 15 states that "free government rests, as does all progress, upon the broadest possible diffusion of knowledge" and instructs the Commonwealth to "avail itself of those talents which nature has sown so liberally among its people by assuring the opportunity for their fullest development by an effective system of education throughout the Commonwealth."

121.    Article VIII, § 1 requires the State's General Assembly to "provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth and shall seek to ensure that an educational program of high quality is established and continually maintained." *See Scott v. Commonwealth*, 247 Va. 379 (1994).

122.    Article VIII, § 3 requires the General Assembly to "provide for the compulsory elementary and secondary education of every eligible child of appropriate age."

123.    By requiring M.M. to stay home from school with no valid public health justification, Defendants are depriving her of her right to a public-school education.

124.    M.M.'s case illustrates how problematic this policy is because she had been required to stay home for two weeks less than three weeks prior to beginning the latest quarantine.

125.    In fact, of the 25 school days between November 1 and December 13, M.M. was quarantined for 14 of them.

126.    This already puts her at a significant disadvantage compared to children who have been vaccinated.

127.    Theoretically, an unvaccinated child could be subject to endless quarantines. And given the rise in cases in the region, this is not merely theoretical, but likely.

128.    Thus, M.M. is being deprived of the right to an education guaranteed her by the Virginia State Constitution.

## COUNT III:  VIOLATION OF DUE PROCESS CLAUSE AND UNCONSTITUTIONAL CONDITIONS DOCTRINE

129.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

130.    The Due Process Clause of the Fourteenth Amendment and Article 1, § 11 of the State Constitution provide that no State "shall deprive any person of life, liberty, or property, without due process of law."

131.    The Virginia State Constitution provides that "all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety."  Article I, § 1.

132.    This means, *inter alia*, the individual possesses the right to "act[] as he may judge best for his interest" and "to live and work where he will; to earn his livelihood by any lawful calling."  *Young v. Commonwealth*, 101 Va. 853, 862-63 (1903).

133.   "[T]here are certain inherent rights which men do not surrender by entering into organized society, and of which they cannot be arbitrarily deprived by the state." *Taylor v. Smith*, 140 Va. 217 (1924).

134.   "These are individual rights, formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which begins with the fundamental proposition that all men are created equal; that they are endowed with their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness." *Young*, 101 Va. at 862.

135.   The due process protections afforded under the Constitution of Virginia are co-extensive with those recognized in the Federal Constitution. *Shivaee v. Commonwealth*, 270 Va. 112, 119 (2005).

136.   M.M. has a property interest in her education (or, in State constitutional terms, a right to that education) and a liberty interest in deciding whether or not to receive an EUA-approved, medically unnecessary and possibly harmful (to her) vaccine free from pressure or coercion.

137.   Defendants' quarantine policy deprives her of her right to an education and her property interest in that education, without a hearing and without any valid public health rationale. *See Goldberg v. Kelly*, 397 U.S. 254 (1970) (termination of welfare benefits without a hearing violated procedural due process requirements.).  Accordingly, the policy violates her procedural due process rights.

138.   The "touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

139.   The quarantine policy also infringes M.M.'s substantive due process rights, not least of all because it is arbitrary and capricious for the reasons discussed above: it ignores the

CDC's own guidance that students who have recently recovered from COVID-19 do not need to quarantine, it does not adequately account for naturally acquired immunity, and it is inconsistent with Virginia's historical practice of exempting from vaccine requirements those who have had the disease in question.

140.    Also for the reasons discussed above, there is no legitimate public health or other justification for requiring M.M. to quarantine based on a "potential close contact" determination or treating her differently from her vaccinated peers.  There is no valid reason not to recognize her naturally acquired immunity. Accordingly, the quarantine policy constitutes a substantive due process violation under the State and Federal Constitutions.

141.    Relatedly, FCPS' and FCHD's policy constitutes an unconstitutional condition placed upon M.M. and her parents.

142.    The unconstitutional conditions doctrine forbids burdening people's constitutional rights by coercively withholding benefits from those who exercise them.  *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013); *see also Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 454 (1983) ("the government may not deny a benefit to a person because he exercises *a constitutional right*.") (emphasis added); *Memorial Hosp. v. Maricopa Cty.*, 415 U.S. 250 (1974) (finding that state residency requirement impinged on the constitutionally guaranteed right to interstate travel, while lacking a compelling state interest, and thus was unconstitutional); *Speiser v. Randall*, 357 U.S. 513, 518 (1958) (holding that government created unconstitutional condition by denying property tax exemption for engaging in certain speech).

143.    M.M. has the right to bodily autonomy and to decline medical treatment under the United States Constitution.  *Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278 (1990)

(right to refuse unwanted medical care is protected by U.S. Constitution); *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same).

144.    This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997).

145.    The Court has explained that the right to refuse medical care derives from the "well-established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997).

146.    By premising M.M.'s ability to receive an uninterrupted education (a government benefit and right recognized by the Virginia State Constitution) upon her receiving a medically unnecessary vaccine that has a heightened chance of causing her harm due to her natural immunity, the quarantine policy creates an unconstitutional condition. *See Louisiana v. Becerra*, No. 3:21-cv-03970 ("The Plaintiff States' citizens will suffer irreparable injury by having a substantial burden placed on their liberty interests because they will have to choose between losing their jobs or taking the vaccine.").

### COUNT IV: VIOLATION OF STATE AND FEDERAL CONSTITUTIONAL RIGHT TO PARENT

147.    Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth herein.

148.    The Code of Virginia provides that: "[a] parent has a fundamental right to make decisions concerning the upbringing, education, and care of the parent's child." Va. Code Ann. § 1-240.1 (2013).

149.    The United States Supreme Court has recognized a similar right, incorporated in the Fourteenth Amendment's Due Process Clause. *See Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-35 (1925) (holding that a state statute

"unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control.").

150.     Whether to vaccinate one's child—particularly with a medically unnecessary, EUA vaccine, untested in children who have recovered from COVID-19—is a fundamental aspect concerning the child's upbringing and medical care.

151.     Harms from the vaccine are not merely speculative.  As Dr. Koka explains, myocarditis, a potential side effect of mRNA vaccines, may have long-lasting, serious, and adverse effects on the heart.  Koka Decl. ¶¶ 93-100.

152.     While as a general matter, the risk-benefit analysis for adults may favor vaccination, such a calculus has not been conducted for children, who are at exceedingly low risk of a severe outcome from COVID-19.  Indeed, the survival rate for a child M.M.'s age is 99.9984%.  Bhattacharya Decl. ¶ 6.  Because M.M. is healthy and has no known underlying conditions, the survival rate for those of her profile is no doubt even higher.

153.     All these issues are compounded when the child in question has naturally acquired immunity, because she stands to benefit even less from the vaccine than an immunologically naïve child.

154.     This delicate decision, involving the health and well-being of a child, resides with her parents, according to the Virginia Code and the United States Supreme Court.

155.     By predicating M.M.'s ability to obtain an uninterrupted education, along with her immunized peers, upon her receiving such a vaccine, Defendants have deprived M.M.'s parents of their right to make crucial decisions concerning their daughter's upbringing under both the Virginia Code and the United States Constitution.

### COUNT V:  DEFENDANTS' QUARANTINE POLICY IS CONTRARY TO FEDERAL LAW

156.    Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth herein.

157.    Defendants' quarantine policy puts M.M. and her parents in the position of having to give her an unnecessary, possibly harmful, EUA vaccine or else to subject her to potentially endless missed school days, effectively depriving her of her right to an education.

158.    For 5-to-9-year-olds, the COVID-19 survival rate is 99.9984%.  Bhattacharya Decl. ¶ 6.  For healthy children like M.M., it is no doubt even higher.

159.    The federal EUA statute mandates voluntary and informed consent.  *See John Doe No. 1 v. Rumsfeld*, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C. Apr. 6, 2005) (allowing use of anthrax vaccine pursuant to EUA "on a *voluntary* basis").  *See also* 21 U.S.C. § 360bbb-3€(1)(A)(ii).

160.    The federal EUA statute expressly states that recipients of products approved for use under it must be informed of the "option to accept *or refuse* administration" (emphasis added) and of the "significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." *Id.*

161.    Federal law need not contain an express statement of intent to preempt state law for a court to find any conflicting state action invalid under the Supremacy Clause.  *See Geier v. American Honda*, 520 U.S. 861, 867-68 (2000).

162.    Rather, federal law preempts any state law that creates "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399-400 (2012).

163.     Premising M.M.'s ability to obtain an uninterrupted elementary school education (which is in fact her right under the State Constitution) upon her receipt of an EUA vaccine is coercive.  *See* 21 U.S.C. § 360bbb-3.

164.     The conflict between the quarantine policy and the EUA statute is particularly stark given that the statute's informed consent language requires that recipients be given the "option to refuse" the EUA product.  That is at odds with the quarantine policy effectively depriving M.M. of her right to an education if she does not take a vaccine approved only for emergency use.

165.      Notably, no studies have been conducted that addressed the question of the vaccine's safety and efficacy for COVID-19 recovered children.

166.     As Dr. Koka explains, the risk of myocarditis following vaccination is a real factor to consider, *especially* when one has naturally acquired immunity.  We simply do not know the long-term effects of vaccine-related myocarditis—which occurs most often in young people—on the heart, because the vaccines have not existed long enough.

167.     This uncertainty exemplifies the reason that the EUA statute eschews pressure or coercion.

168.     This coercive policy violates the letter, spirit and intent of the EUA statute.  Put differently, the policy frustrates the objectives of the EUA process. *See Geier*, 520 U.S. at 873 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

169.     Accordingly, Defendants' quarantine policy is preempted by federal law.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.    A declaration that Defendants' quarantine policy violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

B.    A declaration that the quarantine policy deprives M.M. of her right to an education under Article I, § 15 and Article VIII, §§ 1,3 of the Virginia State Constitution;

C.    A declaration that the quarantine policy violates M.M.'s Due Process rights under the Fourteenth Amendment and Article 1, § 11 of the Virginia State Constitution, and creates an unconstitutional condition;

D.    A declaration that the quarantine policy violates M.M.'s parents' right to make decisions concerning her upbringing under the Virginia State Code and the Fourteenth Amendment of the United States Constitution;

E.    A declaration that the quarantine policy violates M.M.'s right to decline a vaccine authorized only for emergency use under 21 U.S.C. § 360bbb-3;

F.    Injunctive relief restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), and each of them, from enforcing coercive or otherwise pressuring policies or conditions similar to those in the quarantine policy that act to compel or try to exert leverage on FCPS students with natural immunity to get a COVID-19 vaccine;

G.    Nominal damages;

H.    Attorney's fees pursuant to 42 U.S.C. § 1988; and

I.    Any other just and proper relief.

## JURY DEMAND

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

December 23, 2021

Respectfully submitted,

/s/ *Jenin Younes*

Jenin Younes*
Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
jenin.younes@ncla.legal
*Pro hac vice application forthcoming*
* Admitted only in New York.  DC practice
limited to matters and proceedings before
United States courts and agencies.
Practicing under members of the District of
Columbia Bar.

/s/ *Richard Samp*

Richard Samp
Senior Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
rich.samp@ncla.legal

/s/ *John J. Vecchione*

John J. Vecchione
Senior Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
john.vecchione@ncla.legal

*Attorneys for Plaintiffs*