UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| ERIC MCARTHUR, et al.<br><br><br>*Plaintiffs,*<br><br><br>v.<br><br><br>SCOTT BRABRAND, et al.,<br><br><br><br>*Defendants*. | <br><br><br><br><br>Civil Action No. 1:21-cv-1435<br><br><br>MOTION FOR A TEMPORARY<br>RESTRAINING ORDER AND<br>PRELIMINARY INJUNCTION |

**BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs M.M. and M.H.M. are 7- and 11-year-old (respectively) school children at Sunrise Valley Elementary School in the Fairfax County Public School System (FCPS). Both recovered from COVID-19 in early November 2021, and neither has been vaccinated against COVID-19 because their parents strongly believe such vaccination is not in their medical best interests.

In early December, just weeks after missing the first two weeks of school in November, M.M. was again forced to quarantine for 10 days due to a "potential close contact" with a student or school employee who tested positive for COVID-19 in early December, prompting the filing of

1

this lawsuit on December 23, 2021. Now, as of yesterday morning, both M.M. and her brother, M.H.M., have once again been forced to quarantine for at least another week (the policy was revised in late 2021) due to "potential close contacts" with COVID-19 positive individuals at their schools. Neither child has tested positive him or herself or is exhibiting any symptoms of COVID-19. Were the children vaccinated, they would not have to quarantine because the school exempts all asymptomatic vaccinated children from quarantining, regardless of when they were vaccinated.

In failing to provide the same exemption to students with natural immunity, the school's quarantine policy is arbitrary, irrational, and unlawful. It presumes that students like M.M. and M.H.M. who recovered from COVID-19 just over 90 days ago, present a greater risk of being infected and transmitting the virus than students who were vaccinated much longer ago. Not a shred of scientific evidence supports that presumption. To the contrary, it defies the overwhelming scientific evidence demonstrating that natural immunity is at least as robust and long-lasting as vaccine induced immunity (and very likely more so), and that vaccinated immunity wanes dramatically over time and is ineffective at preventing infection with the now-dominant Omicron variant. There is no basis in law, logic, or evidence, to exclude children from school based on the undeniably false notion that vaccinated immunity is good for all time but natural immunity expires after 90 days.

Only the intervention of this Court can prevent the irreparable harm of subjecting these children to repeated quarantines that defy logic and science and serve no valid public health goal. Accordingly, we ask this Court to immediately issue a temporary restraining order so that the children may return to school without delay, and not be forced to suffer continued learning loss and stigmatization resulting from the District's irrational and arbitrary policies. *Roe v. Shanahan*, 359 F.Supp.3d 382, 410 (granting preliminary injunction, finding showing of irreparable harm

where Plaintiffs face "a particularly heinous brand of discharge, one based on an irrational application of outmoded policies related to a disease surrounding which there is widespread fear[.]").

## FACTS

### I.   BACKGROUND

Eleven-year-old M.H.M. is a fifth-grade student at Sunrise Valley Elementary School in the FCPS district, and his 7-year-old sister, M.M., is a second-grade student at the same school (1/31/22 Declaration of Jenny McArthur, Attachment A ¶¶ 3-4).  M.H.M. tested positive for COVID-19 on October 29, 2021 and isolated for 10 days, returning to school on November 8 after he was cleared by FCHD (Attachment A ¶¶ 5-6, Exhibits 1 & 3).   M.M. contracted the virus around the same time and was thereby prohibited from attending school in person from November 1, 2021 through November 15, 2021 (ECF Doc. 1, Compl. ¶¶ 1-2; Attachment A ¶ 7, Exhibits 4 & 5).[1]  Not three weeks later, on December 2, she was forced to quarantine again because she was identified as a "potential close contact" of another student or staff member who had tested positive for COVID-19 (Compl. ¶ 40; Attachment A ¶ 14, Exhibit 7).  Per FCPS's policy, if M.M. had been vaccinated, she would have been allowed to return without quarantining, provided FCHD confirmed that she was asymptomatic as well as vaccinated (Compl. ¶ 5; Attachment A ¶¶ 16-17).  By contrast, as long as M.M. remains unvaccinated—without regard to her naturally acquired

---

[1] In their Motions to Dismiss, Defendants appear skeptical of Plaintiffs' contentions that M.M. had COVID-19 at this time because she did not receive a PCR test contemporaneously (her parents decided not to go out into the community and risk infecting other people, given that she had symptoms and other members of her family tested positive) (EFC Docs. 13 & 16, Motions to Dismiss).  In combination with this strong evidence that M.M. had COVID-19 along with the rest of her family, she received a positive antibody test on December 3, 2021 (Attachment A ¶¶ 7, 9-10, Exhibits 1, 2 & 6).  Defendants skepticism therefore is unwarranted.

immunity—she can be forced to quarantine any time she is identified as a "potential close contact" of someone at the school who tests positive (Compl. ¶¶ 5-6; Attachment A ¶¶ 17-20).

M.M.'s mother completed a FCHD verification survey on December 3 indicating that M.M. was unvaccinated, had been infected with COVID-19 in the last 90 days, and was experiencing no symptoms (Compl. ¶ 37; Attachment A ¶ 18). Later that day, M.M.'s mother received an email notification from FCHD stating that M.M. could not be cleared to return to school "because [she was] not vaccinated for COVID-19." (Compl. ¶ 38; Attachment A ¶ 19).

On December 7, M.M.'s mother spoke to an individual at FCHD who stated that a positive test within the past 90 days would allow her to return to school immediately. (Compl. ¶ 40; Attachment A ¶ 21). Later that day, M.M.'s father called FCHD back and talked to another person who reported that only vaccination, not a positive PCR test within the past 90 days, would permit release from quarantine. (Compl. ¶ 41). Although both children were troubled by being forced to stay home, M.M. in particular suffered great distress during her last quarantine. (*see* Compl. ¶ 46; Attachment A ¶ 24). M.M. was finally allowed to return to school on December 15, 2021, after being cleared by FCHD. (Attachment A ¶ 22, Exhibits 9 & 10).

Plaintiffs filed a complaint on December 23, 2021, raising several constitutional and statutory claims. Defendants filed separate motions to dismiss: Defendant Ayensu argued that she was not a properly named party to the suit because FCHD is not responsible for the school district's quarantine policy, and Defendants Brabrand and Pekarsky alleged failure to state claims upon which relief may be granted (ECF Docs. 13 & 16, respectively).

On January 31, Mrs. McArthur received emails from Sunrise Valley stating that both M.H.M. and M.M. would have to stay home from school again because they had been identified as potential close contacts with COVID-19 positive individuals at the school (Attachment A, ¶¶ 25, 30,

Exhibits 11 & 13). This is because they were not vaccinated, M.H.M. had been diagnosed with COVID 95 days ago (exceeding the 90 days recognized by FCHD per CDC Guidance), and because the school refused to accept M.M.'s parents' representations that she had had COVID-19 within 90 days (Attachment A, ¶¶ 26-33). As a result, they will lose at least another 5 days of in-person school: the children are offered only a livestream that they can view beginning no later than their third days of quarantine. Once again, the children are subject to potentially endless quarantines similarly situated children who have been vaccinated do not face, despite their recently acquired natural immunity from COVID-19.

## II.    NATURALLY ACQUIRED IMMUNITY VERSUS VACCINE INDUCED IMMUNITY

Plaintiffs' complaint contained substantial information and expert declarations establishing the robustness and durability of naturally acquired immunity. Rather than repeat that here, Plaintiffs urge the Court to read that section of the Complaint and the supporting declarations (*see* ¶¶ 62-88). New data has emerged since that filing.

The lack of efficacy of the vaccines against transmission of the Omicron variant is now evident. A new trial in Israel demonstrated that "the level of antibodies needed to protect and not to g[e]t infected from Omicron is probably too high for the vaccine" to accomplish.[2] Even CDC Director Rochelle Walensky has said that the vaccines do not stop transmission of the Delta and Omicron variants.[3] Likewise, the CDC's webpage does not claim that the vaccines reduce or stop

---

[2] "Israeli study shows 4th shot of COVID-19 vaccine less effective on Omicron," *Reuters* (Jan. 17, 2022), *available at* https://www.reuters.com/world/middle-east/israeli-study-shows-4th-shot-covid-19-vaccine-not-able-block-omicron-2022-01-17/ (last visited Jan. 25, 2022).

[3] Eric Skyes, "CDC Director: Covid vaccines can't prevent transmission anymore," *MSN* (Jan. 10, 2022), *available at* https://www.msn.com/en-us/health/medical/cdc-director-covid-vaccines-cant-prevent-transmission-anymore/ar-AASDndg (last visited Feb, 1, 2022); Tim Hains, "CDC Director: Vaccines No Longer Prevent You From Spreading COVID, *RealClear Politics* (Aug. 6, 2021), *available at*

transmission, particularly in light of the emergence of the Omicron variant.[4] The most highly vaccinated countries in the world (such as Israel and Denmark) and the most highly vaccinated states in the United States (such as Vermont) are currently experiencing case rates that dwarf any prior ones. Pfizer's own CEO recently publicly acknowledged that two doses of Pfizer's mRNA vaccine provide "very little, if any protection" against infection and transmission of the Omicron variant.[5]

At the same time, the evidence continues to accumulate that naturally acquired immunity is—especially in comparison to that induced through vaccines—robust and durable.  Just a week or so ago, the CDC released a study from New York and California providing further evidence that naturally acquired immunity was 2.8 times as effective in preventing hospitalization and 3.3 to 4.7 times as effective in preventing Covid infection compared with vaccination.[6] As Marty Makary explained just last week in an article documenting the disastrous consequences of the refusal to recognize naturally acquired immunity, this study confirms the findings of over 100 others: "[t]he immune system works."[7]  And a new study published in mid-January found that children had

---

https://www.realclearpolitics.com/video/2021/08/06/cdc_director_vaccines_no_longer_prevent_you_from_spreading_covid.html (last visited Feb. 1, 2022).

[4] "Omicron Variant: What You Need to Know," *Centers for Disease Control and Prevention* (Dec. 20, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last visited Jan. 25, 2022).

[5] Ashley Sadler, "Pfizer CEO backtracks on jab effectiveness,"(Jan. 12, 2022), *available at* https://www.lifesitenews.com/news/pfizer-ceo-claimed-covid-jabs-were-100-effective-now-says-2-shots-offer-very-limited-protection-if-any/ (last visited Feb. 1, 2022).

[6] COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis," *Centers for Disease Control and Prevention* (Jan. 28, 2022), *available at* https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm?s_cid=mm7104e1_w    (Jan.    25, 2022).

[7] *The High Cost of Disparaging Natural Immunity to Covid*, THE WALL STREET JOURNAL (Jan. 26, 2022), *available at* https://www.wsj.com/articles/the-high-cost-of-disparaging-natural-immunity-to-covid-vaccine-mandates-protests-fire-rehire-employment-11643214336 (last visited Jan. 31, 2022).

"strong and enduring humoral immune response[s]" to COVID-19 despite tending to have mild or asymptomatic courses.[8]

## ARGUMENT

Rule 65(a) of the Federal Rules of Civil Procedure allows a court to issue a preliminary injunction after notice has been provided to an adverse party. A preliminary injunction is appropriate if: (1) there is a substantial likelihood of success on the merits; (2) it is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) the preliminary injunction would not be averse to the public interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Centro Tepeyac v. Montgomery Cnty*, 722 F.3d 184, 190-91 (4th Cir. 2013); *MicroStrategy, Inc., v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).

Likewise, the Court may issue a temporary restraining order without written or oral notice to the adverse party if Plaintiffs establish that immediate and irreparable injury, loss, or damage will result otherwise. *See* Fed. R. Civ. P. 65(b). Alternatively, Plaintiffs request that such a stay be issued, or an "administrative stay" for the same reasons (irreparable harm). *See, e.g., League of Women Voters of S.C. v. Andino*, No. 20-2167, 2020 WL 6395498, *1 (4th Cir. Oct. 29, 2020) (noting appellants sought partial stay and administrative stay and granting partial relief denominated a "stay"); *Clark v. Adams*, No. CIV. 2:99CV98, 2000 33422752, *3 (W.D.N.C. Feb. 29, 2000) (noting an administrative stay was granted to give counsel time to resolve the dispute); *Joshua M. v. Barr*, 439 F. Supp. 3d 632, 647 (E.D. Va. 2020) (granting 60-day administrative stay

---

[8] Hanna Renk, et al., "Robust and durable serological response following pediatric SARS-CoV-2 infection," NATURE (Jan. 10, 2022) *available at* https://www.nature.com/articles/s41467-021-27595-9 (last visited Jan. 31, 2022).

of an immigration removal order "to preserve the status quo pending further briefing before this Court"). Here, every day of missed school is an irreparable harm.

## I.   SUCCESS ON THE MERITS

Plaintiffs have a substantial likelihood of success on the merits of their constitutional claims. That is because all of these claims arise from the lack of rationality underlying the differential treatment of children who have naturally acquired immunity, and children who have been vaccinated. The illogic is all the more stark given very recent studies once again establishing, beyond any doubt, that naturally acquired immunity is superior to that achieved through vaccination, especially against the Omicron variant.

### A.   *The Quarantine Policy Violates Plaintiffs' Constitutional Rights to Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of the laws," and prohibits governments and government officials from arbitrarily discriminating among citizens, denying to some rights or benefits that are made available to other similarly situated citizens, without justification. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 472 U.S. 432 (1985).

The Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992). *See also Cleburne*, 473 U.S. at 440 (holding that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike"); *Roe*, 359 F.Supp.3d at 410 (granting preliminary injunction because HIV positive servicemembers made strong showing that treating them differently violated Equal Protection). To succeed on an Equal Protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated

and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny. *See, e.g., In re Long Term Admin. Segregation of Inmates Designated as Five Percenters,* 174 F.3d 464, 471 (4th Cir.), *cert. denied Mickle v. Moore,* 528 U.S. 874 (1999); *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 818–19 (4th Cir.1995). Ordinarily, a state regulation or policy will be presumed to be valid and will be sustained if the classification is rationally related to a legitimate state interest. *See Cleburne,* 473 U.S. at 440; *Roe*, 359 F.Supp.3d at 418 ("categorical deployment limitation not rationally related to any legitimate interest[.]").

Defendants have violated and are violating M.M. and M.H.M.'s rights under the Equal Protection Clause by treating them differently from their vaccinated peers without any rational basis, let alone a basis that would withstand a higher level of scrutiny such as would be appropriate when a child's right to education is at stake.  There is no question that M.M. and M.H.M. are subject to differential treatment because of their unvaccinated status, as they would not be forced to quarantine for any period of time if vaccinated and asymptomatic.

And, FCPS's refusal to afford students with natural immunity the same exemption from the quarantine policy that is given to vaccinated students does not rationally advance any legitimate governmental interest.  As discussed above and in the Complaint, ¶¶ 64-87, the natural immunity arising from infection with COVID-19 provides at least as much and probably significantly more protection against re-infection and transmission than that conferred by vaccination.

Thus, having recovered from COVID-19 just over three months ago, M.M. and M.H.M. present no greater risk—and very likely a much *lower* risk—of contracting and transmitting the virus than most if not all vaccinated students, particularly those who were vaccinated six or more

9

months ago.  Yet all vaccinated students are exempt from FCPS's quarantine requirement and are entitled to return to school immediately upon FCHD's confirmation of their vaccinated status if they are not symptomatic, even if they were vaccinated many months ago and lack significant current protection against infection and transmission. The arbitrariness is underscored by the fact that up until 2021, Virginia recognized naturally acquired immunity to other viruses, exempting from vaccine requirements children who had recovered from the disease in question.

Nor is this a question of scientific debate on which reasonable minds can differ. There is *no evidence whatsoever*—certainly neither the Defendants nor the CDC have produced or cited any—that children who recovered from COVID-19 just over 90 days ago present a greater risk of being infected and transmitting the virus than do children who were vaccinated much longer ago. *See Roe*, 359 F.Supp.3d at 416 ("[t]he page defendants cite contains no scientific data, evidence, or real-life accounts, but rather is a mere recitation of defendants' policies.  In sum, while plaintiffs have presented considerable evidence in support of their arguments, defendants rely on little more than *ipse dixit.*"). The  scientific  evidence  discussed  above  overwhelmingly  demonstrates  the opposite. And yet the school's quarantine policy exempts all vaccinated students from quarantining indefinitely (so long as they remain asymptomatic), despite the risk they pose of becoming infected and transmitting the virus to others. This is deeply and profoundly irrational. It treats students with natural immunity as second-class citizens and deprives them of the ability to attend school without *any* even arguable rational basis for the distinction. There simply is no legitimate public health justification,  or  any  other  rational  basis,  for  requiring  M.M.  and  M.H.M.  to  quarantine  and excluding them from school when they present no greater (and likely much lower) risk to others than  vaccinated  students  who  are  not  required  to  quarantine. *See Cleburne*, 473 U.S. at 450 (classification may  not be based on "irrational prejudice"); *Louisiana v. Becerra*, No. 3:21-cv-

03970 (W.D. La. Nov. 30, 2021) ("the rejection of natural immunity as an alternative is puzzling");

*Missouri v. Biden*, 2021 WL 5564501 (E.D. Mo. Nov. 29, 2021) at p. 17 and fn. 20, *aff'd Missouri*

*v. Biden*, No. 21-3725 (8th Cir. Dec. 13, 2021) (finding that CMS' changing its posture with respect

to natural immunity constituted evidence of unlawful agency action, and noting that "CMS also

rejected natural immunity, despite an intense public debate and a trove of scientific data on the

strength and durability of natural immunity from COVID-19– alone and compared to vaccine-

induced immunity."), *overruled on other grounds by Missouri v. Biden*, 595 U.S. __, Nos. 21A240

& 21A241 (January 13, 2022) (reversing stays of CMS mandate upheld by Fifth and Eighth

Circuits). Nor is there any valid reason to recognize naturally acquired immunity for only 90 days,

per the CDC Guidance in the quarantine context, but vaccine induced immunity indefinitely. As

discussed, the science simply does not support this policy.

Blindly adopting nonbinding CDC guidance is not an acceptable approach. *See*

*Christensen v. Harris County*, 529 U.S. 576, 587-88 (2000) ("Interpretations such as those in

opinion letters—like interpretations contained in policy statements, agency manuals, and

enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style

deference."); *Appalachian Power v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000). If school districts are

going to discriminate between children, causing them learning loss and emotional distress, they

must be able to establish some rational basis for that, at the very least. There is a reason that

guidance is not law: it has not gone through the legislative process, subject to the input of numerous

individuals with different perspectives. Endowing it with that undeserved authority is poor policy

indeed.

For this Court's constitutional review to be anything more than a rubber stamp, it cannot

be enough to sustain this discriminatory policy for Defendants simply to point to CDC guidance

11

without producing a single study or a single expert who is willing to provide sworn testimony that natural immunity at 95 days confers less protection against infection and transmission than vaccination at six months or longer ago. *See Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988) ("[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review"); *Roe*, 359 F.Supp.3d at 410 ("rational basis review is not 'toothless'"), quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976).

In sum, there is no rational basis for FCPS and FCHD (through its enforcement of the District's policies) to arbitrarily deprive some students of invaluable in-person education, and subject them to the concomitant stigmatization and trauma, for no valid reason whatsoever apart from clinging to an outdated (and never scientifically substantiated) notion that the vaccines confer superior immunity that lasts forever, whereas naturally acquired immunity expires after 90 days.

### B.   The Quarantine Policy Deprives Plaintiffs of their Due Process Rights to an Education Under the State and Federal Constitutions

The Due Process Clause of the Fourteenth Amendment and Article 1, § 11 of the Virginia State Constitution, provide that no State "shall deprive any person of life, liberty, or property, without due process of law." The Virginia State Constitution provides that "all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety." Article I, § 1.

This means, *inter alia*, the individual possesses the right to "act[] as he may judge best for his interest" and "to live and work where he will; to earn his livelihood by any lawful calling." *Young v. Commonwealth*, 101 Va. 853, 862-63 (1903). "[T]here are certain inherent rights which men do not surrender by entering into organized society, and of which they cannot be arbitrarily

12

deprived by the state." *Taylor v. Smith*, 140 Va. 217 (1924). "These are individual rights, formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which begins with the fundamental proposition that all men are created equal; that they are endowed with their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness." *Young*, 101 Va. at 862.

The due process protections afforded under the Constitution of Virginia are co-extensive with those recognized in the Federal Constitution. *Shivaee v. Commonwealth*, 270 Va. 112, 119 (2005). The Supreme Court has explained that: "[p]rotected interests in property are normally not created by the Constitution. Rather, they are created and their dimensions are defined by an independent source[.]" *See Goss v. Lopez*, 419 U.S. 565 (1975).

In *Goss*, several students argued that their suspensions from public school, without a hearing, deprived them of their Fourteenth Amendment rights to due process of law. *Id.* at 567, 568-69. The Court agreed, rejecting the district's claim—made by several administrators—that "because there is no constitutional right to an education at public expense, the Due Process Clause does not protect against expulsions from the public school system." *Id.* at 572.

The Court went on to explain that the position "misconceive[d] the nature of the issue" as "[p]rotected interests in property are normally 'not created by the Constitution. Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Id.,* citing B*oard of Regents v. Roth*, 408 U.S. 564, 577 (1972). *See also Wolff v. McDonnell*, 418 U.S. 539 (1974) (procedural protections of the Due Process Clause were triggered by official cancellation of a prisoner's good-time credits accumulated under state law, although those benefits were not mandated by the Constitution); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (applying limitations of the Due Process Clause to

governmental decisions to revoke parole, although a parolee has no constitutional right to that status); *Connell v. Higginbotham*, 403 U.S. 207 (1971) (state employee who under state law or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge may demand the procedural protections of due process); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (due process right to welfare benefits). Because Ohio had "establish[ed] and maintain[ed] a school system," although not constitutionally obliged to do so, the students had a Due Process right to a public education. *Goss*, 419 U.S. at 574.

The Court also noted that the Due Process Clause "forbids arbitrary deprivations of liberty." That school authorities suspended the students for up to 10 days without a hearing, based on charges of misconduct, infringed those liberty interests. *Id.* at 575. As the Court found in *Goss*, a "10-day suspension from school is not de minimis on our view and may not be imposed in complete disregard of the Due Process Clause." *Goss,* 419 at 576. In fact, the Court explicitly observed that "suspension is for 10 days, is a serious event in the life of the suspended child. Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary." *Id.* at 576.

Under *Goss* as well as various other cases, M.H.M. and M.M. have property rights to their education (or, in State constitutional terms, a right to that education) (*see* Compl. ¶¶ 121-122) and liberty interests in remaining free from the stigmatization of differential treatment due to their unvaccinated status. They have been deprived of those interests, arbitrarily and without a hearing, by FCPS and FCHD. *See Goldberg v. Kelly*, 397 U.S. 254 (1974) (welfare recipients could not be deprived of benefits without a hearing). The *Goss* Court considered a suspension of 10 days a "serious event" in the child's life. *See Goss*, 419 U.S. at 576. Here, both children have already

14

missed substantially more than 10 days.  And they face subsequent forced absences due FCPS's policy, enforced and implemented by FCHD.  Accordingly, their property interests are unquestionably implicated.

Nor can Defendants claim that the ability to view class over the internet is equivalent to in-person instruction.  Commonsense alone should end this debate, as it is beyond evident that physical presence in the classroom, and the ability to interact with one's teachers and peers is crucial to attaining a proper education.  But if there is any doubt, substantial research establishes that learning over Zoom—if it may be called that—is far inferior.[9]

While Defendants are likely to argue Plaintiffs' liberty interests are not being violated because the designation of unvaccinated cannot compare to "charges of misconduct" at issue in *Goss*, surely the Court is aware that in contemporary times, and in this jurisdiction, being unvaccinated culturally marks one as worse than a mere "charge of misconduct."  That is particularly true even though there is no reason whatsoever to consider the unvaccinated and naturally immune any more dangerous than the vaccinated and not naturally immune.

In sum, Defendants' quarantine policy violates Plaintiffs' due process rights by depriving them of property and liberty interests, causing M.M. in particular emotional distress, and doing so without a hearing.  Accordingly, they have shown a substantial likelihood of success on the merits of these claims.

---

[9] *See, e.g.,* Clare Halloran et al., *Pandemic School Mode and Student Test Scores,* NBER WORKING PAPER SERIES (Nov. 2021), *available at* https://www.nber.org/system/files/working_papers/w29497/w29497.pdf (last visited Jan. 31, 2022) (demonstrating catastrophic learning losses in districts that went remote); David Leonhardt, *When School is Voluntary*, THE NEW YORK TIMES (July 12, 2021), *available at* https://www.nytimes.com/2021/07/12/briefing/remote-learning-covid.html (last visited Jan. 31. 2022).

15

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM SHOULD THE TRO NOT BE GRANTED

To satisfy the irreparable injury requirement, Plaintiffs need only demonstrate that absent a preliminary injunction, they are "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (citation omitted). The deprivation of a constitutional right, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also Giovani Carandonola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Greater Baltimore Bd. Of Realtors v. Hughes*, 596 F. Supp. 906, 924 (D. Md. 1984) ("court will follow the majority rule and hold that if plaintiffs are able to demonstrate a loss of constitutional rights, they will have met the irreparable injury requirement."). A party seeking a preliminary injunction must make a clear showing of "actual and imminent" irreparable harm in the absence of injunctive relief. *Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). "[I]rreparable harm occurs when the threatened injury impairs the court's ability to grant an effective remedy," I*nt'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir.), *vacated on other grounds*, —— U.S. ——, 138 S.Ct. 2710 (2018), typically when monetary damages "are difficult to ascertain or are inadequate," *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F.Supp.3d 556, 574 (E.D. Va. 2016).

The harm here cannot be remedied by monetary damages, because it encompasses constitutional violations, learning loss, and stigmazition. *See Roe*, 359 F.Supp.3d at 419 (granting preliminary injunction, finding showing of irreparable harm where Plaintiffs face "a particularly heinous brand of discharge, one based on an irrational application of outmoded policies related to a disease surrounding which there is widespread fear[.]"). As discussed above, M.M. and M.H.M.

16

have already been forced to miss weeks of school due to their initial COVID-19 diagnoses.  M.M. was forced to quarantine once again for 10 days, and both children are now subject to a minimum 5-day quarantine.  The day they return to school, they could have another "potential close contact" and be forced to remain home again.  The *Goss* Court held that being deprived of school for 10 days constituted a constitutional deprivation.  Thus, the children are looking at missing substantially *more* school than the *Goss* defendants, and being deprived of their Due Process property and liberty interests in at the same time.  The violation of the children's constitutional rights alone warrants a TRO and then Preliminary Injunction.  That they are being stigmatized and deprived of the education that their peers are enjoying is yet another reason they are entitled to injunctive relief while this case fully plays out.

### III.   THE THREATENED INJURY OUTWEIGHS ANY HARM TO DEFENDANTS FROM GRANT OF THE TRO AND THE TRO OR INJUNCTION IS IN THE PUBLIC INTEREST

A preliminary injunction or TRO is proper when "the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  *See also Z-Man Fishing Products, Inc. v. Renosky*, 790 F.Supp.2d 418, 425 (D. South Carolina 2011) ("the standard for granting either a TRO or preliminary injunction is the same."), *quoting Moore v. Kempthorne*, 464 F.Supp.2d 519, 525 (E.D. Va. 2006). "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. When constitutional rights are at stake, an injunction serves the public interest.  *See Giovani Carandola*, 303 F.3d 507.

As discussed above, the quarantine policy infringes the children's constitutional rights, and deprives them of the education to which they are entitled.  Given that the children have naturally acquired immunity to COVID-19 that is at least as robust and durable as that conferred by vaccines, and very likely more so, neither Defendants nor the public interest will suffer any harm if they are permitted to return to school immediately, just as their vaccinated peers are permitted to do.

17

## CONCLUSION

The Court should issue a TRO enjoining Defendants from excluding M.H.M. and M.M. from in-person school based on their unlawful quarantine policy.  The children should be permitted to return to school immediately before they fall even further behind than they already have.

Respectfully submitted,

/s/ *Jenin Younes*

Jenin Younes*
Litigation Counsel
Jenin.Younes@ncla.legal
*Admitted Pro Hac Vice*
* Admitted only in New York.  DC practice limited to matters and proceedings before United States courts and agencies.  Practicing under members of the District of Columbia Bar.

/s/ *John J. Vecchione*

John J. Vecchione
Senior Litigation Counsel
New Civil Liberties Alliance
John.Vecchione@ncla.legal
Senior Litigation Counsel
*Admitted in this Court*

NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238

*Attorneys for Plaintiffs*

18