**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **ERIC MCARTHUR and JENNY** | ) | |
| **MCARTHUR,** | ) | |
| **proceeding on their own behalf and on** | ) | |
| **behalf of their minor children, M.J.M.,** | ) | |
| **M.D.M., M.H.M., and M.M.,** | ) | |
| | ) | |
| *Plaintiffs*, | ) | **Civil Case No. 1:21-cv-1435** |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| **SCOTT BRABRAND, Superintendent** | ) | **FOR DECLARATORY AND** |
| **of Fairfax County Public Schools,** | ) | **INJUNCTIVE, AND OTHER RELIEF** |
| **STELLA PEKARSKY, Chair of the** | ) | |
| **Fairfax County School Board, and** | ) | |
| **GLORIA ADDO AYENSU,** | ) | JURY TRIAL DEMANDED |
| **Director of Department of Health for** | ) | |
| **Fairfax County,** | ) | |
| | ) | |
| *Defendants*. | ) | |

**INTRODUCTORY STATEMENT**

1.      Plaintiffs Eric and Jenny McArthur bring this lawsuit on behalf of their minor children, M.J.M. (17 years old), M.D.M. (14 years old), M.H.M. (11 years old), and M.M. (7 years old) ("Plaintiffs"). M.H.M. and M.M. have been arbitrarily and unlawfully prevented from attending in-person public school in Fairfax County, Virginia, and M.J.M. and M.D.M. likewise face an imminent risk of being prevented from attending in-person school, in violation of their rights (1) to Equal Protection and Due Process of the law under the Fourteenth Amendment of the U.S. Constitution and the Virginia State Constitution, (2) to receive an education under the Virginia State Constitution, (3) to not be subject to unconstitutional conditions under the United States Constitution, and (4) to not be coerced or pressured into relinquishing their statutory rights to informed consent as to whether to receive a vaccine authorized only for emergency use under

federal law. In addition, the children's parents have been deprived of their fundamental rights, under the Virginia State Code and the Fourteenth Amendment of the United States Constitution, to make decisions concerning their children's upbringing.

2.      This action challenges the irrational, discriminatory, and coercive quarantine policy adopted and enforced by the Fairfax County Public Schools, in conjunction with the Fairfax County Health Department, for students who have been identified as "potential close contacts" of other students or staff members who have tested positive for COVID-19.

3.      Under the quarantine policy, students who have been fully vaccinated against COVID-19 and are identified as "potential close contacts" are exempt from quarantining and may return to school immediately if they lack symptoms. This exemption applies regardless of how long ago the student was vaccinated, even though vaccinated immunity declines dramatically over time and provides little, if any, protection against infection with the now-dominant Omicron virus.

4.      The policy provides no such exemption for students who have previously been infected with COVID-19, despite the overwhelming evidence showing that natural immunity is at least as robust and long-lasting as vaccinated immunity, and very likely more so. Unlike the exemption for vaccinated students, which lasts indefinitely, the exemption for students with natural immunity applies only to those who have tested positive for COVID-19 in the past 90 days.

5.      Defendants' quarantine policy is thus premised on the demonstrably false notion that vaccinated immunity lasts forever, but natural immunity expires in 90 days. The result is that vaccinated students who have been exposed to a COVID-positive student or staff member may return to school immediately, despite the risk they pose of spreading the virus, whereas unvaccinated students must quarantine, even if they have natural immunity from a prior infection, if that infection occurred more than 90 days ago. What is more, the vaccinated students who are

2

permitted to return to school may then themselves become positive cases, triggering further contact-tracing and more "potential close contact" quarantines—but only for the unvaccinated.

6.      None of the McArthur children has been vaccinated against COVID-19 because their parents strongly believe it is not in their best interests. All of the children have natural immunity against COVID-19. The two younger children contracted COVID-19 at the end of October 2021, and the two older children contracted COVID-19 at the end of December 2021.

7.      M.M., a second-grade student at Sunrise Valley Elementary School, and M.H.M., a fifth-grade student at the same school, have already been forced to quarantine under Defendants' quarantine policy in circumstances where their vaccinated peers would have been exempt. M.M. has been particularly harmed, having been forced to quarantine multiple times.

8.      On December 2, 2021—less than three weeks after M.M. completed a 14-day quarantine following her infection—the school placed her on another 10-day quarantine because she had been identified as a "potential close contact." Because M.M. had not been tested for COVID-19 at the time of her infection, Defendants refused to release her from quarantine and allow her to return to school because they purportedly could not confirm that her infection had occurred within the last 90 days, even though a blood test taken on December 3, 2021, showed she had a high level of antibodies against COVID-19. As a result, M.M. missed another week of school in early December, having just missed two full weeks of school at the beginning of November.

9.      The very next month, on January 31, 2022, the school again placed M.M., this time along with her brother M.H.M., on quarantine because they had been identified as "potential close contacts." Neither child qualified for an exemption because they had both contracted COVID-19 more than 90 days earlier—more than 92 days in the case of M.M., and 95 days in the case of M.H.M.

3

10.     At any time, M.J.M. and M.D.M. could again be required to quarantine following "potential close contacts." And M.J.M. and M.D.M. will likewise be subject to quarantining as soon as 90 days have elapsed since the onset of their infections in late December, while their vaccinated peers remain exempt from the quarantine policy indefinitely.

11.     Defendants' quarantine policy lacks any legitimate public health justification. Having recently been infected with COVID-19, the McArthur children present no greater risk— indeed, they likely present a significantly *lower* risk—of contracting the virus and transmitting it to others than do most if not all students who are vaccinated but not COVID-19 recovered, especially students who were vaccinated many months ago.

12.     This discriminatory treatment of students with natural immunity against COVID-19 is arbitrary and irrational. No scientific evidence supports the conclusion that students who were infected with COVID-19 91 days ago present a greater risk of contracting and transmitting the virus than students who were vaccinated 91 days ago—let alone students who were vaccinated much longer ago. Yet under Defendants' policy, the former are required to quarantine after being identified as a "potential close contact," whereas the latter may return to school immediately.

13.     The McArthur children should not—and under the Equal Protection Clause of the United States Constitution, may not—be excluded from school and required to quarantine when there is no evidence that they present a greater risk of transmitting the virus to those around them than other students whom the school permits to return to school immediately without quarantining.

14.     Likewise, Defendants' policy deprives the McArthur children of their right to an education, guaranteed by the Virginia State Constitution.

15.     By arbitrarily and capriciously depriving them of this right—and doing so without a hearing—Defendants' policy violates their Due Process rights under the Federal and State Constitutions.

16.     By putting the children (and their parents) in the position of having to choose between their right to an uninterrupted public education and a medically unnecessary and potentially harmful vaccine, the policy also creates an unconstitutional condition.

17.     For the same reasons, the quarantine policy deprives the McArthur children's parents of their fundamental right to make decisions concerning their upbringing, recognized by the Virginia State Code and the Fourteenth Amendment of the United States Constitution.

18.     For similar reasons, the policy coerces the children into getting a vaccine approved only under the Emergency Use Authorization (EUA) statute, violating their rights to free and informed consent.

19.     The court should accordingly declare Defendants' quarantine policy unconstitutional and unlawful, enjoin its application, and award all other just and proper relief.

## JURISDICTION AND VENUE

20.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this District.

22.     This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

## PARTIES

23.    The McArthurs reside in Vienna, Virginia, and all four of their children attend schools in the Fairfax County Public School District ("FCPS").

24.    Seven-year-old M.M. is a second-grade student at Sunrise Valley Elementary School. (1/31/22 Declaration of Jennifer McArthur, Attachment A ¶ 4). Her eleven-year-old brother M.H.M. is a fifth-grade student at the same school. *(Id.* ¶ 3).

25.    Their older brothers, 17-year-old M.J.M. and 14-year-old M.D.M., are in eleventh and ninth grade, respectively, at South Lakes High School.

26.    Collectively, the McArthurs will be referred to as "Plaintiffs."

27.    Scott Brabrand is Superintendent of FCPS. According to FCPS's website, Mr. Brabrand "oversees day to day operations" of the school district. He is sued in his official capacity.

28.    Stella Pekarsky is Chair of the Fairfax County Public School Board ("the Board"). According to FCPS's website, the Board "is charged by the statutes of Virginia and the regulations of the Virginia Board of Education to operate the public schools of Fairfax County by setting general school policy and establishing guidelines that will ensure the proper administration of the [FCPS] programs." Ms. Pekarsky is sued in her official capacity.

29.    Gloria Addo-Ayensu is Director of the Department of Health for Fairfax County ("FCHD"). Upon information and belief, FCPS developed the quarantine policy in conjunction with FCHD. And until just days ago, FCHD participated in implementing and enforcing the policy by confirming vaccination status and "clearing" children to return to school. Ms. Ayensu is sued in her official capacity.

30.    Collectively, Mr. Brabrand, Ms. Pekarsky, and Ms. Ayensu will be referred to as "Defendants."

6

## STATEMENT OF FACTS

**I.  BACKGROUND**

31.  M.H.M. tested positive for COVID-19 on October 29, 2021 (as did his father) and isolated for 10 days, returning to school on November 8 after he was cleared by FCHD (Attachment A ¶¶ 5-6, Exhibits 1 & 3).

32.  On October 31, 2021, M.M. began experiencing symptoms similar to those of her father and M.H.M, specifically nausea, a sore throat, fatigue, and a low-grade fever (Attachment A ¶ 9).

33.  On no prior occasion prior to that date had M.M. experienced any symptoms of COVID-19 since the beginning of the pandemic. (Attachment A ¶ 12).

34.  Plaintiff Jenny McArthur also began exhibiting similar symptoms, which she confirmed as resulting from a COVID-19 infection through an at-home test (Attachment A ¶ 9). To the best of Mr. and Mrs. McArthur's recollection, Mrs. McArthur used the last test the family had on hand.

35.  As a result of her close contact with COVID-positive M.H.M., M.M. was placed on quarantine and prohibited from attending school in person from November 1, 2021, through November 15, 2021, missing a full two weeks of school. (Attachment A ¶ 7, Exhibits 4 & 5).

36.  M.M.'s parents decided not to have her tested at the time because her symptoms were mild and because, by the time her symptoms began, her father and brother had already tested positive for COVID-19, her mother was displaying symptoms, and M.M. had already been placed on quarantine from school as a "close contact" of her brother. (Attachment A ¶ 10).

37.  To get M.M. tested, her parents would have had to go out into the community while sick with COVID-19, which they believed would be irresponsible. (Attachment A ¶ 10).

38.     They also did not see a need to get her tested because the quarantine policy at that time provided no indication that a prior positive test would be relevant to M.M.'s ability to avoid quarantining if she were later identified as a "potential close contact." (Attachment A ¶ 13).

39.     M.M.'s infection with COVID-19 was confirmed through an antibody test on December 3, 2021 (Attachment A ¶¶ 7, 9-10, Exhibits 1, 2 & 6).

40.     Less than three weeks later, on the evening of Thursday, December 2, 2021, Sunrise Valley notified M.M.'s parents by email that M.M. had been identified as a "potential close contact" of another student or staff member who had tested positive for COVID-19. (Attachment A ¶ 14, Exhibit 7).

41.     The notification explained that M.M. was being placed on a 10-day quarantine during which she could not attend school and that "[y]our child may return to school and resume school activities on: December 13." (Attachment A ¶ 15).

42.     Under the heading "How to Return to In-Person Learning and Activities," the notification provided a link to a "COVID Contact Vaccination Verification survey," which parents were requested to complete only "[i]f your child is fully vaccinated." The notification was silent as to students who had previously recovered from COVID-19. (Attachment A ¶ 16).

43.     Under the quarantine policy then in effect, a fully vaccinated student who was identified as a "potential close contact" was permitted to return to school immediately upon verification by FCHD that the student was vaccinated and asymptomatic. (Attachment A ¶ 17).

44.     This exemption from the quarantine policy applied to all students who had been fully vaccinated against COVID-19 at any point in time. (*Id.*).

45.     The policy provided no similar exemption for students who had previously been infected and recovered from COVID-19.

46.     On information and belief, when FCPS originally issued the quarantine requirement, it applied to all students identified as "potential close contacts," regardless of vaccination status. After parents of vaccinated students complained, the policy was changed to exempt vaccinated students and allow them to return to school immediately, without quarantining.

47.     On December 3, 2021, M.M.'s mother filled out the FCHD verification survey, indicating that M.M. had not been vaccinated against COVID-19, but that she had been infected with COVID-19 within the last 90 days and was experiencing no symptoms. (Attachment A ¶ 18).

48.     Later that afternoon, M.M.'s mother received an email notification from FCHD stating that "we are unable to clear your child to go back to school because they are not vaccinated for COVID-19." (Attachment A ¶ 19).

49.     The same day, M.M.'s mother spoke to the principal of Sunrise Valley and explained that M.M. had recently been infected with COVID-19 and completed a 14-day quarantine just a few weeks ago. The principal responded that neither proof of prior infection nor a negative COVID-19 test would release M.M. from quarantine and allow her to return to school. (Attachment A ¶ 20).

50.     On December 7, M.M.'s mother spoke to an individual at FCHD who stated that a positive test for M.M. within the last 90 days would allow her to be released from quarantine. The individual stated that an antibody test would not suffice, however, because it would not prove the infection occurred within the last 90 days. The representations of M.M.'s parents regarding the circumstances of her infection were not accepted as adequate to establish the fact of timing. (Attachment A ¶ 21).

51.     Later the same day, M.M.'s father called FCHD back and spoke to another person. This second individual stated that he had never heard that a positive test within the last 90 days would allow release from quarantine, but rather only vaccination would.

52.     This person also told M.M.'s father that if she were to receive a COVID-19 test on that day (notwithstanding her naturally acquired immunity) she would likely test positive because of her previous infection, and could be treated as a current positive case because FCHD did not have a record of a prior positive COVID-19 test for M.M.

53.     That would entail subjecting her to an additional 10-day quarantine.

54.     Fearing this scenario, M.M.'s parents declined to get her tested pursuant to the updated quarantine policy released on December 6, 2021, which provided an option for an earlier return for students who provided a negative test taken on or after their fifth day of quarantine.

55.     M.M. returned to school on December 13, 2021. She missed six full days of school, having already missed two weeks of school only a few weeks earlier. Of the 25 school days between November 1 and December 13, M.M. was quarantined for 14 of them. (Attachment A ¶ 22).

56.     M.M. suffered mental and emotional distress, as well as learning loss, as a result of being excluded from in-person school. She began crying when told she had been placed on quarantine and would miss another week of school. (Attachment A ¶ 24).

57.     Throughout the quarantine she was very emotional, having temper tantrums that were unusual, and she experienced difficulty focusing on schoolwork. Mrs. McArthur had difficulty keeping her calm. (*Id.*).

58. In their initial complaint which was filed only on behalf of M.M., Plaintiffs averred that M.M. would continue to be subject to quarantine whenever the school identifies her as a "potential close contact" of an infected student or staff member. (Complaint ¶ 47, Doc. 1).

59. As cases had been rising in the D.C.-Virginia-Maryland region, the complaint alleged that in all likelihood M.M. would soon have another "potential close contact" and again be forced to quarantine, unlike her vaccinated peers.  (Complaint ¶ 48-49, Doc. 1).

60. That has now occurred. On January 31, 2022, Mrs. McArthur received separate notices as to both M.M. and M.H.M. stating that they had "potential close contacts," and would have to quarantine for at least 5 days (Attachment ¶¶ 25, 30).

61. Because M.H.M. and M.M. had contracted COVID-19 more than 90 days earlier and are unvaccinated, they did not qualify for an exemption and were forced to quarantine.

62. Had the children been vaccinated—regardless of how long ago—they would not have had to quarantine (Attachment A ¶ 33).

63. On February 1, 2022, M.M. was permitted to return to school as apparently five days had passed since the "potential close contact." M.H.M., whose "potential close contact" apparently occurred later with a different person, was not permitted to return until February 3.

64. Effective at 5:00 pm on Friday, February 4, 2022, FCPS made further changes to the quarantine policy. Going forward, the FCHD quarantine email to families will be replaced by an FCPS Pause (Close Contact) Letter. And the FCHD Vaccine Verification Survey will be replaced by an FCPS Student Quarantine Exemption and Attestation Form (available at https://www.fcps.edu/sites/default/files/media/forms/se365.pdf).

65. In other words, apparently FCHD will no longer be responsible for clearing (or refusing to clear) children to return to school.

66.     The updated policy continues the same arbitrary and irrational discrimination against students with natural immunity. For students under the age of 17, all who have completed a 2-dose vaccine series at least 14 days prior to being identified as a close contact are eligible for exemption from quarantining, whereas students with natural immunity are eligible only if they have tested positive for COVID-19 within the last 90 days.

67.     Thus, as under the prior policy, M.M. and M.H.M. may be forced to quarantine again at any time, despite their naturally acquired immunity, because they contracted COVID-19 more than 90 days ago and are not vaccinated.

68.     While M.J.M. and M.D.M. are still within the 90-day period since their positive PCR tests, as this litigation plays out that window will expire, leaving them in the same position as their younger siblings.

69.     During the prior quarantine periods, M.M. and M.H.M. have been sent home with written assignments. Now, they are supposed to have the opportunity to view class over Zoom beginning no later than their third days of quarantine.

70.     Voluminous research confirms that in-person class and the ability to interact with the teacher and a child's peers in a physical setting are crucial to a child's social, intellectual, and emotional development.

71.     The McArthurs are not opposed to vaccination generally and have given all of their children routine immunizations. (Attachment A ¶ 34).

72.     However, they are opposed to vaccinating their children against COVID-19 because they believe that the risks of vaccination for healthy children, especially for their COVID-recovered children, outweigh the benefits of vaccinating them against a virus that does not pose a significant risk to them. (Attachment A ¶ 34).

12

73.     They are not alone: Norway, Sweden, and Finland recommend against vaccinating children ages 5-11, as they have concluded that the risks exceed the benefits for that age group. Norway advises against vaccinating COVID-recovered children ages 12-15.

74.     Mr. and Mrs. McArthur believe that it would be unethical and contrary to their moral obligation as parents to subject their children to an unnecessary medical procedure that is not in their best interests (Attachment A ¶ 34).

75.     Defendants' quarantine policy puts pressure on Mr. and Mrs. McArthur to subject their children to an unnecessary medical procedure so that they can attend school along with their vaccinated peers without being subjected to theoretically limitless quarantine periods whenever they are deemed "potential close contacts." (Attachment A ¶ 35).

## II.     THE COVID-19 VACCINES

76.     The Pfizer BioNTech vaccine has received Emergency Use Authorization (EUA) only for children under 16 years of age.

77.     The standard for EUA review and authorization is lower than that required for full FDA approval.

78.     Typically, vaccine development includes six stages: (1) exploratory; (2) preclinical (animal testing); (3) clinical (human trials); (4) regulatory review and approval; (5) manufacturing; and (6) quality control. *See* CDC, *Vaccine Testing and the Approval Process* (May 1, 2014), *available at* https://bit.ly/3rGkG2s (last visited February 7, 2022.

79.     The third phase generally takes place over years, because it can take that long for a new vaccine's side effects to manifest. *Id.*

80.     The third phase must be followed by a period of regulatory review and approval, during which data and outcomes are peer-reviewed and evaluated by FDA. *Id.*

81.     Finally, to achieve full approval, the manufacturer must demonstrate that it can produce the vaccine under conditions that assure adequate quality control.

82.     FDA must then determine, based on "substantial evidence," that the medical product is effective and that the benefits outweigh its risks when used in accordance with the product's approved labeling. *See* CDC, *Understanding the Regulatory Terminology of Potential Preventions and Treatments for COVID-19* (Oct. 22, 2020), *available at* bit.ly/3x4vN6s (last visited February 7, 2022).

83.     In contrast to this rigorous, six-step approval process that includes long-term data review, FDA grants EUAs in emergencies to "facilitate the availability and use of medical countermeasures, including vaccines, during public health emergencies, such as the current COVID-19 pandemic." FDA, *Emergency Use Authorization for Vaccines Explained* (Nov. 20, 2020), *available at* bit.ly/3x8wImn (last visited February 7, 2022).

84.     EUAs allow FDA to make a product accessible to the public on a voluntary use basis based on the best available data, without waiting for all the evidence needed for full approval. *See id.*

85.     The EUA statute lays out the: "appropriate conditions designed to ensure that individuals to whom the product is administered are informed." They must be told:

> that the Secretary has authorized the *emergency use* of the product;
> of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
> *of the option to accept or refuse administration of the product*, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks (emphasis added).

21 U.S.C. § 360bbb-3(e)(1)(A)(i).

86.     The Pfizer BioNTech vaccine received emergency use authorization for 5-to-11-year-olds on October 29, 2021, and for 12-to-15-year-olds on May 10, 2021.[1]

87.     To date, no study has been conducted that focused upon the safety and efficacy of any of the COVID-19 vaccines for COVID-recovered children. *See* Dr. Mahesh Shenai, "The Most Neglected Subgroup: Vaccination in COVID-recovered Children," *Substack* (October 22, 2021), *available at* https://maheshshenai.substack.com/p/the-most-neglected-subgroup-vaccination (last visited February 7, 2022).

## III.   PRIOR INFECTION LEADS TO NATURALLY ACQUIRED IMMUNITY TO COVID-19 AT LEAST AS ROBUST AS VACCINE-ACQUIRED IMMUNITY

88.     Naturally acquired immunity developed after recovery from COVID-19 provides robust protection from subsequent SARS-CoV-2 infection. Declaration of Drs. Jayanta Bhattacharya and Martin Kulldorff, ("Joint Decl.") ¶¶ 15-24, attached as Exhibit A; 12/20/2021 Declaration of Dr. Jayanta Bhattacharya ("Bhattacharya Decl.") ¶¶ 12-31, attached as Exhibit B.

89.     Multiple extensive, peer-reviewed studies comparing naturally acquired and vaccine-induced immunity have concluded overwhelmingly that the former provides equivalent or greater protection against reinfection from COVID-19 than immunity generated by mRNA vaccines (BioNTech and Moderna). Joint Decl. ¶¶ 18-24; Bhattacharya Decl. ¶¶ 15-18.

90.     A study from Israel released several months ago found that *vaccinated* individuals had 13.1 times greater risk of testing positive, 27 times greater risk of symptomatic disease, and around 8.1 times greater risk of hospitalization than unvaccinated individuals who possess naturally acquired immunity. Joint Decl. ¶ 20.

---

[1] Notably, the Johnson and Johnson (Janssen) vaccine, which had been in distribution under an EUA for adults, was recently restricted by the CDC due to blood clotting side effects, and the CDC has recommended receiving the Moderna or Pfizer BioNTech vaccine instead.

91.     The authors concluded that the "study demonstrated that natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 [BioNTech's research name] two-dose vaccine-induced immunity." Joint Decl. ¶ 20.

92.     Recent Israeli data found that those who had received the BioNTech vaccine were 6.72 times *more likely* to suffer a subsequent infection than those with natural immunity. David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection*? ISRAELNATIONALNEWS.COM (Jul. 13, 2021), *available at* https://www.israelnationalnews.com/ News/News.aspx/309762 (last visited Dec. 16, 2021).

93.     Israeli data also indicates that the protection BioNTech grants against infection is short-lived compared to naturally acquired immunity and degrades significantly faster. *See* Nathan Jeffay, *Israeli, UK Data Offer Mixed Signals on Vaccine's Potency Against Delta Strain*, THE TIMES OF ISRAEL (July 22, 2021), *available at* bit.ly/3xg3uCg (last visited Dec. 16, 2021).

94.     A recent study from Qatar tracked nearly a million individuals for six months after vaccination. The study's authors concluded that the Pfizer vaccine's "induced protection against infection appears to wane rapidly after its peak right after the second dose, but it persists at a robust level against hospitalization and death for at least six months following the second dose." Bhattacharya Decl. ¶¶ 22-23.

95.     The "Qatari study is no outlier." Bhattacharya Decl. ¶ 25. Several United States studies, as well as one conducted in the United Kingdom, yielded similar results. *Id.* at 26-28.

96.     These findings of highly durable natural immunity should not be surprising, as they hold for SARS-CoV-1 and other respiratory viruses. According to a paper published in *Nature* in August, 2020, 23 patients who had recovered from SARS-CoV-1 still possess CD4 and CD8 T

cells, 17 years after infection during the 2003 epidemic.[2] A *Nature* paper from 2008 found that 32 people born in 1915 or earlier still retained some level of immunity against the 1918 flu strain—some 90 years later.[3] Bhattacharya Decl. ¶ 20.

97.     A CDC/IDSA clinician call on July 17, 2021, summarized the then-current state of the knowledge regarding the comparative efficacy of natural and vaccine immunity. The presentation reviewed three studies that directly compared the efficacy of prior infection versus mRNA vaccine treatment and concluded "the protective effect of prior infection was similar to 2 doses of a COVID-19 vaccine."

98.     Given that there is currently *more* data on the durability of naturally acquired immunity than there is for vaccine immunity, researchers rely on the expected durability of naturally acquired immunity to predict vaccine immunity. Joint Decl. ¶ 23; Bhattacharya Decl. ¶ 12.

99.     Indeed, naturally and vaccine-acquired immunity utilize the same basic immunological mechanism—stimulating the immune system to generate an antibody response. Joint Decl. ¶ 16; Bhattacharya Decl. ¶ 13.

100.     The level of antibodies in the blood of those who have natural immunity was initially the benchmark in clinical trials for determining the efficacy of vaccines. Joint Decl. ¶ 16.

[2] Le Bert, N., Tan, A. T., Kunasegaran, K., Tham, C. Y. L., Hafezi, M., Chia, A., Chng, M. H. Y., Lin, M., Tan, N., Linster, M., Chia, W. N., Chen, M. I. C., Wang, L. F., Ooi, E. E., Kalimuddin, S., Tambyah, P. A., Low, J. G. H., Tan, Y. J. & Bertoletti, A. (2020). SARS-CoV-2-specific T cell immunity in cases of COVID-19 and SARS, and uninfected control. *Nature*, 584, 457-462. doi: 10.1038/s41586-020-2550-z

[3] Yu, X., Tsibane, T., McGraw, P. A., House, F. S., Keefer, C. J., Hicar, M. D., Tumpey, T. M., Pappas, C., Perrone, L. A., Martinez, O., Stevens, J., Wilson, I. A., Aguilar, P. V., Altschuler, E. L., Basler, C. F., & Crowe Jr., J. E. (2008). Neutralizing antibodies derived from the B cells of 1918 influenza pandemic survivors. *Nature*, 455, 532-536. doi: 10.1038/nature07231

101.    Studies have demonstrated prolonged immunity with respect to memory T and B cells, bone marrow plasma cells, spike-specific neutralizing antibodies, and IgG+ memory B cells following a COVID-19 infection. Joint Decl. ¶ 17; Bhattacharya Decl. ¶ 14.

102.    New variants of COVID-19 resulting from the virus's mutation do not escape the natural immunity developed by prior infection from the original strain of the virus. Joint Decl. ¶¶ 29-33; Bhattacharya Decl. ¶ 17.

103.    While the CDC and the news media have touted a study from Kentucky as proof that those with naturally acquired immunity should get vaccinated, that conclusion is unwarranted. As Drs. Bhattacharya and Kulldorff explain, although individuals with naturally acquired immunity who received a vaccine showed somewhat increased antibody levels, "[t]his does not mean that the vaccine increases protection against symptomatic disease, hospitalizations or deaths." Joint Decl. ¶ 37.  In other words, higher antibody levels do not necessarily translate into a clinical benefit. Nor does any study demonstrate that boosting a naturally immune person's antibody levels via vaccination reduces transmission.

104.    The Kentucky study is also problematic because it appears to be cherry-picked. The CDC gathered data on this subject from all 50 states but seems to have chosen to draw attention to the one state that yielded data that it could represent as supporting its position. *See* Marty Makary, "Covid Confusion at the CDC," THE WALL STREET JOURNAL (Sept. 13, 2021), *available at* https://www.wsj.com/articles/covid-19-coronavirus-breakthrough-vaccine-natural-immunity-cdc-fauci-biden-failure-11631548306 (last visited February 7, 2022).

105.    The CDC has also claimed that another study of several thousand patients hospitalized with "covid-like illness," demonstrates the superiority of vaccine-achieved immunity. "Laboratory-Confirmed COVID-19 Among Adults Hospitalized with COVID-19 Like Illness,"

*CDC* (Oct. 29, 2021), *available at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7044e1.htm (last visited Nov. 3, 2021).

106.    Experts have pointed out that this study is highly problematic for many reasons, chief among them that its design meant that it did not actually address the question of whether the COVID-recovered benefit from being vaccinated. Bhattacharya Decl. ¶ 30. *See* Martin Kulldorff, "A Review and Autopsy of Two COVID Immunity Studies," *Brownstone Institute* (Nov. 2, 2021), *available at* https://brownstone.org/articles/a-review-and-autopsy-of-two-covid-immunity-studies/ (last visited February 7, 2022).

107.    Rather, "the CDC study answers neither the direct question of whether vaccination or Covid recovery is better at decreasing the risk of subsequent Covid disease, or whether the vaccine rollout successfully reached the frail. Instead, it asks which of these two has the greater effect size. It answers whether vaccination or Covid recovery is more related to Covid hospitalization or if it is more related to other respiratory type hospitalizations." Kulldorff, "A Review and Autopsy." *See* Bhattacharya Decl. ¶ 32-33.

108.    Dr. Kulldorff explains that the Israeli study discussed above, indicating that naturally acquired immunity provides significantly better protection against reinfection, produced far more reliable results due to its superior design. *See* Kulldorff, "A Review and Autopsy."

109.    Indeed, shortly after publishing the results of the study, CDC (much more quietly) conceded that: "[a] systematic review and meta-analysis including data from three vaccine efficacy trials and four observational studies from the US, Israel, and the United Kingdom, found no significant difference in the overall level of protection provided by infection as compared with protection provided by vaccination; this included studies from both prior to and during the period in which Delta was the predominant variant." "Science Brief: SARS-CoV-2 Infection-induced and

Vaccine-induced Immunity," *CDC* (Oct. 29, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/vaccine-induced-immunity.html (last visited February 7, 2022).

110.    In short, contrary to the claims of the CDC and the news media, this study did *not* establish a valid reason to vaccinate individuals with naturally acquired immunity. *See* Joint Decl. ¶ 37; Bhattacharya Decl. ¶¶ 32-33.

111.    As further evidence that naturally acquired immunity is robust and durable, the CDC recently acknowledged that it was unable to provide documentation of even a single case of a COVID-19-recovered, unvaccinated individual spreading the virus to another person. *See* 11/5/21 Letter of Roger Andoh in Response to FOIA Request, attached as Exhibit C.

112.    Just weeks ago, the CDC released a study from New York and California providing further evidence that naturally acquired immunity was 2.8 times as effective in preventing hospitalization and 3.3 to 4.7 times as effective in preventing Covid infection compared with vaccination. COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis," *Centers for Disease Control and Prevention* (Jan. 28, 2022), *available at* https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm?s_cid=mm7104e1_w (Jan. 25, 2022). *See* Jeffrey Klausner and Noam Kojima, *The CDC is finally recognizing 'natural immunity'—legislators should follow suit*, THE HILL (Feb. 3, 2022), *available at* https://thehill.com/opinion/healthcare/592457-the-cdc-is-finally-recognizing-natural-immunity-legislators-should-follow (Feb. 3, 2022) ("Given now that CDC recognizes the protective effect of prior infection, it is time to update vaccination policies[.]").

113.    As Marty Makary explained just last week in an article documenting the disastrous consequences of the refusal to recognize naturally acquired immunity, this study confirms the

findings of over 100 others: "[t]he immune system works." *The High Cost of Disparaging Natural Immunity to Covid*, THE WALL STREET JOURNAL (Jan. 26, 2022), *available at* https://www.wsj.com/articles/the-high-cost-of-disparaging-natural-immunity-to-covid-vaccine-mandates-protests-fire-rehire-employment-11643214336 (last visited Jan. 31, 2022).

114.   And a new study published in mid-January found that children had "strong and enduring humoral immune response[s]" to COVID-19 despite tending to have mild or asymptomatic courses. Hanna Renk, et al., "Robust and durable serological response following pediatric SARS-CoV-2 infection," NATURE (Jan. 10, 2022) *available at* https://www.nature.com/articles/s41467-021-27595-9 (last visited Jan. 31, 2022).

115.   The Commonwealth of Virginia's public policy has traditionally recognized naturally acquired immunity, as it does not require school children to be vaccinated for diseases from which they have recovered.

116.   For instance, the law mandating vaccination of school children for measles, mumps, rubella, and varicella (chickenpox) *explicitly exempts* from the requirements those who can demonstrate existing immunity through serological testing that measures protective antibodies. 12 Va. Admin. Code § 5-110-80 (2021).

117.   The refusal to recognize naturally acquired immunity for COVID-19 is thus at odds with Virginia's historical approach, as established in law by the state legislature—*i.e.*, the only body in state government invested with the police power to decide questions of health and safety.

IV.   **PRIOR INFECTION LEADS TO HEIGHTENED RISK OF ADVERSE EVENTS FROM THE VACCINE**

118.   Though the COVID-19 vaccines appear to be relatively safe at a population level, as with all medical interventions, some individuals will suffer adverse consequences, even severe ones. Such side effects may include common, temporary reactions such as pain and swelling at the

vaccination site, fatigue, headache, muscle pain, fever, and nausea. While rarer, they can also cause serious side effects that result in hospitalization or death. Joint Decl. ¶¶ 25-26.

119.    The vaccines may very well cause long-term side effects that remain unknown at this time due to their relatively recent development. Joint Decl.¶¶ 26-27.

120.    There is "little doubt that the mRNA vaccines are associated with myocarditis." 12/20/21 Declaration of Dr. Anish Koka ("Koka Decl."), ¶ 7, attached as Exhibit D.

121.    Evidence has developed regarding the real risk of vaccine-induced myocarditis (heart inflammation), particularly for adolescent males like M.J.M. and M.D.M.

122.    Multiple independent data sets suggest that vaccine-induced myocarditis occurs at rates 400 to 500% greater than the CDC's estimates and may in fact exceed the rates of COVID-related cardiac complications in healthy men under 40 years. Martina Patone, et al., "Risks of myocarditis, pericarditis, and cardiac arrhythmias associated with COVID-19 vaccination or SARS-CoV-2 infection," *Nature Medicine* (Dec. 14, 2021), *available at* https://www.nature.com/articles/s41591-021-01630-0 (last visited Jan. 25, 2022); Sharff et al., "Risk of Myopericarditis following COVID-19 mRNA vaccination," MEDRXIV (Dec. 27, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.12.21.21268209v1 (last visited Jan. 25, 2022) ("[T]rue incidence of myopericarditis is markedly higher than the incidence reported to US advisory committees."); Chua et al., "Epidemiology of Acute Myocarditis/Pericarditis in Hong Kong Adolescents Following Comirnaty Vaccination," PUBMED (Nov. 28, 2021), *available at* https://pubmed.ncbi.nlm.nih.gov/34849657/ (last visited Jan. 25, 2022); David Zweig (@davidzweig), Twitter, https://twitter.com/davidzweig/status/1477750160033726464?s=20 (Jan. 2, 2022, 4:14PM).

123.    In other words, the risk of cardiac complications from the vaccine may be greater than the risk posed by COVID itself.

124.    Vaccine-related myocarditis is associated with a significant leak of cardiac enzymes from the heart and thus can result in permanent heart damage. Koka Decl. ¶ 11.

125.    Although vaccine myocarditis is associated with reduction of heart function that appears to normalize quickly, cardiac magnetic resonance imaging ("MRI") has been finding the formation of scar tissue after vaccine myocarditis that is similar to findings in non-vaccine myocarditis. Koka Decl. ¶ 12.

126.    Early evidence suggests that about one-third of patients who suffer an episode of vaccine myocarditis have evidence of scar/fibrosis, seen in a 3-month follow up. Koka Decl. ¶ 13.

127.    This could have long-term consequences. A systemic review of literature found that the presence of scar tissue detected by cardiac MRI is associated with an increased risk of death, heart failure, need for cardiac transplantation, and serious cardiac arrhythmias. Koka Decl. ¶ 14.

128.    While some have argued that the risk of myocarditis from contracting COVID-19 is higher than that from vaccines, a study in the Journal of the American Medical Association demonstrated that diagnosis of myocarditis peaked only after widespread vaccine administration. Koka Decl. ¶ 15.

129.    Moreover, this risk/benefit calculus does not account for those with naturally acquired immunity.

130.    In sum:

> vaccine related myocarditis is a *potentially serious* medical condition that can lead to fibrosis in heart muscle. Fibrosis and scarring found within the heart muscle has been associated with *long term complications* related to cardiac arrhythmias and even sudden cardiac death. It is not yet known what the long-term sequelae will be for those patients who have developed scarring and fibrosis related to vaccine myocarditis. Rates of vaccine myocarditis in certain

23

sub-populations may exceed the risks from SARS-Cov2 associated myocarditis (emphasis added).

Koka Decl. ¶ 17.

131.    That the Johnson and Johnson vaccine has recently been sidelined due to safety concerns, after nearly a year, illustrates the fact that there are many unknowns with respect to adverse consequences of the vaccine.

132.    Recent research indicates that vaccination presents a heightened risk of adverse effects—including serious ones—to those who have previously contracted and recovered from COVID-19. Joint Decl. ¶ 28.

133.    The heightened risk of adverse effects results from "preexisting immunity to SARS-Cov-2 [that] may trigger unexpectedly intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals." Angeli, *et al.*, *SARS-CoV-2 Vaccines: Lights and Shadows*, 88 EUR. J. INTERNAL MED. 1, 8 (2021). *See also* Jennifer Block, "Vaccinating people who have had covid-19: why doesn't natural immunity count in the US?" BRITISH MEDICAL JOURNAL (Sept. 13, 2021), *available at* https://www.bmj.com/content/374/bmj.n2101 (last viewed February 7, 2022) (citing several experts and studies establishing that those who have previously been infected are more likely to experience adverse side effects from the vaccines).

134.    Vaccination of the naturally immune may increase their chances of reinfection. Some experts believe that subsequent vaccination (especially a two-dose regimen) for those who have been previously infected may cause "'exhaustion,' and in some cases even a deletion, of T-cells," leading to a depleted immune response. *Id.*

## CLAIMS FOR RELIEF
### COUNT I: VIOLATION OF THE EQUAL PROTECTION CLAUSE

135.     Plaintiffs reallege and incorporate by reference the foregoing allegations as though fully set forth herein.

136.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of the laws."

137.     Under the Equal Protection Clause, state and local governments and government officials may not arbitrarily discriminate among citizens, denying to some rights or benefits that are made available to other similarly situated citizens, without justification. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 472 U.S. 432 (1985).

138.     The Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). *See also Cleburne*, 473 U.S. at 440 (explaining that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike"); *Roe*, 359 F.Supp.3d at 410 (granting preliminary injunction because HIV-positive servicemembers made strong showing that treating them differently violated Equal Protection).

139.     To succeed on an Equal Protection claim, a plaintiff must demonstrate (1) that he has been treated differently from others with whom he is similarly situated and (2) that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny. *See, e.g., In re Long Term Admin. Segregation of Inmates Designated as Five Percenters,* 174 F.3d 464, 471 (4th Cir.), *cert. denied Mickle v. Moore,* 528 U.S. 874 (1999); *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 818–19 (4th Cir. 1995).

140.     Ordinarily, a state regulation or policy will be presumed valid and sustained if the classification is rationally related to a legitimate state interest. *See Cleburne,* 473 U.S. at 440; *Roe*, 359 F.Supp.3d at 418 ("categorical deployment limitation not rationally related to any legitimate interest[.]"). A higher level of scrutiny applies when fundamental rights are involved.

141.     Defendants have violated and are violating the McArthur children's rights under the Equal Protection Clause by treating them differently from their vaccinated peers without any rational basis, let alone one that would withstand a higher level of scrutiny, as should be used when a child's rights to education and bodily integrity are at stake.

142.     There is no question that the McArthur children are subject to differential treatment because of their unvaccinated status, as they would not be forced to quarantine for any period of time if vaccinated and asymptomatic.

143.     And Defendants' refusal to afford students with natural immunity the same exemption from the quarantine policy that is provided to vaccinated students does not rationally advance any legitimate governmental interest.

144.     As discussed above, the natural immunity arising from infection with COVID-19 provides at least as much and probably significantly more protection against re-infection and transmission than that conferred by vaccination.

145.     Thus, having recovered from COVID-19 just over three months ago (M.M. and M.H.M.) and one month ago (M.J.M. and M.D.M.), the McArthur children present no greater risk—and very likely a much *lower* risk—of contracting and transmitting the virus than most if not all vaccinated students, particularly those who were vaccinated longer ago.

146.     There is no legitimate public health justification, or any other rational basis, for requiring the McArthur children to quarantine (which M.M. has now had to do repeatedly) and

26

excluding them from school, when they present no greater risk to those around them than vaccinated students who are not required to quarantine and may return to school immediately.

147.    Defendants' policy, treating students with natural immunity as second-class citizens and depriving them of the ability to attend school without *any* even arguable rational basis for the distinction, is simply arbitrary and irrational. *See Cleburne*, 473 U.S. at 450 (classification may not be based on "irrational prejudice"); *Louisiana v. Becerra*, No. 3:21-cv-03970 (W.D. La. Nov. 30, 2021) ("the rejection of natural immunity as an alternative is puzzling"); *Missouri v. Biden*, 2021 WL 5564501 (E.D. Mo. Nov. 29, 2021) at p. 17 and fn. 20, *aff'd Missouri v. Biden*, No. 21-3725 (8th Cir. Dec. 13, 2021) (finding that CMS's changing its posture with respect to natural immunity constituted evidence of unlawful agency action, and noting that "CMS also rejected natural immunity," despite a "trove of scientific data on the strength and durability of natural immunity from COVID-19 alone and compared to vaccine-induced immunity"), *overruled on other grounds by Missouri v. Biden*, 595 U.S. __, Nos. 21A240 & 21A241 (January 13, 2022) (reversing stays of CMS mandate upheld by Fifth and Eighth Circuits).

148.    Nor is there any valid reason to recognize naturally acquired immunity for only 90 days but vaccine-induced immunity indefinitely. As discussed, the science simply does not support this policy.

149.    Blindly adopting CDC guidance is not a rational basis, particularly when that guidance is itself not backed by scientific data and, indeed, is contradicted by the overwhelming scientific evidence, including the CDC's own data. Moreover, CDC has lately been coming around to recognizing natural immunity, yet FCPS and FCHD are not following these newer developments.

150.    There is a reason that guidance is not law: guidance has not gone through the constitutionally prescribed legislative process, subject to the input of numerous individuals with different perspectives. So, endowing it with undeserved authority is poor policy.

151.    This arbitrary, irrational, and discriminatory treatment—compounded by Virginia's tradition of recognizing naturally acquired immunity in school vaccination requirements—violates the McArthur children's fundamental rights to equal protection of the laws under the Fourteenth Amendment of the Constitution.

152.    Equal protection problems are compounded because individuals with naturally acquired immunity are at a disadvantage when it comes to vaccination, since immunization poses a greater risk of harm to them than to those who are unvaccinated and have not acquired immunity naturally, and immunization may in fact deplete their immune response.

153.    If Defendants are going to discriminate between groups of children, causing them learning loss, stigmatization, and emotional distress, they must be able to establish some rational basis for that discrimination, at the very least. *See Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988) ("[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review"); *Roe*, 359 F.Supp.3d at 410 ("rational basis review is not 'toothless'"), quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976).

154.    In sum, for no valid public health reason whatsoever, the McArthur children (and their parents) are forced to choose between the uninterrupted education enjoyed by the children's vaccinated peers and a heightened risk of adverse side effects and even possible depletion of the children's naturally acquired immunity.

## COUNT II: VIOLATION OF STATE RIGHT TO AN EDUCATION

155.    Plaintiffs reallege and incorporate by reference the foregoing allegations as though fully set forth herein.

28

156.    The ability to receive in-person public elementary and secondary school instruction is a significant public benefit, and a fundamental right, protected by Article I, § 15, and Article VIII §§ 1, 3 of the Virginia State Constitution.

157.    Article I, § 15 states that "free government rests, as does all progress, upon the broadest possible diffusion of knowledge" and instructs the Commonwealth to "avail itself of those talents which nature has sown so liberally among its people by assuring the opportunity for their fullest development by an effective system of education throughout the Commonwealth."

158.    Article VIII, § 1 requires the State's General Assembly to "provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth and shall seek to ensure that an educational program of high quality is established and continually maintained." *See Scott v. Commonwealth*, 247 Va. 379 (1994).

159.    Article VIII, § 3 requires the General Assembly to "provide for the compulsory elementary and secondary education of every eligible child of appropriate age."

160.    In *Scott*, the Virginia Supreme Court declared education a fundamental right under the State constitution. 247 Va. at 386.

161.    By requiring the McArthur children to stay home whenever they have "potential close contacts," with no valid public health justification, Defendants are depriving them of their right to a public-school education.

162.    M.M.'s case illustrates how problematic this policy is because she was required to stay home for another week less than three weeks after completing a two-week quarantine.

163.    In fact, of the 25 school days between November 1 and December 13, 2021, M.M. was quarantined for 14 of them.

164.    Then, she was once again forced to quarantine at the beginning of February.

29

165.    This already puts her at a significant disadvantage compared to children who have been vaccinated.

166.    M.H.M., after missing more than a week of school when he was infected, has also now already missed two more days of school on "potential close contact" quarantine.

167.    These quarantines will continue indefinitely whenever M.M. or M.H.M. is identified as a "potential close contact."

168.    Nor can Defendants claim that the opportunity to view class over the internet is equivalent to in-person instruction.

169.    Common sense alone should end this debate, as it is beyond evident that physical presence in the classroom and the ability to interact with one's teachers and peers are crucial to attaining a proper education. Substantial research establishes that learning over Zoom—if it can be called that—is far inferior. *See, e.g.,* Clare Halloran et al., *Pandemic School Mode and Student Test Scores,* NBER WORKING PAPER SERIES (Nov. 2021), *available at* https://www.nber.org/system/files/working_papers/w29497/w29497.pdf (last visited Jan. 31, 2022) (demonstrating catastrophic learning losses in districts that went remote); David Leonhardt, *When School is Voluntary*, THE NEW YORK TIMES (July 12, 2021), *available at* https://www.nytimes.com/2021/07/12/briefing/remote-learning-covid.html (last visited Jan. 31, 2022).

170.    Thus, M.M. and M.H.M. have been deprived of their right to an education guaranteed them by the Virginia State Constitution. M.J.M. and M.D.M. could also be so deprived at any moment after their 90-day exemption from quarantining expires.

## COUNT III: VIOLATION OF DUE PROCESS CLAUSE AND UNCONSTITUTIONAL CONDITIONS DOCTRINE

171.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

172.    The Due Process Clause of the Fourteenth Amendment and Article 1, § 11 of the State Constitution provide that no State "shall deprive any person of life, liberty, or property, without due process of law."

173.    The Virginia State Constitution provides that "all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety." Article I, § 1.

174.    This means, *inter alia*, the individual possesses the right to "act [] as he may judge best for his interest" and "to live and work where he will; to earn his livelihood by any lawful calling." *Young v. Commonwealth*, 101 Va. 853, 862-63 (1903).

175.    "[T]here are certain inherent rights which men do not surrender by entering into organized society, and of which they cannot be arbitrarily deprived by the state." *Taylor v. Smith*, 140 Va. 217 (1924).

176.    "These are individual rights, formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which begins with the fundamental proposition that all men are created equal; that they are endowed with their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness." *Young*, 101 Va. at 862.

177.     The due process protections afforded under the Constitution of Virginia are co-extensive with those recognized in the Federal Constitution. *Shivaee v. Commonwealth*, 270 Va. 112, 119 (2005).

178.     The United States Supreme Court has explained that: "[p]rotected interests in property are normally not created by the Constitution. Rather, they are created and their dimensions are defined by an independent source[.]" *See Goss v. Lopez*, 419 U.S. 565 (1975).

179.     The McArthur children possess a property interest in their education (or, in State constitutional terms, a right to that education) and a liberty interest in deciding whether or not to receive an EUA-approved, medically unnecessary and possibly harmful vaccine free from pressure or coercion.

180.     Defendants' quarantine policy effectively deprives them of their right to an education and their property interest in that education, without a hearing and without any valid public health rationale. *See Goldberg v. Kelly*, 397 U.S. 254 (1970) (termination of welfare benefits without a hearing violated procedural due process requirements.). Accordingly, the policy violates their procedural due process rights.

181.     The "touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

182.     The Due Process Clause "forbids arbitrary deprivations of liberty."

183.     In *Goss*, 419 U.S. at 575, school authorities who suspended the students for up to 10 days without a hearing, based on charges of misconduct, infringed those liberty interests.

184.     A "10-day suspension from school is not de minimis on our view and may not be imposed in complete disregard of the Due Process Clause." *Goss,* 419 U.S. at 576.

185.     In fact, the Court explicitly observed that "if the suspension is for 10 days, [it] is a serious event in the life of the suspended child. Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary." *Ibid.*

186.     M.M. has already missed far more than 10 days, M.H.M. has missed almost 10 days, and their brothers are at imminent risk of likewise being deprived of in-person education.

187.     Also for the reasons discussed above, there is no legitimate public health or other justification for requiring the McArthur children to quarantine based on a "potential close contact" determination or treating them worse than their vaccinated peers. There is no valid reason not to recognize their naturally acquired immunity beyond 90 days, while exempting vaccinated students from quarantining indefinitely. Accordingly, the quarantine policy constitutes a substantive due process violation under the State and Federal Constitutions.

188.     Relatedly, Defendants' quarantine policy constitutes an unconstitutional condition placed upon the McArthur children and their parents.

189.     The unconstitutional conditions doctrine forbids burdening people's constitutional rights by coercively withholding benefits from those who exercise them. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013); *see also Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 454 (1983) ("the government may not deny a benefit to a person because he exercises *a constitutional right*.") (emphasis added); *Memorial Hosp. v. Maricopa Cty.*, 415 U.S. 250 (1974) (finding that state residency requirement impinged on the constitutionally guaranteed right to interstate travel, while lacking a compelling state interest, and thus was unconstitutional);

*Speiser v. Randall*, 357 U.S. 513, 518 (1958) (holding that government created unconstitutional condition by denying property tax exemption for engaging in certain speech).

190.    The children have the constitutional rights to bodily autonomy and to decline medical treatment under the United States Constitution. *Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278 (1990) (right to refuse unwanted medical care is protected by U.S. Constitution); *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same).

191.    This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997).

192.    The Court has explained that the right to refuse medical care derives from the "well-established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997).

193.    By premising the McArthur children's ability to receive an uninterrupted, in person education (a government benefit and fundamental right recognized by the Virginia State Constitution) upon receiving a medically unnecessary vaccine that has a heightened chance of causing harm due to their naturally acquired immunity, the quarantine policy creates an unconstitutional condition. *See Louisiana v. Becerra*, No. 3:21-cv-03970 ("The Plaintiff States' citizens will suffer irreparable injury by having a substantial burden placed on their liberty interests because they will have to choose between losing their jobs or taking the vaccine.").

## COUNT IV: VIOLATION OF STATE AND FEDERAL CONSTITUTIONAL RIGHT TO PARENT

194.    Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth herein.

195.    The Code of Virginia provides that: "[a] parent has a fundamental right to make decisions concerning the upbringing, education, and care of the parent's child." Va. Code Ann. § 1-240.1 (2013).

196.    The United States Supreme Court has recognized a similar right, incorporated in the Fourteenth Amendment's Due Process Clause. *See Pierce v. Society of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-35 (1925) (holding that a state statute "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control.").

197.    Whether to vaccinate one's child—particularly with a medically unnecessary vaccine only authorized for emergency use, untested in children who have recovered from COVID-19—is a fundamental aspect concerning the child's upbringing and medical care.

198.    Harms from the vaccine are not merely speculative. As Dr. Koka explains, myocarditis, a potential side effect of mRNA vaccines, may have long-lasting, serious, and adverse effects on the heart. *See supra*, ¶¶ 93-100.

199.    While as a general matter, the risk-benefit calculus for many adults may favor vaccination, such an assessment has not been conducted for children, who are at exceedingly low risk of a severe outcome from contracting COVID-19.

200.    Indeed, the survival rate for a child M.M.'s age is 99.9984%, and for her brothers is 99.99968%. Bhattacharya Decl. ¶ 6. Because the children are healthy and have no known underlying conditions, the survival rate for those of their profile is no doubt even higher.

201.     All these issues are compounded when the children in question have naturally acquired immunity, because they stand to benefit even less from the vaccine than an immunologically naïve child.

202.     This delicate decision, involving the health and well-being of children, resides with their parents, according to the Virginia Code and the United States Supreme Court.

203.     By predicating their children's ability to obtain an uninterrupted education, along with their vaccinated peers, upon their receiving such a vaccine, Defendants have deprived Mr. and Mrs. McArthur of their right to make crucial decisions concerning their children's upbringing under both the Virginia Code and the United States Constitution.

## COUNT V: DEFENDANTS' QUARANTINE POLICY IS CONTRARY TO FEDERAL LAW (M.D.M., M.H.M., AND M.M.)

204.     Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth herein.

205.     Defendants' quarantine policy puts Mr. and Mrs. McArthur in the position of having to give their children an unnecessary, possibly harmful, EUA vaccine or else to subject them to potentially endless missed school days, effectively depriving them of the right to the education their peers enjoy.

206.     The federal EUA statute mandates voluntary and informed consent. *See John Doe No. 1 v. Rumsfeld*, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C. Apr. 6, 2005) (allowing use of anthrax vaccine pursuant to EUA "on a *voluntary* basis"). *See also* 21 U.S.C. § 360bbb-3.

207.     The federal EUA statute expressly states that recipients of products approved for use under it must be informed of the "option to accept *or refuse* administration" (emphasis added)

and of the "significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." *Id.*

208.    Federal law need not contain an express statement of intent to preempt state law for a court to find any conflicting state action invalid under the Supremacy Clause. *See Geier v. American Honda*, 520 U.S. 861, 867-68 (2000).

209.    Rather, federal law preempts any state law that creates "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399-400 (2012).

210.    Premising the children's ability to obtain an uninterrupted elementary school education (which is in fact their right under the State Constitution) upon receipt of an EUA vaccine is coercive. *See* 21 U.S.C. § 360bbb-3.

211.    The conflict between the quarantine policy and the EUA statute is particularly stark given that the statute's informed consent language requires that recipients be given the "option to refuse" the EUA product. That is at odds with the quarantine policy that effectively deprives the children of their right to an education if they do not take a vaccine approved only for emergency use.

212.    Notably, no studies have been conducted that even addressed the question of the vaccine's safety and efficacy for COVID-19 recovered children—none.

213.    As Dr. Koka explains, the risk of myocarditis following vaccination is a real factor to consider, *especially* when one has naturally acquired immunity. We simply do not know the long-term effects of vaccine-related myocarditis—which occurs most often in young people—on the heart, because the vaccines have not existed long enough.

214.     This concern is most acute for M.D.M., who falls into the demographic range at heightened risk for myocarditis.

215.     This uncertainty exemplifies the reason that the EUA statute eschews pressure or coercion.

216.     This coercive policy violates the letter, spirit and intent of the EUA statute. Put differently, the policy frustrates the objectives of the EUA process. *See Geier*, 520 U.S. at 873 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

217.     Accordingly, Defendants' quarantine policy is preempted by federal law.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.     A declaration that Defendants' quarantine policy violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

B.     A declaration that the quarantine policy deprives all four children of their right to an education under Article I, § 15 and Article VIII, §§ 1,3 of the Virginia State Constitution;

C.     A declaration that the quarantine policy violates the children's Due Process rights under the Fourteenth Amendment and Article 1, § 11 of the Virginia State Constitution, and creates an unconstitutional condition;

D.     A declaration that the quarantine policy violates the children's parents' right to make decisions concerning their upbringing under the Virginia State Code and the Fourteenth Amendment of the United States Constitution;

E.      A declaration that the local school system's quarantine policy violates the McArthur children's federal statutory right to decline a vaccine authorized only for emergency use under 21 U.S.C. § 360bbb-3—and therefore that the quarantine policy is preempted by federal law;

F.      Injunctive relief restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), and each of them, from enforcing the quarantine policy—or other coercive or otherwise pressuring policies or conditions similar to those in the quarantine policy that act to compel or try to exert leverage on FCPS students with natural immunity to get a COVID-19 vaccine—against the McArthur children;

G.      Nominal damages;

H.      Attorney's fees pursuant to 42 U.S.C. § 1988; and

I.      Any other just and proper relief.

## JURY DEMAND

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

February 7, 2022

Respectfully submitted,

/s/ *Jenin Younes*

Jenin Younes*
Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
jenin.younes@ncla.legal
*Admitted pro hac vice*

\* Admitted only in New York.  DC practice limited to matters and proceedings before United States courts and agencies. Practicing under members of the District of Columbia Bar.

/s/ *Richard Samp*

Richard Samp
Senior Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
rich.samp@ncla.legal

/s/ *John J. Vecchione*

John J. Vecchione
Senior Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
john.vecchione@ncla.legal
*Attorneys for Plaintiffs*