# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | |
|---|---|
| ERIC MCARTHUR and JENNY MCARTHUR, proceeding on their own behalf and on behalf of their minor children, M.J.M., M.D.M., M.H.M., and M.M., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:21-cv-1435 |
| SCOTT BRABRAND, Superintendent of Fairfax County Public Schools, STELLA PEKARSKY, Chair of the Fairfax County School Board, and GLORIA ADDO AYENSU, Director of Department of Health for Fairfax County, | |
| *Defendants.* | |

---

## PLAINTIFFS' OPPOSITION TO DEFENDANTS BRABRAND AND PEKARSKY'S MOTION TO DISMISS

Jenin Younes
Admitted pro hac vice
Rich Samp, VSB No. 33856
John Vecchione, VSB No. 73828
New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210 (telephone)
Jenin.Younes@ncla.legal
Rich.Samp@ncla.legal
John.Vecchione@ncla.legal

Counsel to Plaintiffs

Dated:  March 8, 2022

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................II

TABLE OF AUTHORITIES ............................................................................................ III

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

THE NEW SCIENTIFIC EVIDENCE AND INDICATIONS THAT THE CDC HAS
INTENTIONALLY MISLED THE AMERICAN PUBLIC .......................................... 4

DEFENDANTS' CLAIMS ................................................................................................ 6

STANDARD OF REVIEW ............................................................................................... 6

ARGUMENT ..................................................................................................................... 7

I.      SINCE THE QUARANTINE POLICY IS "CAPABLE OF REPETITION, YET EVADING REVIEW,"
PLAINTIFFS' CLAIMS MAY NOT BE DISMISSED AS MOOT ............................................. 7

II.     THE FACTUAL AVERMENTS IN THE COMPLAINT ESTABLISH PLAINTIFFS' ENTITLEMENT TO
RELIEF ........................................................................................................................... 9

III.    DEFENDANTS' QUARANTINE POLICY VIOLATES THE EQUAL PROTECTION CLAUSE .......... 11

        A.      Intermediate Level Scrutiny Applies .............................................................. 11

        B.      Defendants' Policy Cannot Surmount Rational Basis Review .................................... 13

IV.     PLAINTIFFS ARE ENTITLED TO VINDICATE THEIR RIGHTS TO AN EDUCATION UNDER THE
STATE CONSTITUTION .................................................................................................. 16

V.      DEFENDANTS' QUARANTINE GUIDANCE VIOLATES PLAINTIFFS' DUE PROCESS RIGHTS ... 18

        A.      Plaintiffs Have Property and Liberty Interests in Their Education ............................. 18

        B.      Policies of General Application Can Violate Individual Rights, There Is No Crisis in
        Virginia that Justifies Violating Plaintiffs' Rights, and the McArthur Children Do Not Pose
        a Danger Warranting Removal from School ....................................................... 21

        C.      The Quarantine Policy Amounts to a *de facto* Vaccine Mandate, to Which Intermediate
        or Rational Basis with a Bite Level Scrutiny Applies ............................................. 22

VI.     THE QUARANTINE POLICY INFRINGES PLAINTIFFS' DUE PROCESS RIGHT TO MAKE
DECISIONS CONCERNING THE HEALTH AND WELFARE OF THEIR CHILDREN ................................. 27

VII.    PLAINTIFFS ARE ENTITLED TO BRING CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER 21 U.S.C. § 360BBB-3 FOR VIOLATIONS OF THEIR STATUTORY RIGHTS TO INFORMED
CONSENT ...................................................................................................................... 29

CONCLUSION ............................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*A Soc'y Without a Name v. Comm'w of Va.*, 655 F.3d 342 (4th Cir. 2011) ................................... 6

*Appalachian Power v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) ...................................................... 15

*Armstrong v. Exceptional Child Center*, 575 U.S. 320m 326 (2015)......................................... 30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 7

*Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988) ................................................ 15

*Bauer v. Summey*, No. 2:21-cv-02952 (D. S. C. Oct. 21, 2021) .................................................. 12

*Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)................................................................... 19

*Bowen v. Gilliard*, 483 U.S. 587 (1987) .................................................................................... 13

*Carmen's Corner Store v. Small Business Association*, 520 F.Supp.3d 726 (D. Maryland 2021). 9

*Cherrie v. Virginia*, 787 S.E.2d 855 (Va. 2016) ......................................................................... 17

*Christensen v. Harris County*, 529 U.S. 576, 587-88 (2000) ..................................................... 15

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985)................................... 11, 12

*Connell v. Higginbotham*, 403 U.S. 207 (1971) ......................................................................... 19

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ............................................. 30

*D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016)........................................................................... 28

*District of Columbia v. Heller*, 554 U.S. 570 (2008).................................................................. 26

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435 (4th Cir. 2011)........................... 6

*Ex parte Young*, 209 U.S. 123, 155-56 (1908)........................................................................... 30

*FCC v. Beach Communications*, 508 U.S. 307 (1993) ................................................................ 14

*Federal Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449 (2007)................................. 8

*Flory v. Smith*, 134 S.E. 360 (Va. 1926).................................................................................... 16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000) ............................ 8

*Goldberg v. Kelly*, 397 U.S. 254 (1974) .................................................................................... 20

*Goss v. Lopez*, 419 U.S. 565 (1975) ..................................................................................... 19, 20

*Grimm v. Gloucester County School Board*, 972 F.3d 586, 607 (4th Cir. 2020) .................. 11, 12

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)................................................................... 23, 25

*Jordan v. Jackson*, 15 F.3d 333 (4th Cir. 1994) ........................................................................ 28

*Kheriaty v. Regents of University of California*, No. 8:21-cv-01367 (C.D. Cal. Sept. 29, 2021) 12

*Klaassen v. Board of Trustees*, 2021 WL 3073926 (July 18, 2021) ................................... 9, 29, 30

*Lawrence v. Texas*, 539 U.S. 558, 580 (2003) ............................................................. 11

*Mathews v. Diaz*, 426 U.S. 67, 87 (1976) ................................................................. 11

*Mathews v. Lucas*, 427 U.S. 495 (1976) .................................................................. 15

*Memorial Hosp. v. Maricopa Cty*, 415 U.S. 250 (1974) ................................................ 26

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ............................................................... 19

*Murphy v. Hunt*, 455 U.S. 478 (1982) ..................................................................... 8

*Pedersen v. Office of Personnel Management*, 881 F.Supp.2d 294 (D. Conn. 2012) ................. 13

*People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F.Supp.3d 547 (M.D. N. Carolina 2020) ..................................................................................................... 11

*Pierce v. Society of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510 (1925) ........... 27

*Plyler v. Doe*, 457 U.S. 202 (1982) ....................................................................... 12

*Porter v. Clarke*, 852 F.3d 358 (4th Cir. 2017) ........................................................... 8

*R.S.W.W. v. City of Keego Harbor*, 397 F.3d 427 ....................................................... 26

*Regan v. Taxation With Representation of Wash.*, 461 U.S. 540 (1983) ................................ 26

*Resurrection School v. Hertel*, 11 F.4th 437 (6th Cir. 2021) ............................................ 28

*Riggins v. Nevada*, 504 U.S. 127 (1992) ............................................................. 24, 25

*Roe v. Shanahan*, 359 F.Supp.3d 382 (E.D. Va. 2019) ................................................. 11

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63 (2020) .................................. 22

*S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475 (4th Cir. 2015) . 8

*Scott v. Commonwealth*, 247 Va. 379 (1994) ........................................................... 16

*Sell v. United States*, 539 U.S. 166 (2003) ........................................................... 24, 25

*Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754 (4th Cir. 2011) ........................... 7

*Spencer v. Kemna*, 523 U.S. 1 (1998) ...................................................................... 8

*Stanley v. Illinois*, 405 U.S. 645 (1972) ................................................................. 28

*Troxel v. Granville*, 530 U.S. 57 (2000) ................................................................. 27

*United States v. Hardy*, 545 F.3d 280 (4th Cir. 2008) .................................................... 7

*United States v. Locke*, 471 U.S. 84 (1985) ............................................................. 21

*Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021) ....................................................... 7

*Washington v. Harper*, 494 U.S. 210 (1990) ...................................................... 23, 24, 25

*Williams v. Brown*, No. 6:21-cv-1332-AA (D. Or. Oct. 19, 2021) ...................................... 12

*Wolff v. McDonnell*, 418 U.S. 539 (1974) .................................................................. 19

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ............................................................... 22

**Statutes**

12 Va. Admin. Code § 5-110-80.................................................................................. 28

S.B. 739 § 22............................................................................................................... 4

**Other Authorities**

Apoorva Mandavelli and Noah Weiland, "Pfizer Shot Is Far Less Effective in 5- to 11-Year-Olds than in Older Kids, New Data Show," *The New York Times* (Feb. 28, 2022) ........................... 5

Apoorva Mandavelli, *The CDC Isn't Publishing Large Portions of the Covid Data it Collects*, THE NEW YORK TIMES (Feb. 20, 2022).................................................................... 5

Clare Halloran et al., *Pandemic School Mode and Student Test Scores,* NBER WORKING PAPER SERIES (Nov. 2021) .................................................................................. 17

Dana Goldstein, "It's 'Alarming': Children Are Severely Behind in Reading," *The New York Times* (Mar. 8, 2022)..................................................................................... 18

David Leonhardt, *When School is Voluntary*, THE NEW YORK TIMES (July 12, 2021) ............... 17

Jennifer Block, "Vaccinating people who have had covid-19: why doesn't natural immunity count in the US?" BRITISH MEDICAL JOURNAL (Sept. 13, 2021) ............................................. 25

**INTRODUCTION**

Plaintiffs Jenny and Eric McArthur bring this suit on behalf of their four minor children, all of whom have recently acquired natural immunity to COVID-19 and are unvaccinated. Because the Fairfax County Public School District ("FCPS") and the Fairfax County Health Department ("FCHD") refuse to recognize naturally acquired immunity, the two younger children were required to quarantine following "potential close contacts" with COVID-19 when their vaccinated peers were not. As of March 1, 2022, FCPS is no longer requiring children to quarantine following individual contacts.

The science is clear, and has been since the school year started, that naturally acquired immunity is equivalent to or more protective than the best available vaccines. Accordingly, treating the McArthur children differently from their vaccinated peers violates their rights: (1) to Equal Protection and Due Process of law under the Fourteenth Amendment of the U.S. Constitution and the Virginia State Constitution; (2) to receive an education under the Virginia State Constitution; and (3) to be free of coercion or pressure to relinquish their statutory rights to informed consent as to whether to receive a vaccine authorized only for emergency use under federal law. In addition, the children's parents have been deprived of their fundamental rights, under the Virginia State Code and the Fourteenth Amendment of the United States Constitution, to make decisions concerning their children's upbringing.

While Defendants argue that the case is moot because there is no reason to believe the children will be forced to quarantine again, a contention they are likely to reiterate in light of the most recent policy change, both claims are unavailing. Absent declaratory and injunctive relief, the unconstitutional and discriminatory policy remains capable of repetition but evading review.

Thus, the McArthurs are entitled to pursue their claims under well-established exceptions to the mootness doctrine.

## BACKGROUND

The McArthurs reside in Vienna, Virginia, and all four of their children attend school in the Fairfax County Public School District (First Amended Complaint ["FAC"] ¶ 23). Seven-year-old M.M. attends second grade at Sunrise Valley Elementary School, where her 11-year-old brother, M.H.M., is a fifth grader (FAC ¶ 24). Their brothers, 17-year-old M.J.M and 14-year-old M.D.M., are in eleventh and ninth grade, respectively, at South Lakes High School (FAC ¶ 25).

M.H.M. tested positive for COVID-19 on October 29, 2021, along with his father, and isolated for 10 days, returning to school on November 8 after he was cleared by FCHD (FAC ¶ 31). On October 31, 2021, M.M. began experiencing symptoms similar to those of her father and brother, specifically nausea, a sore throat, fatigue, and a low-grade fever (FAC ¶ 32). On no occasion prior to that date had M.M. experienced any symptoms of COVID-19 since the beginning of the pandemic (FAC ¶ 33). Plaintiffs therefore have plausibly alleged that M.M. contracted COVID-19. Plaintiff Jenny McArthur exhibited similar symptoms, which she confirmed resulted from a COVID-19 infection through an at-home test (FAC ¶ 34). M.M. was cleared to return to school by FCHD on November 15, 2021, having been out since November 1 (FAC ¶ 34).

Not three weeks later, on December 2, M.M. was forced to quarantine again for 10 days because she was identified as a "potential close contact" of another student or staff member who had tested positive for COVID-19 (FAC ¶ 40). The following day, she tested positive for antibodies (FAC ¶ 39). On December 3, M.M.'s mother completed a FCHD verification survey indicating that M.M. was unvaccinated, had been infected with COVID-19 in the last 90 days, and was experiencing no symptoms (FAC ¶ 37). Later that day, M.M.'s mother received an email

notification from FCHD stating that M.M. could not be cleared to return to school "because [she was] not vaccinated for COVID-19." (FAC ¶ 48). M.M. returned to school on Monday, December 13, 2021 (FAC ¶ 55).

Per FCPS's policy at the time, if M.M. had been vaccinated, she would have been allowed to return without quarantining, provided FCHD confirmed that she was asymptomatic as well as vaccinated (FAC ¶¶ 43-45). By contrast, as long as M.M. remained unvaccinated—without regard to her naturally acquired immunity—she could be forced to quarantine any time she was identified as a "potential close contact" of someone at the school who tested positive (FAC ¶¶ 44-45). Of the 26 school days between November 3 and December 10, M.M. was quarantined for 15 of them.

M.M. suffered emotional distress, as well as learning loss, as a result of being excluded from in-person school. She began crying when told she had been placed on quarantine and would miss another week of school, and had tantrums that were atypical for her (FAC ¶ 56-57).

M.J.M. and M.H.M. contracted COVID-19 in late December of 2021 (FAC ¶ 10).

In their initial complaint, filed only on behalf of M.M., Plaintiffs averred that their daughter could be quarantined whenever the school identified her as a "potential close contact" of an infected student or staff member (Complaint ¶ 47, Doc. 1). That eventuality did indeed transpire. On January 31, 2022, Mrs. McArthur received separate notices as to both M.M. and M.H.M. stating that they had "potential close contacts," and would have to quarantine for at least 5 days (FAC ¶ 60). Had the children been vaccinated—regardless of how long ago—the policy would not have required them to quarantine (FAC ¶ 62).

On February 1, 2022, M.M. was permitted to return to school, as apparently five days had passed since the "potential close contact." M.H.M., whose "potential close contact" occurred later with a different person, was not permitted to resume in-person class until February 3 (FAC ¶ 64).

Effective at 5:00 pm on Friday, February 4, 2022, FCPS made further changes to the quarantine policy. FCHD would no longer be responsible for clearing (or refusing to clear) children to return to school (FAC ¶ 65). In all other respects, the updated policy continued the same arbitrary and irrational discrimination against students with natural immunity (FAC ¶ 66).[1]

The McArthurs are not opposed to vaccination generally and have given all of their children routine immunizations. (FAC ¶ 71). However, they are opposed to vaccinating their children against COVID-19 because they believe that the risks of vaccination for healthy children, especially for their COVID-recovered children, outweigh the benefits (FAC ¶ 72). Defendants' quarantine policy puts unjustified pressure on Mr. and Mrs. McArthur to subject their children to an unnecessary medical procedure so that they can attend school without being subjected to theoretically limitless quarantine periods whenever they are deemed "potential close contacts," and treated differently from their vaccinated peers while posing no greater danger to others (FAC ¶ 75).

## THE NEW SCIENTIFIC EVIDENCE AND INDICATIONS THAT THE CDC HAS INTENTIONALLY MISLED THE AMERICAN PUBLIC

In the interests of economy, Plaintiffs will not reiterate the voluminous evidence establishing that naturally acquired immunity is superior to that induced through vaccination. *See* FAC ¶¶ 88-135.

---

[1] FCPS announced yet another alteration to its policy via email on February 28, 2022 (after Defendants filed their MTD), stating that contact tracing and quarantining would only be required in the event of an outbreak, effective March 1, 2022. This may be in response to new S.B. 739 § 22.1-2.1 (Va. 2022), which severely limits the circumstances in which remote learning can serve as a substitute, and caps remote learning at ten days per school year. Nevertheless, it is evident that Defendants intend to continue to discriminate against unvaccinated children—naturally immune or not—as in their motion opposing a preliminary injunction, they explain that even naturally immune unvaccinated children will have to mask and test for five days if there is an outbreak at their school (ECF Doc. 36).

However, since filing the complaint, some pertinent information has surfaced. New data from Pfizer indicates that, for 5-11-year-olds, the vaccine "offers virtually no protection against infection, even within a month after full immunization." Apoorva Mandavelli and Noah Weiland, "Pfizer Shot Is Far Less Effective in 5- to 11-Year-Olds than in Older Kids, New Data Show," *The New York Times* (Feb. 28, 2022), *available at* https://www.nytimes.com/2022/02/28/health/pfizer-vaccine-kids.html (last visited Mar. 6, 2022).

A recent video of an interview with Dr. Paul Offit, among the nation's most vociferous vaccine advocates, is telling with respect to the lack of intellectual or scientific rigor underlying CDC's natural immunity denialism.[2] Offit was in the room when a handful of individuals made the decision to reject natural immunity's efficacy, which was not based on science, but rather "bureaucratic more than anything else."

In a similar vein, CDC Director Rochelle Walensky admitted just days ago that she and her agency overstated the efficacy of COVID-19 vaccines and did not take into account the possibility of waning protection and new variants. She stated that "when the CNN feed came that it was 95% effective, the vaccine, so many of us wanted it to be helpful, so many of us wanted to say, 'OK this is our ticket out.'" Next, she remarked, "we had perhaps too little caution and too much optimism." Likewise, a recent investigative piece in the *New York Times* detailed various other ways in which CDC has not been straightforward with the American public about the vaccines and their efficacy (or lack thereof). *See* Apoorva Mandavelli, *The CDC Isn't Publishing Large Portions of the Covid Data it Collects*, THE NEW YORK TIMES (Feb. 20, 2022), *available at* https://www.nytimes.com/2022/02/20/health/covid-cdc-data.html (last visited Mar. 6, 2022).

---

[2] Michael P. Senger (@MichaelPSenger), Twitter (Feb. 11, 2022, 10:22AM), https://twitter.com/MichaelPSenger/status/1492157117721047042.

Among other information, CDC purposely hid data showing that the booster provides no additional protection to individuals under 50 years of age. *Id.*

## DEFENDANTS' CLAIMS

On February 22, 2022, Defendants Pekarsky and Brabrand filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).[3] *See* ECF Doc. 33 ("Def MTD"). Defendants argue Plaintiffs' claims are moot, their factual averments foreclose relief, and their constitutional and statutory rights have not been violated (*see* Def. MTD at 3-30).

## STANDARD OF REVIEW

In reviewing a Rule 12(b) motion, a court "must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences … in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 449 (4th Cir. 2011). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Comm'w of Va.*, 655 F.3d 342, 346 (4th Cir. 2011).

After reviewing the complaint and drawing all inferences in the plaintiffs' favor, the court may grant the motion to dismiss *only if* the plaintiffs have "failed to set forth fair notice of what the claim is and the grounds upon which it rests that make such a claim plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint will survive a motion to dismiss if it contains sufficient factual matter to state a claim for relief that is plausible on its face and provides more than labels and conclusions or a formulaic recitation of the elements of a cause of

---

[3] Defendant Ayensu filed a 12(b)(6) motion to dismiss on different grounds related to her role (or, as she alleges, lack thereof) in formulating and enforcing the quarantine policy. *See* ECF Doc. 29).

action. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The rules do not require a probability of success but simply "more than a mere possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556.

## ARGUMENT

**I.** **Since the Quarantine Policy Is "Capable of Repetition, Yet Evading Review," Plaintiffs' Claims May Not Be Dismissed as Moot**

Defendants claim that this case is moot because the children have not been placed on a pause since February 4, 2022, the date of the most recent policy change, and "it is possible that these Plaintiffs will never have another 'close contact' with another student, and never be paused from in-person learning again" (MTD at 4). First, as noted earlier, unvaccinated children are right now being treated differently from vaccinated children. *See supra* at note 1.

Second, Plaintiffs seek retrospective relief, in the form of nominal damages, for violations of their rights that are already complete and that FCPS played a significant role in inflicting. For that reason alone, the claims are not moot. *See Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021) ("nominal damages provide the necessary redress for a completed violation of a legal right.").

Third, *none* of the various alterations to the quarantine policy that have been made over the past months eliminates the core issue, which is that discriminating between vaccinated children and those who have naturally acquired immunity presents issues of constitutional dimension.

"[T]he doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction," *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)), which extends only to actual cases or controversies, U.S. Const. art. III, § 2. When a case or controversy ceases to exist—either due to a change in the facts or the law—"the litigation is moot, and the court's subject matter jurisdiction ceases to exist also." *Porter*

*v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) (quoting *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015)).

There are exceptions to the mootness doctrine that "allow claims to remain live even when events occur after litigation commences that would deprive a plaintiff of standing to bring those claims at the outset of a lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000). One such exception applies to disputes that are "capable of repetition, yet evading review." *Federal Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449, 462 (2007). The exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998).

That is precisely the situation ere. As in many COVID-related cases, Defendants change their policies every few weeks or months, and then argue that claims alleging rights violations stemming from prior policies are moot. In fact, responding to Plaintiffs' original complaint, Defendants claimed there was no reason to believe that M.M. would be "paused" again. Shortly thereafter she was again placed on pause, establishing a "'reasonable expectation' or 'demonstrated probability' that 'the same controversy will recur involving the same complaining party.'" *FEC*, 551 U.S. at 463 (citing *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)).

Defendants' quarantine policy has seriously impacted the McArthur children's lives, especially M.M., who was quarantined three time in three months, and been most emotionally affected by the policy. Defendants should not be permitted to abuse the mootness doctrine and thereby avoid being held responsible for their unlawful policies. There is no way to get into court while the children are actually being quarantined, given their short duration, while at the same time

there is every reason to believe that quarantines may continue to recur, as indeed they have. *See FECE*, 551 U.S. at 463 ("entirely unreasonable … to expect that [Plaintiff] could have obtained complete judicial review of its claims in time … during the BCRA blackout periods"; internal citations and quotation marks omitted).

Defendants' reliance upon *Klaassen v. Trustees of Indiana Univ.*, No. 1:21-cv- 238, 2021 WL 3073926), *aff'd* 7 F.4th 592 (Aug. 2, 2021), *vacated as moot* 2022 WL 213329 (7th Cir. Jan. 25, 2022) is misplaced. As the students in those cases had sought and obtained exemptions, they were not subject to the challenged vaccine policy and would not be again. Likewise, in *Carmen's Corner Store v. Small Business Association*, 520 F.Supp.3d 726 (D. Maryland 2021), the challenged rule was superseded by a new one, making it extremely unlikely the same plaintiffs would suffer the same injury. That is not the case here: the children remain subject to Defendants' discriminatory policies. There has been no repudiation of the rule requiring quarantining of unvaccinated, naturally immune children with close contacts, but exempting their vaccinated peers in identical situations.[4] Rather, FCPS sued Governor Youngkin.

## II. THE FACTUAL AVERMENTS IN THE COMPLAINT ESTABLISH PLAINTIFFS' ENTITLEMENT TO RELIEF

Defendants go to great lengths to dispute Plaintiffs' allegations that M.M. had COVID-19 at the end of October and beginning of November 2021 (Def. MTD at 6-7). Initially, at this stage of the inquiry, Plaintiffs' factual assertions are to be taken accepted as true. *A Soc'y Without a*

---

[4] Defendants may argue that the March 1 policy moots this case because students are no longer required to quarantine following individual contacts. Again, there has been no express statement to the effect that unvaccinated, naturally immune children will be treated identically to their vaccinated peers in the future. The school district could, at any time, revert to one of the older policies, especially given its intent to disregard S.B. 739 § 22.1-2.1 when it comes to masking.

*Name*, 655 F.3d at 346.  As this is a factual claim, the allegation that M.M. contracted COVID-19 at that time must be accepted for purposes of Defendants' motion.

But even if a factual inquiry were appropriate here, all evidence supports Plaintiffs' position that M.M. had COVID-19 in late October/early November.  She displayed symptoms typical of having contracted the virus at that time, when her mother, father, and brother all had positive PCR tests.  On December 3, 2021, the day after the exposure that led to her second quarantine, she tested positive for COVID-19 antibodies.  This amount of circumstantial evidence in a criminal case would be enough to convict a defendant beyond a reasonable doubt.

More fundamentally, M.M.'s positive antibody test establishes conclusively that she contracted COVID-19 *sometime*, and Plaintiffs' claims do not rest on M.M. having had COVID-19 within 90 days of her December quarantine. The exemption requirement for vaccinated children does not expire after 90 days, and Plaintiffs contest any disparity in treatment between vaccinated children and children who have had COVID-19 (*see* FAC ¶ 135-54). A positive antibody test is *better* proof of natural immunity than a PCR test, and yet Defendants refused to accept that evidence as a basis to release M.M. from her December quarantine because they irrationally and unscientifically refuse to recognize natural immunity more than 90 days after infection, while unscientifically treating vaccinated immunity as if it lasts indefinitely.

While Defendants base their claim that the "factual averments foreclose Plaintiffs' request for relief" on the fact that M.M. did not take a COVID-19 test in late October/early November, they do not address the fact that the amended complaint is *also* based on the January quarantine of both M.M. and her brother, M.H.M., which happened after their positive antibody and PCR tests, respectively.

**III.    DEFENDANTS' QUARANTINE POLICY VIOLATES THE EQUAL PROTECTION CLAUSE**

**A.  Intermediate Level Scrutiny Applies**

Contrary to Defendants' view, a higher level of scrutiny is warranted here (*see* Def. MTD at 7-8).  Intermediate review, also called "rational basis with a bite," applies when the party claiming the constitutional violation (usually under the Fourteenth Amendment's Equal Protection Clause) belongs to a politically "unpopular" group. *See People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F.Supp.3d 547 (M.D.N.C. 2020) (quoting *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) ("A law motivated by animus or by a desire to harm a politically unpopular group is reviewed under a more searching form of rational basis review.")).  *See also Mathews v. Diaz*, 426 U.S. 67, 87 (1976) ("denial of food stamps to households containing unrelated members was not only unsupported by any rational basis but was actually intended to discriminate against certain politically unpopular groups."); *Grimm v. Gloucester County School Board*, 972 F.3d 586, 607 (4th Cir. 2020) (*quoting City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985) (state action is unconstitutional when it creates 'arbitrary or irrational' distinctions between classes of people out of a 'bare … desire to harm a politically unpopular group.'")).

In *Roe v. Shanahan*, 359 F.Supp.3d 382, 410 (E.D. Va. 2019), a case brought by servicemembers who were subject to differential treatment based on their HIV-positive status, the court used intermediate or heightened rational basis analysis.   *Shanahan*, 359 F.Supp.3d at 410. Finding in favor of the servicemembers, it observed that the "categorical deployment limitation is not rationally related to any legitimate interest" and the plaintiffs faced "a particularly heinous brand of discharge, one based on an irrational application of outmoded policies related to a disease surrounding which there is widespread fear[.]" *Id.*

Few groups are more unpopular in Northern Virginia today than the unvaccinated. Plaintiffs' FAC adequately alleges that Defendants' policy is driven by irrational animus toward this category of individuals given the dearth of scientific justification for elevating vaccine-induced immunity over that conferred by recovering from infection. Put otherwise, the policy itself demonstrates that a higher-level review than traditional rational basis is necessary here. *See Grimm*, 972 F.3d at 607, *quoting Cleburne*, 473 U.S. at 607.

The cases Defendants cite to stand for the proposition that standard rational basis analysis applies are not binding on this Court (*see* Def. MTD at 9). This and related issues are being litigated fervently throughout the country, but as of yet have not been passed upon by a federal court of appeals. There is certainly no decision from either the Fourth Circuit or the Supreme Court. Second, in the cases Defendants cite, the plaintiffs did not argue for intermediate or a more searching form of rational basis review, so the courts did not have the opportunity to rule on the issue. *See Bauer v. Summey*, No. 2:21-cv-02952 (D. S. C. Oct. 21, 2021), Doc. 17 (brief in support of motion for preliminary injunction); *Kheriaty v. Regents of University of California*, No. 8:21-cv-01367 (C.D. Cal. Sept. 29, 2021), Docs. 15-1, 31, 54 (brief in support of motion for preliminary injunction and reply and brief opposing motion to dismiss, respectively); *Williams v. Brown*, No. 6:21-cv-1332-AA (D. Or. Oct. 19, 2021), Docs. 11, 17 (motion for TRO and reply, respectively). Put otherwise, none of these decisions expressly repudiates the contention that a higher standard of review should apply here.

Furthermore, given that this issue involves discriminating among *children*—who are impressionable, vulnerable, and politically powerless—a heightened form of review is warranted. Indeed, in *Plyler v. Doe*, 457 U.S. 202 (1982), the Court applied heightened (intermediate) scrutiny to equal protection violations in assessing claims involving the right of undocumented children to

attend public school.  *Id.* at 220.  The Court explained that the law in question was "directed against children, and imposes its discriminatory burden on the basis of a legal characteristic over which children can have little control."  It then observed that:

> denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit.

*Id.* at 221-22.

See also *Pedersen v. Office of Personnel Management*, 881 F.Supp.2d 294 (D. Conn. 2012) (explaining that political powerlessness may be a reason to apply heightened scrutiny to equal protection claims) (citing *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987)).[5]

### B.  Defendants' Policy Cannot Surmount Rational Basis Review

The quarantine policy does not advance any legitimate government interest, and so cannot withstand even standard rational basis analysis.  Having recovered from COVID-19 about four months ago (M.M. and M.H.M.) and nearly three months ago (M.J.M. and M.D.M.), the McArthur children present a much *lower* risk of contracting and transmitting the virus than most if not all vaccinated students, particularly those who were vaccinated six or more months ago. *See* FAC ¶¶ 88-115.  Yet all vaccinated students are exempt from FCPS's quarantine requirement and entitled to return to school immediately, even if they were vaccinated many months ago and lack significant current protection against infection and transmission. This is deeply and profoundly irrational. It treats students with natural immunity as second-class citizens and deprives them of the ability to attend school without *any* even arguably rational basis for the distinction. There simply is no legitimate public health justification, nor any other rational basis, for requiring the McArthur

---

[5] Defendants also argue that no fundamental right is implicated (Def. MTD at 10).  Plaintiffs will address that argument in the due process section of the brief.

children to quarantine and excluding them from school when they present no greater (and likely much lower) risk to others than vaccinated students who are not required to quarantine.

This is not a question of scientific debate upon which reasonable minds can differ. There is *no evidence whatsoever* that COVID-recovered children present a greater risk of being infected and transmitting the virus than do children who were vaccinated much longer ago. In fact, as the new Pfizer data demonstrates, the vaccine does not prevent infection at all in children M.M. and M.H.M.'s age. In short, the quarantine policy is not merely "based on rational speculation unsupported by evidence or empirical data" (the standard rational basis test). *FCC v. Beach Communications*, 508 U.S. 307, 315 (1993). It *conflicts* with the existing evidence and empirical data. That means it cannot survive even the lowest level of rational basis review.

Nor is there any valid reason to recognize naturally acquired immunity for only 90 days (per the CDC, which apparently serves as the basis of authority for the quarantine policy).[6] As discussed, the science simply does not support this limit. This is all the more so given the CDC's lack of credibility: its own director has conceded that the agency relied on *CNN* for information about the effectiveness of the vaccines; that it reached conclusions about the vaccines based upon a desire to be optimistic rather than evidence; and that the CDC did not consider the possibility of waning efficacy and new COVID-19 variants, basic concepts with which even lay people are familiar. These admissions undercut any argument that the CDC's Guidance, recommendations, or positions are necessarily rational.

---

[6] Defendants' argument that the presence of antibodies is "insufficient for immunity consideration" is a profoundly unscientific statement (Def. MTD at 14). Indeed, it is by testing for the presence of antibodies that researchers determine whether vaccines are effective during trials (*see* Joint Decl., Exhibit A of FAC ¶ 16).

14

Even aside from the fact that the agency has established that its Guidance should not be relied upon, blindly adopting nonbinding CDC Guidance does not establish a rational basis for a policy. *See Christensen v. Harris County*, 529 U.S. 576, 587-88 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); *Appalachian Power v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000). If school districts are going to discriminate among *children*, causing the disfavored group learning loss and emotional distress, they must, at the very least, be able to establish some rational basis for their actions. There is a reason that guidance is not legally binding: it has not gone through the legislative process, subject to the input of numerous individuals with different perspectives. Endowing it with undeserved authority is poor policy, and it unlawfully converts guidance into binding rules.

For this Court's constitutional review to be anything more than a rubber stamp, it cannot be enough to sustain this discriminatory policy for Defendants simply to point to CDC guidance—particularly given the tangible evidence that the agency's approach to the vaccines and natural immunity is not only unscientific but based upon wishful thinking, at best—without producing a single study or a single expert who is willing to provide sworn testimony that natural immunity at 95 days confers less protection against infection and transmission than vaccination at six months or longer ago. *See Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988) ("[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review"); *Roe*, 359 F.Supp.3d at 410 ("rational basis review is not 'toothless'") (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)).

None of the cases to which Defendants cite involved children (*see* Def. MTD at 11-12). Not only is this a reason that the inquiry should be subjected to a higher level of review (*see supra*

at 11-14), but it also makes a difference in assessing the rationality of the policy, given the evidence that the vaccine does not reduce infection rates in the age groups to which M.M. and M.H.M. belong. Finally, none of those decisions binds this Court, and no court of appeals has directly addressed this issue (*see* Def. MTD at 11-12). In sum, there is no rational basis for FCPS to arbitrarily treat the naturally immune differently from the vaccinated.

Most importantly, the FAC includes sufficient factual allegations to render plausible its claim that Defendants' policy is irrational. If Defendants choose to contest those allegations, they will have a full opportunity to disprove them with evidence at trial.

## IV. PLAINTIFFS ARE ENTITLED TO VINDICATE THEIR RIGHTS TO AN EDUCATION UNDER THE STATE CONSTITUTION

Defendants argue that: (1) there is no private right of action with respect to the state constitutional right to an education; (2) the right to an education does not translate into entitlement to in-person education; and (3) they may enact reasonable regulations that entail deprivation of in-person instruction.

It is true, as Defendants point out, that the Virginia State Constitution instructs the General Assembly to provide for free and compulsory education for children (*see* Def. MTD at 14-15). But Defendants cite no authority to substantiate their proposition that that provision precludes individuals from vindicating deprivations of their constitutionally recognized rights to an education. *See Scott v. Commonwealth*, 247 Va. 379, 386 (1994) (recognizing that Virginia Constitution grants fundamental right to an education).

According to Defendants, under *Flory v. Smith*, 134 S.E. 360, 363 (Va. 1926), the quarantine policy does not violate the McArthur children's right to an education (*see* Def. MTD at 16). There, the court held that a school board policy prohibiting students from leaving school grounds during lunch was reasonable stating that "[i]t is neither restraint nor infringement for the

16

legislature to enact laws to debar a child from the mere privilege of acquiring an education at the expense of the State until he is willing to submit himself to all reasonable regulations enacted for the purpose of promoting efficiency and maintaining discipline." *Id.* at 171. The issue in *Flory* was that the students were required to stay on campus during lunch, a situation not at all analogous to this case. Rather, Plaintiffs allege that FCPS's policy effectively deprives them of an education, not that they have to follow certain (very reasonable) rules in order to attend school. Moreover, that was a policy of inclusion that applied to everyone, not exclusion of a few.

*Cherrie v. Virginia*, 787 S.E.2d 855, 860 (Va. 2016) is inapposite (*see* Def. MTD at 17). *Cherrie* explicitly contrasted the claimed *statutory* right at issue there with those rights "protected under the Constitution of Virginia . . . . The existence of any viable right of action, therefore, must come from statutory law." *Id.* at 857. At issue is not a statutory right, but a constitutional one.

Defendants try to reframe the issue by claiming that Plaintiffs are attempting to exert control over the *quality* of their children's education because even during quarantine periods the children had access to remote instruction (*see* Def. MTD at 17). Defendants point to Article VIII, § 2, granting authority *only* to the Board of Education to set quality-of-education standards (*id.*).

Plaintiffs are arguing that Defendants' policy effectively deprives them of an education, not that FCPS has fallen short in terms of the quality of education provided. Learning over Zoom is not an adequate substitute for in-person instruction. The inadequacy of Zoom education is exacerbated by the discriminatory manner in which it has been foisted on the McArthur children, thereby placing them at a disadvantage compared to their vaccinated peers.[7] In fact, an article

---

[7] *See, e.g.,* Clare Halloran et al., *Pandemic School Mode and Student Test Scores,* NBER WORKING PAPER SERIES (Nov. 2021), *available at* https://www.nber.org/system/files/working_papers/w29497/w29497.pdf (last visited Jan. 31, 2022) (demonstrating catastrophic learning losses in districts that went remote); David Leonhardt, *When School is Voluntary*, THE NEW YORK TIMES (July 12, 2021), *available at*

published today in the *New York Times* described recent studies indicating that children are "severely" behind in reading due to school closures and remote learning. *See* Dana Goldstein, "It's 'Alarming': Children Are Severely Behind in Reading," *The New York Times* (Mar. 8, 2022), *available at* https://www.nytimes.com/2022/03/08/us/pandemic-schools-reading-crisis.html (last visited Mar. 8. 2022).

Defendants cite cases permitting students to require children to stay home if they are suffering from a contagious disease, for disciplinary reasons, or for bringing firearms to school. Defendants thus analogize the McArthur children, whose "crime" is having naturally acquired immunity to COVID-19, to people actually suffering from contagious illnesses, carrying guns, or committing disciplinary infractions. That inapt comparison is indicative of the irrational animus that is driving these policies, as discussed. *See supra*, at 11-14.

## V. DEFENDANTS' QUARANTINE GUIDANCE VIOLATES PLAINTIFFS' DUE PROCESS RIGHTS

### A. Plaintiffs Have Property and Liberty Interests in Their Education

Defendants argue that Plaintiffs have failed to establish a due process claim for a number of reasons, all of which are based upon misapprehensions or misrepresentations of the law. Defendants claim that Plaintiffs have no property interest in their education under Virginia law, which is required to establish the deprivation of liberty or property underpinning the substantive due process claim (*see* Def. MTD at 18-19). To support this position, they cite *Flory*, 134 S.E. at 362, in which the plaintiffs posited an entitlement to direct education and other aspects of school operations based upon their vested property rights in the public school system. That is an entirely different concept from the interest asserted here, which is that Plaintiffs possess a property right

_____

https://www.nytimes.com/2021/07/12/briefing/remote-learning-covid.html (last visited Jan. 31. 2022).

in their *education* (as opposed to the schools).  The Supreme Court has agreed with this contention.  *See Goss v. Lopez*, 419 U.S. 565 (1975) (holding that public elementary and secondary school students possess both property and liberty interests in continued enrollment, and that those interests are protected under the Due Process Clause).

In *Goss*, several students argued that their suspensions from public school, without a hearing, deprived them of their Fourteenth Amendment rights to due process of law.  *Id.* at 567, 568-69.  The Court agreed, rejecting the district's claim—made by several administrators—that "because there is no constitutional right to an education at public expense, the Due Process Clause does not protect against expulsions from the public school system."  *Id.* at 572.

The Court went on to explain that the position "misconceive[d] the nature of the issue" as "[p]rotected interests in property are normally 'not created by the Constitution. Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits."  *Id.* (citing B*oard of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  *See also Wolff v. McDonnell*, 418 U.S. 539 (1974) (procedural protections of the Due Process Clause were triggered by official cancellation of a prisoner's good-time credits accumulated under state law, even though those benefits were not mandated by the Constitution); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (applying limitations of the Due Process Clause to governmental decisions to revoke parole, even though a parolee has no constitutional right to that status); *Connell v. Higginbotham*, 403 U.S. 207 (1971) (state employee who under state law or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge may demand the procedural protections of due process).  Because Ohio had "establish[ed] and maintain[ed] a school system," although not constitutionally

obliged to do so, the defendants could not deprive students of a public education without affording them the procedural protections required under the Due Process Clause. *Goss*, 419 U.S. at 574.

The Court also noted that the Due Process Clause "forbids arbitrary deprivations of liberty." That school authorities suspended the students for up to 10 days without a hearing, based on charges of misconduct, infringed upon those liberty interests. *Id.* at 575. As the Court found in *Goss*, a "10-day suspension from school is not *de minimis* on our view and may not be imposed in complete disregard of the Due Process Clause." *Goss*, 419 at 576. In fact, the Court explicitly observed that "suspension … for 10 days is a serious event in the life of the suspended child. Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary." *Id.* at 576.

Under *Goss* as well as various other cases, the McArthur children have property interests in their education (or, in state constitutional terms, a right to that education) (*see* FAC ¶¶ 155-70, *supra* at 17-19) and liberty interests in remaining free from the stigmatization of differential treatment due to their unvaccinated status.

Defendants have deprived the McArthur children of those rights and interests, arbitrarily and *without a hearing*. *See Goldberg v. Kelly*, 397 U.S. 254 (1974) (welfare recipients could not be deprived of benefits without a hearing). The *Goss* Court considered a suspension of 10 days a "serious event" in the child's life. *See Goss*, 419 U.S. at 576. Here, the two younger children have already missed substantially more than 10 days. And they face subsequent forced absences due to Defendants' policies, which Defendants have been revising on a regular basis and which are quite capable of repetition. Indeed, Defendants have never disavowed any of the various policies to

which the McArthurs have objected. Accordingly, their liberty and property interests are unquestionably implicated.

**B. Policies of General Application Can Violate Individual Rights, There Is No Crisis in Virginia that Justifies Violating Plaintiffs' Rights, and the McArthur Children Do Not Pose a Danger Warranting Removal from School**

Defendants cite a series of cases to support their claim that "vaccination provisions of general applicability do not violate [procedural] due process." (Def. MTD at 19-20).

This concept initially applied in the context of *legislative* action, as explicated in *United States v. Locke*, 471 U.S. 84, 108 (1985).

> [A] *legislature* generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements (emphasis added).

> *Id.*

In contrast to *Locke*, FCPS's quarantine policy was not a product of the legislative process, which by necessity entails input from the public and incorporates perspectives of many lawmakers. Indeed, it did not even go through the notice and comment process to which agency rulemaking is subject. That is one of the reasons that *Locke* found procedural protections adequate if enacted through the legislature. Furthermore, this is *not* a "vaccination[] provision[] of general applicability." It is a policy that irrationally, unscientifically, and arbitrarily treats one group of children as dangerous, and another as safe. The other court decisions that Defendants cite (all from jurisdictions outside the Fourth Circuit) are consistent with *Locke*; most of them explicitly tied their holdings to rules established via legislation.

Defendants' contentions that this "time of crisis" warrants summary administrative action is similarly unavailing (*see* Def. MTD at 20). There is no genuine crisis in Virginia at this time

for schoolchildren (to be contrasted with nursing homes and other facilities that house vulnerable populations to which Governor Youngkin has directed his efforts). *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 70 (2020) (Gorsuch, J., concurring) ("[e]ven if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical.").

Defendants claim that the quarantine policy is akin to a "disciplinary proceeding" because the children "pose[] a continuing danger" under *Goss*, 419 U.S. at 581-82 and that the McArthurs' telephone discussions with FCHD at the commencement of M.M.'s first quarantine constituted a hearing (*see* Def. MTD at 21-22). As set out at length in the FAC's factual allegations, the McArthur children do not pose a danger—certainly no greater than vaccinated children. Second, it is ludicrous to categorize the McArthurs' telephonic conversations with FCHD bureaucrats as equivalent to a hearing for due process purposes. A hearing involves an impartial trier of the fact, not a casual conversation with a health department employee who lacks decision making authority. That the McArthurs received conflicting information with respect to whether an infection within 90 days served as ground for an exemption from quarantining establishes that this was not an adequate process.

### C. The Quarantine Policy Amounts to a *de facto* Vaccine Mandate, to Which Intermediate or Rational Basis with a Bite Level Scrutiny Applies

Defendants' statements that "vaccination provisions of general applicability do not violate [procedural] due process" serve as an implicit concession that the quarantine policy amounts to a *de facto* vaccine requirement (*see* Def. MTD at 19-20). This is a position with which Plaintiffs agree. The vast majority of parents do not want their children to be subjected to differential treatment, particularly with respect to missed school days (*see* FAC ¶ 75).

Standard rational basis is not the appropriate level of analysis when assessing an alleged violation of a substantive due process right. *See Youngberg v. Romeo*, 457 U.S. 307 (1982) ("[i]n

determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'").

*Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905), has wrongly been interpreted (including by Defendants) to stand for the proposition that rational basis should be applied to all vaccine mandates (*see* Def. MTD at 23-24).[8]  The *Jacobson* Court held that it would not strike down a state legislature's law intended to protect public health, safety, or morals, unless it bore "no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law[.]" *Jacobson*, 197 U.S. at 31.  The *Jacobson* Court's test—whether there is a "substantial relation" between the government's interest and the law in question (which if lacking, would require a court to invalidate the law, *Jacobson* said)–is a far more exacting standard than "rational speculation unsupported by evidence or empirical data" (the standard rational basis test according to *Beach Communications*, the canonical modern rational basis case). *See Beach Communications*, 508 U.S. at 315.

This substantial-relation concept was expanded upon in a subsequent line of cases, among them *Washington v. Harper*, 494 U.S. 210 (1990). There, the Supreme Court recognized that prison inmates possess a liberty interest in avoiding the unwanted administration of psychotropic drugs.  While ultimately the Court ruled in the state's favor, it also acknowledged that "the forcible injection of medication into a nonconsenting person's body represents a substantial interference

---

[8] Defendants also cite *Jacobson*'s discussion of quarantines for people on boats with others suffering from yellow fever or cholera to provide support for FCPS's policy.  First, that decision did not arise in the context of individuals with naturally acquired immunity to the diseases in question who are very unlikely to become infected and spread the disease, and certainly no more so than vaccinated individuals.  Second, cholera and yellow fever—especially in the early 1900's—had fatality rates many times higher than COVID-19.  Third, the *Jacobson* Court specifically said quarantine might be appropriate in "some circumstances," not that all quarantine orders are *ipso facto* lawful.  *See Jacobson*, 197 U.S. at 25, 29.

with that person's liberty." *Id.* at 229. The Court applied some higher level of scrutiny than rational basis because of the rights at stake; it stated that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others *and the treatment is in the inmate's medical interest.*" *Id.* at 242 (emphasis added). The Court balanced the prisoner's medical and liberty interests against the State's interest in prison safety and security. That standard is not the functional equivalent of rational basis review, which subordinates individual rights, asking only whether the government has an interest and can articulate some nexus between the interest and the challenged law.

The Court employed a similar approach in *Riggins v. Nevada*, 504 U.S. 127, 135 (1992), explaining that the Fourteenth Amendment, under *Harper*, prohibited forcing antipsychotic drugs on a convicted prisoner "absent a finding of overriding justification and a determination of medical appropriateness" and evidence that there were no "less intrusive alternatives." Denying that it was actually utilizing strict scrutiny, the Court castigated the district court for neglecting to take into account possible alternatives to forced medication or "indicat[ing] a finding that safety considerations or other compelling concerns outweighed Riggins' interest in freedom from unwanted antipsychotic drugs." *Id.* at 136.

*Sell v. United States*, 539 U.S. 166, 179 (2003) summarized the holdings of *Riggins* and *Harper*: the Government may forcibly administer psychotropic drugs to a mentally ill inmate, "but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." Additionally, "a court must find that *important* government interests are at stake." *Id.* at 180. That standard is not "rational basis" review, which does not require that the court deem the interest important. *See also*

*Cruzan v. Missouri Department of Health*, 497 U.S. 261, 278 (1990) (holding that State appropriately balanced the individual's liberty interests against the state interest in not erroneously ceasing life support and describing *Jacobson* as having "balanced an individual's interest in declining an unwanted smallpox vaccine against the State's interest in preventing disease.").

*Harper, Riggins, Sell, Cruzan*—and even *Jacobson,* as interpreted by the *Cruzan* Court— implemented a balancing test, which afforded more weight to individuals' rights and interests than does standard rational basis analysis. All of these cases support the contention that there is a substantive due process liberty interest in refusing unwanted medication. This jurisprudence requires courts to assess the medical propriety of treatment: the government cannot require people to take any medication, regardless of medical necessity and various other circumstances, simply because it can articulate an interest—here, mitigating spread and severity of COVID-19. True, these cases do not compel application of strict scrutiny, but they employ a multi-pronged test that requires the court to balance the individual's liberty and medical interests against the necessity of the government action and importance of its goal. All medical treatments carry the risk of adverse effects, which may not manifest in the short-term, and the COVID vaccines are no exception. While at a population level they appear relatively safe, the vaccines are not sugar water. Anyone who takes them can have a bad reaction, and emerging evidence shows that the myocarditis risk, especially for young men like M.J.M. and M.D.M., is substantially higher than initially believed and may exceed any commensurate risk from COVID-19 itself (*especially* when the individuals in question are COVID-recovered).[9] Thus, there is a liberty interest in avoiding injection itself, being

---

[9] *See* Declaration of Anish Koka, Attachment D of FAC; Jennifer Block, "Vaccinating people who have had covid-19: why doesn't natural immunity count in the US?" BRITISH MEDICAL JOURNAL (Sept. 13, 2021), *available at* https://www.bmj.com/content/374/bmj.n2101 (last viewed Dec. 13, 2021) (Vaccination of the naturally immune may increase their chances of reinfection. Some experts believe that subsequent vaccination for those who have been previously infected may cause

able to refuse a vaccine that confers no benefit and may cause harm, and having the cost-benefit assessment reside with the individual receiving the vaccine as opposed to unelected policymakers.

To the extent that some courts have held otherwise, as discussed in Part III, none of those decisions binds this Court, many of those courts were not presented with this specific argument, and as of yet, no Courts of Appeals have addressed the issue. *See supra* at 12-13.

Additionally, for these reasons, and contrary to Defendants' contentions (*see* MTD at 25-27), the quarantine policy constitutes an unconstitutional condition, as it premises their rights to receive an uninterrupted, in person education upon receiving a medically unnecessary vaccine (*see* FAC ¶¶ 188-193). Assuming *arguendo* that, as Defendant's posit, there is "no fundamental right to decline a vaccine" (Def. MTD at 26), that is irrelevant for purposes of this inquiry. Unconstitutional conditions doctrine does not require infringement of a fundamental (enumerated) right. *See District of Columbia v. Heller*, 554 U.S. 570, 634 (2008) (explaining that fundamental rights are those explicitly granted in the Bill of Rights). In *Memorial Hosp. v. Maricopa Cty*, 415 U.S. 250 (1974), for example, the right articulated was that to interstate travel, alleged under the Fourteenth Amendment—unquestionably not a specifically enumerated right. *See also Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 454 (1983) ("the government may not deny a benefit to a person because he exercises *a constitutional right*.") (emphasis added); *R.S.W.W. v. City of Keego Harbor*, 397 F.3d 427, 434 (2005)(("[unconstitutional conditions] doctrine should equally apply to prohibit the government from conditioning benefits on a citizen's agreement to surrender due process rights.").

---

"'exhaustion,' and in some cases even a deletion, of T-cells," leading to a depleted immune response.);

**VI. THE QUARANTINE POLICY INFRINGES PLAINTIFFS' DUE PROCESS RIGHT TO MAKE DECISIONS CONCERNING THE HEALTH AND WELFARE OF THEIR CHILDREN**

Contrary to Defendants' contentions, the quarantine policy interferes with Mr. and Mrs. McArthur's fundamental rights to parent their children under the Virginia Code and the Fourteenth Amendment's Due Process Clause. *See* U.S. Const., Amend. XIV; Va. Code Ann. § 1-240.1 (2013). *See also Pierce v. Society of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-35 (1925) (holding that a state statute "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control.").

Defendants' claim that the policy does not interfere with Plaintiffs' decision not to vaccinate their children is disingenuous (*see* MTD at 27). No parent wants his or her child kept from school. The quarantine policy, which favors vaccination for no logical reason, pressures the McArthurs to vaccinate their children *even though* they believe it is not in the children's best interests.

Their position is, in many parts of the world, the default one. Norway, Sweden, and Finland recommend against vaccinating healthy children ages 5-11, as they have concluded that the risks exceed the benefits for that age group. Norway advises against vaccinating COVID-recovered children ages 12-15. As discussed, data released very recently from Pfizer demonstrated that the vaccine is *not effective at all* in preventing infection in the 5-11 age group. *See supra* at 5.

A policy that privileges vaccination over natural immunity is completely irrational. It certainly cannot survive any form of scrutiny, let alone the higher one to which this inquiry is subject since Mr. and Mrs. McArthur's fundamental rights are jeopardized by the quarantine policy. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest at issue in this case— the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court" and finding that warrants "heightened

protection against government interference[.]"); *Stanley v. Illinois*, 405 U.S. 645, 658 (1972) (applying balancing test to alleged due process violation of right to parent children, rather than rational basis analysis); *D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016) ("few rights are more fundamental in and to our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate[.]") (quoting *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 342 (4th Cir. 1994)).

The cases that Defendants cite to support their contention that COVID-19 policies trump parental rights fail as they are: (1) about masks, which, while undoubtedly harmful to children's development, do not involve injection of chemicals into their bodies, which is irreversible; and (2) non-binding on this court. Furthermore, the issue of whether forcibly masking school children constitutes constitutional violations is currently being considered in the Sixth Circuit. *See Resurrection School v. Hertel*, 11 F.4th 437 (6th Cir. 2021), *vacated* 16 F.4th 1215 (6th Cir. 2021) (ordering hearing *en banc*; oral argument scheduled for March 9, 2022).

These vaccines are not like others that children are required to receive in order to attend school. They have been in existence for under two years. There is no history of mandating vaccines for schoolchildren that have not been tested for years, and usually decades, or for naturally immune children. In fact, state law is to the contrary. *See* 12 Va. Admin. Code § 5-110-80 (2021) (exempting from, *inter alia*, measles, mumps, rubella, and varicella vaccination requirements those who have serological evidence of immunity). Nor is there a history of requiring or pressuring them to take vaccines that are non-sterilizing (do not prevent transmission). In sum, the policy is intentionally coercive and thereby unlawful.

**VII.  PLAINTIFFS ARE ENTITLED TO BRING CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER 21 U.S.C. § 360BBB-3 FOR VIOLATIONS OF THEIR STATUTORY RIGHTS TO INFORMED CONSENT**

Defendants cite three cases to support the proposition that the Emergency Use Authorization (EUA) statute does not provide a private right of action, but only empowers the Secretary of the Department of Health and Human Services to enforce informed consent.  Def. MTD at 28-30.  Initially, Defendants' cited cases (*Klaassen v. Trustees of Indiana Univ.*, No. 1:21-cv- 238, 2021 WL 3073926), *aff'd* 7 F.4th 592 (Aug. 2, 2021), *vacated as moot on other grounds* 2022 WL 213329 (7th Cir. Jan. 25, 2022)), *Lloyd v. Sch. Bd. of Palm Beach Cty*., 2021 WL 5353879, at *5 (S.D. Fla. Oct. 29, 2021), and *Johnson v. Brown*, 2021 WL 4846060, at *18 (D. Or. Oct. 18, 2021)) do not carry precedential weight in this jurisdiction.  In any event, Defendants' arguments and *Klassen*, *Lloyd*, and *Johnson* are based on a fundamental misapprehension of the legal principles at stake.

Plaintiffs acknowledge that 21 U.S.C. § 360bbb-3 does not include language that *expressly* provides for a private cause of action.  Nothing in the part of the statute to which Defendants point, however, suggests that Congress intended to preclude individuals from enforcing their statutory rights not to take an EUA treatment.  *See* 21 U.S.C. § 360bbb-3(e)(1)(A)(ii).  True, "private right of action" may not be the correct terminology for this situation.  Nevertheless, Plaintiffs may seek injunctive relief to cease the violation of their rights to informed consent under 21 U.S.C. § 360bbb-3.  The right to informed consent necessarily resides with the person receiving the treatment.  The EUA statute does not give that right to anyone except those who already have it, in this case, Plaintiffs.

The Supreme Court has unequivocally established that the Supremacy Clause permits individuals to seek injunctive relief in federal court against state officers in order to prevent

enforcement of state laws that are preempted by federal statutes. *See Armstrong v. Exceptional Child Center*, 575 U.S. 320, 326 (2015) (citing *Ex parte Young*, 209 U.S. 123, 155-56 (1908) ("if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted.")). *See also Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) (granting plaintiffs injunctive relief, even though federal statute that allegedly preempted state law did not create a provide right of action and so was probably not enforceable under § 1983).

In any event, as the questions have not been determined by a higher court—both whether the statute allows individuals to sue for injunctive and declaratory relief under it and whether public schools may mandate EUA vaccines—at the very least they are unsettled. Accordingly, dismissal of this count at this stage would be inappropriate.

Relatedly, and contrary to Defendants' position, *see* Def. MTD at 29, *Klaassen*'s determination that "the informed consent requirement under the EUA statute only applies to medical providers," *see* 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)), cannot be an accurate reading of the statute. Informed consent is an utterly hollow concept if school districts can premise access to an invaluable in-person, uninterrupted education, upon taking the product in question, and there is no evidence whatsoever that Congress intended public schools to be able to circumvent the informed consent requirement. *See BST Holdings*, No. 21-60845 * 18 (mandate "substantially burden[s] the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)".).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss and permit Plaintiffs to prosecute their claims.

Dated: March 8, 2022

Respectfully submitted,

<u>*/s/ Jenin Younes*</u>
JENIN YOUNES
Litigation Counsel
*Admitted pro hac vice*
RICH SAMP, VSB No. 33856
Senior Litigation Counsel
JOHN VECCHIONE, VSB No. 73828
Senior Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210

*Counsel to Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2022, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: March 8, 2022

*s/ Jenin Younes*
JENIN YOUNES