IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ERIC MCARTHUR, et al.,          )
                                   )
       Plaintiffs,          )
                                   )
       v.                 )       1:21-cv-1435 (LMB/IDD)
                                   )
SCOTT BRABRAND, et al.,       )
                                   )
       Defendants,       )

## MEMORANDUM OPINION

In this civil action, plaintiffs Eric and Jenny McArthur and their four minor children ("plaintiffs") challenge a now-defunct Fairfax County Public Schools ("FCPS") COVID-19 quarantine policy, which plaintiffs allege treated vaccinated students more favorably than unvaccinated students whom plaintiffs claim were naturally immune because of a recent COVID-19 infection. Plaintiffs sued two FCPS officials—Scott Brabrand, the Superintendent of FCPS, and Stella Pekarsky, the Chair of the Fairfax County School Board (together, "defendants")—and a public health official—Dr. Gloria Addo Ayensu, the Director of the Department of Health for Fairfax County ("Dr. Ayensu"). Defendants and Dr. Ayensu filed separate motions to dismiss plaintiffs' Amended Complaint. After hearing argument on those motions, the Court granted Dr. Ayensu's motion from the bench and took defendants' motion under advisement. For the reasons stated in this Memorandum Opinion, defendants' Motion to Dismiss Amended Complaint ("Motion") [Dkt. No. 32] will be granted.

I. BACKGROUND

**A.  Factual Background**

Eric and Jenny McArthur have four minor children, all of whom attend FCPS.  They are M.J.M. (11th grade), M.D.M. (9th grade), M.H.M. (5th grade), and M.M. (2nd grade).  [Dkt. No. 20] at ¶¶ 23-25.  As of the briefing of the pending Motion, none of the McArthur children had been vaccinated against COVID-19.  Id. at ¶ 6.

On Friday, October 29, 2021, 5th grader M.H.M. and Mr. McArthur tested positive for COVID-19.  Id. at ¶ 31.  After Ms. McArthur notified M.H.M.'s elementary school, which M.M. also attended, the assistant principal notified the family that M.M. would have to quarantine for 14 days, beginning on Monday, November 1, because she was in close contact with M.H.M. [Dkt. No. 24-1] at Att. A ¶ 7; Id. at Ex. 4.  The email informed the McArthurs that during M.M.'s quarantine, she could access asynchronous assignments from her teachers each day and a livestream or video recording of classroom instruction by "[n]o later than the third day" of her quarantine; however, she could not participate in those classroom discussions, because her audio and video would be off.  Id. at Ex. 4.

On Sunday, October 31, 2021, M.M. and Ms. McArthur began experiencing symptoms associated with COVID-19.  [Dkt. No. 20] at ¶¶ 32, 34; [Dkt. No. 24-1] at Att. A ¶ 9.  M.M.'s symptoms included nausea, sore throat, fatigue, and a low-grade fever.  [Dkt. No. 20] at ¶ 32. Although Ms. McArthur took an at-home test that confirmed she was COVID-positive, M.M. was not tested.[1]  Id. at ¶ 34.  As a result of their quarantine, M.H.M. missed about four days of

---

[1] On December 3, 2021, an antibody test confirmed that M.M. had COVID-19 antibodies.  [Dkt. No. 20] at ¶ 39.  The McArthurs attribute these antibodies to M.M.'s October/November illness, because at no previous point had she experienced symptoms associated with COVID-19.  Id. at ¶ 33.

in-person learning and returned to class on Monday, November 8, 2021.[2]  Id. at ¶ 31.  M.M.

missed about eight days of in-person learning and returned to class on Monday, November 15.

[Dkt. No. 24-1] at Att. A ¶¶ 6-8.

On the evening of Thursday, December 2, 2021, the McArthurs were notified that M.M.

had been identified as "a potential close contact" of another individual who had tested positive

for COVID-19 and would therefore have to quarantine again.  [Dkt. No. 20] at ¶ 40.  Under

FCPS's quarantine policy at the time, a fully vaccinated student who was identified as a

"potential close contact" of a COVID-positive individual could return to school as soon as the

Fairfax County Health Department ("FCHD") verified that the student was vaccinated and

asymptomatic.  Id. at ¶¶ 42-43.  In contrast, an unvaccinated student who was identified as a

"potential close contact" had to quarantine for 10 days, regardless of whether the student tested

negative, was asymptomatic, or had recently recovered from a COVID-19 infection.[3]  Id. at ¶ 45;

[Dkt. No. 24-1] at Att. A ¶¶ 15-20.  Accordingly, the notice informed the McArthurs that M.M.

could return to school on Monday, December 13, 2021.  [Dkt. No. 24-1] at Ex. 7.  This news

upset M.M., who cried when she learned she would miss more school.  [Dkt. No. 20] at ¶ 56.

During the quarantine, M.M. had temper tantrums and difficulty focusing on remote learning.

Id. at ¶ 57.

---

[2] Monday, November 1, 2021, and Tuesday, November 2, 2021, were not school days; they were
teacher workdays.  See 2021-22 Standard School Year Calendar, Fairfax County Public Schools,
https://www.fcps.edu/calendars/standard-school-year-calendar (last visited June 15, 2022); see
also [Dkt. No. 36-1] at ¶ 7.  Because this fact is a matter of public record and not subject to
reasonable dispute, the Court can take judicial notice of it without converting the pending
Motion into a motion for summary judgment.  See Hall v. Virginia, 385 F.3d 421, 424 n.3 (4th
Cir. 2004); Long v. Barr, 451 F. Supp. 3d 507, 516 n.5 (E.D. Va. 2020).

[3] This policy deviated from FCHD's recommendation that unvaccinated students quarantine for
14 days.  [Dkt. No. 24-1] at Ex. 7.

On Monday, December 6, 2021, FCPS updated its quarantine policy "[g]iven the importance of in-person instruction, recognized quarantine alternatives by the Centers for Disease Control and Prevention (CDC) and Virginia Department of Health (VDH), and a decrease in community transmission." [Dkt. No. 24-1] at Ex. 9. The updated policy allowed an unvaccinated student who was identified as a "potential close contact" to return to school after seven days of quarantine if the child remained asymptomatic and provided a negative COVID-19 test taken on or after the fifth day of quarantine. Id. FCPS notified the McArthurs that "this new return option is immediately available" to M.M, id.; however, the McArthurs did not take advantage of it, because they believed that M.M. might have tested positive given the recentness of her previous illness. [Dkt. No. 20] at ¶¶ 52-54. Consequently, M.M. returned to school on Monday, December 13, 2021, after having missed six days of in-person learning. Id. at ¶ 55.

That same month, although on an unspecified date, the two older children, M.J.M. and M.D.M., contracted COVID-19; however, there is no allegation in the Amended Complaint that either M.J.M. or M.D.M. were required to quarantine or missed any in-person instruction. Moreover, there is no allegation that the two younger children, M.M. and M.H.M., had to quarantine because of this exposure. [Dkt. No. 20] at ¶¶ 6, 68.

On January 31, 2022, the McArthurs were notified that M.M. and M.H.M. had been identified as "potential close contacts" of an infected person and had to quarantine for five days under further updated quarantine guidance. Id. at ¶ 60. At the time, the revised FCPS quarantine policy provided an exemption for unvaccinated students who had been infected with COVID-19 within the last 90 days; however, neither M.M. nor M.H.M. were eligible for that exception, because it had been more than 90 days since M.H.M. had COVID-19 and since M.M. had an illness that the family suspected was COVID-19. [Dkt. No. 20] at ¶ 61. Nonetheless, M.M. was

4

allowed to return to school on February 1, 2022, because five days had apparently passed since the "potential close contact." Id. at ¶ 63.  M.H.M., who had been exposed to a different COVID-positive individual, returned to school on February 3, 2022.  Id.

As of March 1, 2022, FCPS stopped identifying "close contacts in association with school-related exposures." [Dkt. No. 36-2] at ¶ 15.[4]  Under the new policy, FCPS notifies parents of positive cases at school, but non-infected students may continue attending school as long as they remain symptom-free, regardless of vaccination status. Id.  Accordingly, "factors such as whether an affected student is vaccinated or unvaccinated, or whether the student has previously contracted COVID-19 more or less than 90 days ago, will not play a role in the determination of whether a student may attend school in-person." Id.  As of March 14, 2022, FCPS expected to implement a "test to stay" program, where in the event of a COVID-19 outbreak at a school, asymptomatic unvaccinated students may remain in school as long as they wear a mask and test negative using a "home-self test" for five days after the exposure. Id. at ¶ 17.

**B. Procedural History**

On December 23, 2021, after M.M.'s second quarantine, Eric and Jenny McArthur filed a Complaint on behalf of themselves and M.M. against defendants and Dr. Ayensu.[5]  [Dkt. No. 1]. The Complaint alleged that M.M. was naturally immune from COVID-19 because of a recent infection and that, because of her natural immunity, there was no legitimate basis to treat her differently from a vaccinated student. Id. at 1.  In five counts, the Complaint alleged violations of the Equal Protection Clause of the United States Constitution (Count I); the right to receive an

---

[4] Although this evidence is extrinsic to the Complaint, defendants have offered it only to support their Rule 12(b)(1) motion.  [Dkt. No. 40] at 3 n.2.

[5] This civil action was reassigned to the undersigned judge on February 1, 2022.

education under the Virginia Constitution (Count II); substantive and procedural due process rights under the United States and Virginia Constitutions (Count III); the right of parents to make decisions concerning the care of their children under the United States Constitution and Virginia Code § 1-240.1 (Count IV); and the Emergency Use Authorization statute, 21 U.S.C. § 360bbb-3 (Count V).  The Complaint requested declaratory and injunctive relief, as well as nominal damages. Id. at 28-29.

In January 2022, defendants and Dr. Ayensu filed motions to dismiss the Complaint. [Dkt. No. 12, 15].  On February 1, 2022, the day after the McArthurs were notified that M.M. would have to quarantine for the third time, plaintiffs moved for a temporary restraining order to prevent the school from excluding M.M. yet again [Dkt. No. 18]; however, plaintiffs withdrew the motion that same day after they learned that, because five days had passed since the exposure, M.M. could attend school the next day [Dkt. No. 19].

On February 7, 2022, plaintiffs filed the pending Amended Complaint (the "Complaint") that added the other three children, M.J.M., M.H.M., and M.D.M., as plaintiffs and moved for a preliminary injunction.  [Dkt. No. 20, 25].  Defendants and Dr. Ayensu filed renewed motions to dismiss.  [Dkt. No. 28, 32].  On March 7, 2022, after FCPS revoked its policy requiring unvaccinated students to quarantine if exposed to a COVID-positive individual, plaintiffs withdrew their motion for a preliminary injunction, recognizing that it was "no longer necessary." [Dkt. No. 38].

## II. ANALYSIS

Defendants have moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  A motion to dismiss under Rule 12(b)(1) tests whether a court has subject matter jurisdiction over the claims, whereas a motion to dismiss under Rule 12(b)(6) tests whether a

complaint states a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(1),

12(b)(6).  This Memorandum Opinion will address each motion in turn.

### A. The 12(b)(1) Motion

In bringing a 12(b)(1) motion, a defendant can argue either "that a complaint simply fails

to allege facts upon which subject matter jurisdiction can be based" or "that the jurisdictional

allegations of the complaint [are] not true." Kerns v. United States, 585 F.3d 187, 192 (4th Cir.

2009) (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)).  The former is known as a

facial challenge, and the latter is known as a factual challenge.  See Kuntze v. Josh Enters., Inc.,

365 F. Supp. 3d 630, 636 (E.D. Va. 2019).  Although the parties have not addressed this

distinction, defendants appear to avail themselves of both challenges, arguing that several

plaintiffs lack standing based on the allegations in the Complaint—a facial challenge—and that

the March 2022 change to the quarantine policy has made plaintiffs' claims moot—a factual

challenge.  If defendants succeed on either challenge, the Court would be deprived of subject

matter jurisdiction over at least some of the claims.  See In re Rivada Networks, 230 F. Supp. 3d

467, 471 (E.D. Va. 2017) ("A federal court lacks subject matter jurisdiction to adjudicate a case

when the matter is moot or the claimant lacks Article III standing." (footnote omitted)).

When addressing a facial challenge to its jurisdiction, a court must "apply a standard

patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged." Kerns, 585 F.3d at

193.  In contrast, when addressing a factual challenge, a court "may regard the pleadings as mere

evidence on the issue and . . . consider evidence outside the pleadings."[6] Kuntze, 365 F. Supp.

---

[6] Plaintiffs do not contend that the facts relevant to the factual challenge are intertwined with the merits, which would generally require "either denying the 12(b)(1) motion and proceeding with the case, or converting the 12(b)(1) motion into a motion for summary judgment on the merits." Kuntze, 365 F. Supp. 3d at 638.  In fact, the relevant facts—i.e., the March 2022 change in defendants' quarantine policy—are undisputed.

3d at 636 (footnote omitted) (quoting <u>Velasco v. Gov't of Indonesia</u>, 370 F.3d 392, 398 (4th Cir. 2004)).  Regardless of the particular challenge, a plaintiff bears the burden of proving that the court has jurisdiction, and a court must dismiss the action if a plaintiff fails to carry that burden. <u>Adams</u>, 697 F.2d at 1219.

The standing issue is relatively straightforward.  Defendants correctly argue that M.J.M. and M.D.M. lack standing to challenge the quarantine policy, because the Complaint fails to allege that either student was quarantined under the policy.  Put simply, neither M.J.M. nor M.D.M. are alleged to have suffered a concrete injury traceable to defendants.  <u>See</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (standing requires an "injury in fact" that is "fairly traceable" to the defendant and that is "likely" to be "redressed by a favorable decision").  Plaintiffs concede this point by failing to address it in their opposition to defendants' Motion. <u>See</u> <u>Harris v. Esper</u>, No. 1:18-cv-901, 2019 WL 8888214, at *2 (E.D. Va. Aug. 15, 2019). Accordingly, M.J.M. and M.D.M. must be dismissed as plaintiffs.

The mootness issue requires more discussion.  The doctrine of mootness ensures that "an actual controversy [is] extant at all stages of review, not merely at the time the complaint is filed." <u>Carter v. Fleming</u>, 879 F.3d 132, 137 (4th Cir. 2018) (quoting <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 67 (1997)).  An actual controversy ceases to exist "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." <u>Id.</u> (quoting <u>Chafin v. Chafin</u>, 568 U.S. 165, 172 (2013)).  This can happen when the facts or law underlying the case change, including "when the claimant receives the relief he or she sought to obtain through the claim." <u>Simmons v. United Mortg. & Loan Inv., LLC</u>, 634 F.3d 754, 763 (4th Cir. 2011) (quoting <u>Friedman's, Inc. v. Dunlap</u>, 290 F.3d 191, 197 (4th Cir. 2002)). Because the requirement of a live controversy applies "independently to each form of relief

8

sought," it is appropriate to address each form of relief separately.  See Carter, 879 F.3d at 137

(quoting McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders of Jud. Conf.

of U.S., 264 F.3d 52, 55 (D.C. Cir. 2001)); see also Friends of the Earth, Inc. v. Laidlaw Env't

Servs. (TOC), Inc., 528 U.S. 167, 185 (2000).

     There is no longer any need for an injunction because defendants' current and anticipated

future policies give plaintiffs the prospective relief they wanted: M.M. and M.H.M. will no

longer be prevented from attending school in-person, assuming they are not actually ill.

According to Lea Skurpski, the Director of Operations and Strategic Planning for FCPS, FCPS

now permits all students, whether vaccinated or not, to continue attending school in-person after

being exposed to a COVID-19 positive individual as long as the student remains symptom-free.

[Dkt. No. 36-2] at ¶ 15.  Even in the event of an outbreak, an unvaccinated student who is

exposed may still attend school in person as long as the student tests negative for five days and

wears a mask during those five days.  Id. at ¶ 17.  Plaintiffs have admitted that these policy

changes made their motion for a preliminary injunction "no longer necessary," and the Court

finds that plaintiffs' admission applies with equal force to their argument for a permanent

injunction.

     Although plaintiffs argue that their request for injunctive relief is "live" for several

reasons, they do not contest that the new quarantine policy has allowed M.M. and M.H.M. to

attend school without interruption.  What plaintiffs do argue is that the new policy still treats

M.M. and M.H.M. differently than vaccinated students by requiring unvaccinated students to test

negative and wear a mask for five days in the event of an exposure.  Although defendants do not

respond to that argument, the Court finds that it does not warrant discussion because wearing a mask for five days is a de minimis burden.[7]

Plaintiffs also argue that injunctive relief is not moot because FCPS's quarantine policy is "capable of repetition, yet evading review," which is a "narrow" exception to the mootness doctrine reserved for "'exceptional' circumstances."[8] Int'l Brotherhood of Teamsters, Loc. Union No. 639 v. Airgas, Inc., 885 F.3d 230, 237 (4th Cir. 2018) (quoting Williams v. Ozmint, 716 F.3d 801, 810 (4th Cir. 2013)). This exception requires a plaintiff to demonstrate that "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 462 (2007) (quoting Spencer v. Kemna, 523 U.S. 1, 17 (1998)); Incumaa v. Ozmint, 507 F.3d 281, 289 (4th Cir. 2007). To satisfy the second element, "a mere physical or theoretical possibility" that a plaintiff will be subject to a similar quarantine policy is not enough. Murphy v. Hunt, 455 U.S. 478, 482-83 (1982) (per curiam). Instead, the Supreme Court has stated "that there must be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party." Id. (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)).

---

[7] Even this district court has, at times, required unvaccinated individuals to wear a mask when in the courthouse, while permitting vaccinated individuals to be in the courthouse without masks. See General Order No. 2021-12 at 3-4, No. 2:20-mc-7 (E.D. Va. Aug. 13, 2021), ECF No. 37 ("Employees and contractors of the U.S. District Court . . . must either be vaccinated against the COVID-19 virus, or alternatively: (1) be tested for COVID-19 twice a week . . . ; and (2) wear a mask while indoors in our Courthouses and Court facilities . . . ." (footnotes omitted)).

[8] Plaintiffs do not raise any other mootness exception, such as the closely related "voluntary cessation" exception.

Although the quarantine policy did not last long enough to be fully litigated, and instead was repeatedly changed in a matter of weeks, there is no "reasonable expectation" that plaintiffs will be subject to a similar quarantine policy in the future. In the event of a future COVID-19 surge, defendants have already announced their intention to implement a "test to stay" policy, which would allow unvaccinated children like plaintiffs to stay in school. Accordingly, plaintiffs have shown nothing more than "a mere physical or theoretical possibility" that FCPS will renege on its stated intention and revert to a quarantine policy that excludes M.M. and M.H.M. Faced with similar arguments, multiple courts have denied injunctive relief as moot, citing among other factors the development of vaccines and treatments. See Northland Baptist Church of St. Paul v. Walz, --- F.4th ---, No. 21-2283, 2022 WL 2167935, at *4 (8th Cir. 2022) ("Courts across the country have similarly found that, due to developments in the COVID-19 public health crisis, such as the availability of vaccines, orders like Governor Walz's [executive orders] are not capable of repetition yet evading review.").

Although any claim for prospective relief is moot, plaintiffs' claims for retrospective relief, such as nominal damages, are not. The Fourth Circuit has recognized that "plausible claims for damages defeat mootness challenges," and that "[u]nder this Circuit's precedent, 'even if a plaintiff's injunctive relief claim has been mooted, the action is not moot if the plaintiff may be entitled to at least nominal damages.'" Grimm v. Gloucester Cnty. School Bd., 972 F.3d 586, 604 (4th Cir. 2020) (quoting Rendelman v. Rouse, 569 F.3d 182, 187 (4th Cir. 2009)); see also Uzuegbunam v. Preczewski, 141 S. Ct. 792, 802 (2021) ("[W]e conclude that a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is

based on a completed violation of a legal right."). Because plaintiffs specifically requested nominal damages in the Complaint, their Complaint is not entirely moot.[9]

Finally, plaintiffs seek declaratory relief, and such relief can be awarded retrospectively. For example, in Grimm, a student challenged a school's restroom policy for transgender students but then graduated during the course of litigation and withdrew his claim for injunctive relief and compensatory damages. 972 F.3d at 604. Nonetheless, the Fourth Circuit rejected the argument that the plaintiff's challenge was entirely moot and permitted the plaintiff to pursue claims for nominal damages and declaratory relief, just as the McArthurs are seeking here. Moreover, allowing plaintiffs to pursue declaratory relief does not change the scope of this civil action, because if the Court were to decide that plaintiffs are entitled to nominal damages, that decision would necessarily involve the Court declaring that the quarantine policy violated their rights. For these reasons, defendants' 12(b)(1) Motion will be granted as to M.J.M. and M.D.M., who lack standing, and as to plaintiffs' claims for prospective relief, which are moot, but denied in all other respects.

## B.  The 12(b)(6) Motion

A motion to dismiss under Rule 12(b)(6) requires a court to dismiss a complaint if the well-pleaded factual allegations in the complaint, when taken as true and viewed in the light most favorable to the plaintiff, fail to state a claim that is "plausible on its face."  See E.I. du

---

[9] The requests for nominal damages and a declaratory judgment distinguish this civil action from McCray v. Fairfax County School Board, in which a similar challenge to the same FCPS quarantine policy was dismissed as moot. See Order, McCray v. Fairfax Cnty. School Bd., No. 1:22-cv-56 (E.D. Va. Mar. 15, 2022), ECF No. 27. In McCray, the pro se plaintiff only requested forward-looking injunctive relief, whereas here plaintiffs requested both forward- and backward-looking relief. See Complaint, No. 1:22-cv-56 (E.D. Va. Jan. 20, 2022), ECF No. 1. Only the requests for nominal damages and a declaratory judgment save this civil action from being entirely moot.

Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); Philips v. Pitt Cnty. Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009). In assessing such a motion, a court need not accept as true legal conclusions or unwarranted inferences. Philips, 572 F.3d at 180.

At the outset, defendants argue that M.M. should be dismissed because the allegation that M.M. was naturally immune to COVID-19 when she was quarantined in December is too speculative, given that she did not take a COVID-19 test when she was ill in October and November 2021. This Court disagrees. At this stage, plaintiffs' well-pleaded allegations are accepted as true. The Complaint alleges that in late October and early November, three of the six McArthur family members tested positive, and although M.M. was never tested, she exhibited symptoms consistent with COVID-19. These allegations, viewed in the light most favorable to plaintiffs, plausibly claim that M.M. had COVID-19 at that time. Accordingly, M.M. will not be dismissed from this civil action.

    1.  <u>Alleged Violation of the Equal Protection Clause (Count I)</u>

Count I alleges that defendants violated the McArthur children's rights under the Equal Protection Clause of the Fourteenth Amendment by treating them differently from their vaccinated classmates without adequate justification. To succeed on this claim, plaintiffs "must first demonstrate that [they] ha[ve] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).

The first showing is not a point of contention, because defendants do not appear to dispute that plaintiffs were treated differently from similarly situated students on the basis of

vaccination status and that the unequal treatment was purposeful; however, the parties dispute

which level of scrutiny applies.  Defendants argue for the standard that is most deferential to a

law or policy, which is called rational basis review.  Rational basis review "requires only that the

classification rationally further a legitimate state interest." Nordlinger v. Hahn, 505 U.S. 1, 10

(1992).  Its deferential nature "embodies an idea critical to the continuing vitality of our

democracy: that courts are not empowered to 'sit as a superlegislature to judge the wisdom or

desirability of legislative policy determinations.'" Wilkins v. Gaddy, 734 F.3d 344, 348 (4th Cir.

2013) (quoting City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976)).  It applies "unless a

classification warrants some form of heightened review because it jeopardizes exercise of a

fundamental right or categorizes on the basis of an inherently suspect characteristic."[10]

Nordlinger, 505 U.S. at 10.  Because laws that rely on these types of classifications are deserving

of less deference, they are reviewed under one of two "heightened" forms of review.  City of

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).  The first is intermediate scrutiny,

which plaintiffs argue should apply to defendants' quarantine policy.  Intermediate scrutiny

typically applies to laws that categorize groups based on sex, and it requires a court to strike

down a law unless it is "substantially related to a sufficiently important governmental interest."

Id.  The second form of heightened review is strict scrutiny, "the most demanding test known to

constitutional law." City of Boerne v. Flores, 521 U.S. 507, 534 (1997).  It typically applies to

classifications based on race, alienage, or national origin, and it requires a court to strike down a

law unless it is "narrowly tailored to further compelling governmental interests." Grutter v.

----

[10] A right is fundamental if it is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (quoting Moore v. East Cleveland, 431 U.S. 494, 503 (1977) (plurality opinion), and Palko v. Connecticut, 302 U.S. 319, 325-26 (1937)).

14

Bollinger, 539 U.S. 306, 326 (2003); City of Cleburne, 473 U.S. at 440.  Plaintiffs do not claim strict scrutiny is applicable here.

Defendants argue that heightened review is not warranted partly because their policy did not jeopardize any fundamental rights protected by the United States Constitution.  In response, plaintiffs briefly state in a footnote that they would address defendants' argument "in the due process section" of their brief, but no direct response is to be found in plaintiffs' brief.  [Dkt. No. 39] at 13 n.5.  Regardless, it is clear that defendants' policy did not jeopardize M.M.'s or M.H.M.'s exercise of a federal fundamental right.  For example, plaintiffs claim that the policy jeopardized their right to an education, but education is not a "fundamental" right within the United States Constitution.  See Plyler v. Doe, 457 U.S. 202, 223 (1982) ("Nor is education a fundamental right . . . .").  Plaintiffs also claim that the policy jeopardized their right to decline unwanted medical care, but that argument is meritless.  To the extent a right to decline unwanted medical treatment exists, plaintiffs cannot credibly claim that defendants' policy jeopardized it because both M.M. and M.H.M. have exercised that asserted right by remaining unvaccinated as of the briefing of the Motion.[11]

Next, defendants argue that heightened review is not justified because the quarantine policy does not categorize students on the basis of a suspect classification, like race or sex.  They are correct; it is a vaccination-based classification.  Defendants cite several cases holding that unvaccinated people do not constitute a suspect class.  See Bauer v. Summey, --- F. Supp. 3d ---, No. 2:21-cv-2952, 2021 WL 4900922, at *12 (D.S.C. Oct. 21, 2021) ("Although the Policies

---

[11] Although plaintiffs also assert in their brief a right to "remain[] free from the stigmatization of differential treatment due to their vaccine status," [Dkt. No. 39] at 20, the Complaint does not assert this as a right.  In any event, plaintiffs do not identify any case recognizing that asserted right as fundamental.

treat unvaccinated individuals differently than those vaccinated by only subjecting the former to potential termination, such differential treatment does not target a suspect class."); Williams v. Brown, --- F. Supp. 3d ---, No. 6:21-cv-1332, 2021 WL 4894264, at *9 (D. Or. Oct. 19, 2021) ("The Court is fully in agreement with this growing consensus and finds that no fundamental right or suspect classification is implicated by the Oregon vaccine mandates and so rational basis review will apply to Plaintiffs' claims."); Halgren v. City of Naperville, --- F. Supp. 3d ---, No. 21-cv-5039, 2021 WL 5998583, at *38 (N.D. Ill. Dec. 19, 2021) ("Plaintiffs have not identified any legal support for the notion that vaccination status alone is a traditional suspect (or quasi-suspect) class within the meaning of the Equal Protection Clause."); Kheriaty v. Regents of Univ. of Cal., No. 21-1367, 2021 WL 4714664, at *7 (C.D. Cal. Sept. 29, 2021) ("Whether the class here is formulated as 'non-vaccinated individuals,' 'individuals who have previously had COVID-19,' or 'non-vaccinated individuals with immunity to COVID-19,' Kheriaty presents no authority to show that any court has found a similar classification to be suspect or quasi-suspect."). Plaintiffs have failed to cite any conflicting authorities and have not offered any reasons to disagree with these cases. They simply point out that these decisions are not binding on this Court.

Despite the weight of authority against them, plaintiffs argue that heightened scrutiny is warranted because defendants' quarantine policy was "driven by irrational animus" towards a politically unpopular group, the unvaccinated, see Grimm, 972 F.3d at 607 ("[S]tate action is unconstitutional when it creates 'arbitrary or irrational' distinctions between classes of people out of 'a bare . . . desire to harm a politically unpopular group.'" (quoting City of Cleburne, 473 U.S. at 446-47)); however, there are no facts alleged in the Complaint from which one can reasonably infer that defendants established the quarantine policy to harm students like M.M.

and M.H.M.  This is pure speculation, and as such, it is insufficient to justify heightened scrutiny

and insufficient to withstand a motion to dismiss.  See Twombly, 550 U.S. at 555.  Plaintiffs' last

argument is that heightened review is necessary simply because children are involved.  To

support this argument, plaintiffs rely on Plyler v. Doe, in which the Supreme Court applied a

heightened form of scrutiny to strike down a law denying public education to undocumented

school children; however, in doing so, Plyler focused on the unique circumstances of

undocumented children, not children generally, and the Supreme Court has subsequently

declined to extend Plyler beyond its "unique circumstances."  See Plyler, 457 U.S. at 217-20;

Kadrmas v. Dickinson Pub. Schs., 487 U.S. 450, 460 (1988) (quoting Plyler, 457 U.S. at 239

(Powell, J., concurring)).  Accordingly, rational basis review will be applied to plaintiffs' claim.

Rational basis review affords defendants' quarantine policy a "strong presumption of

validity" and requires that the policy be upheld if it is "rationally related to a legitimate

governmental interest."  Thomasson v. Perry, 80 F.3d 915, 928 (4th Cir. 1996) (en banc)

(quoting Heller v. Doe, 509 U.S. 312, 318-19 (1993)).  This standard puts the burden on

plaintiffs "to negative every conceivable basis which might support" the quarantine policy.  Id.

(quoting Heller, 509 U.S. at 320).  As defendants point out, the Supreme Court has stated that

"[s]temming the spread of COVID-19 is unquestionably a compelling interest."  See Roman

Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67 (2020).  The key question is therefore

whether the quarantine policy was rationally related to that compelling governmental interest.

Plaintiffs argue it was not.  According to plaintiffs, if the goal of the quarantine policy was to

contain the spread of COVID-19 within a public school, it did not make any sense in the event of

a COVID-19 exposure to pause in-person learning for naturally immune students but not

vaccinated students.  Plaintiffs further argue that the reason this distinction did not make any

17

sense is that naturally acquired immunity is as strong as, if not stronger than, vaccine-induced immunity.

Plaintiffs' claim fails because, as plaintiffs acknowledge in their Complaint, defendants relied on public health experts like the CDC in developing their quarantine policy, and the CDC had essentially stated that the efficacy of natural immunity as it related to COVID-19 reinfection was still being studied at the time.  In fact, the Complaint cites a CDC report published on October 29, 2021, around the same time M.M. and M.H.M. are alleged to have contracted COVID-19, that concluded that although "[a]vailable evidence shows that fully vaccinated individuals and those previously infected with SARS-CoV-2 each have a low risk of subsequent infection for at least 6 months," there were several reasons to trust vaccine-induced immunity over natural immunity at that time.  Science Brief: SARS-CoV-2 Infection-Induced and Vaccine-Induced Immunity, CDC (Oct. 29, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/vaccine-induced-immunity.html [hereinafter CDC Report]; [Dkt. No. 20] at ¶ 109.  For example, the CDC Report stated that "[t]he body of evidence for infection-induced immunity is more limited than that for vaccine-induced immunity in terms of the quality of evidence (e.g., probable bias towards symptomatic or medically-attended infections) and types of studies (e.g., observational cohort studies, mostly retrospective versus a mix of randomized controlled trials, case-control studies, and cohort studies for vaccine-induced immunity)," and that "[t]here are insufficient data to extend the findings related to infection-induced immunity at this time to . . . children," like M.M. and M.H.M.  CDC Report, supra.  As a result, the CDC "continue[d] to recommend COVID-19 vaccination for all eligible persons, including those who have been previously infected with SARS-CoV-2."  CDC Report, supra.

Plaintiffs dispute the scientific underpinnings of these reasons, maintaining that the CDC's concerns about natural immunity are baseless and that there is "no evidence whatsoever that COVID-recovered children present a greater risk of being infected and transmitting the virus than do children who were vaccinated much longer ago." [Dkt. No. 39] at 14. For support, plaintiffs rely on declarations attached to the Complaint from medical professors at Stanford University and Harvard University advocating for natural immunity and from a cardiologist cautioning that the COVID-19 vaccines are associated with myocarditis. Nonetheless, these arguments do not establish that the CDC's guidance was irrational. Although not a "formal systematic review," the CDC Report was a "comprehensive" overview of scientific evidence based on "both peer-reviewed and preprint publications, as well as unpublished CDC data." See CDC Report, supra. Plaintiffs can disagree with this evidence, but their contrary evidence, including the declarations attached to the Complaint, only shows that the efficacy of natural immunity as it related to COVID-19 reinfection was a question on which reasonable minds differed. That the CDC favored one side of this debate does not make its position irrational, and it does not render defendants' decision to follow CDC guidance irrational. Moreover, plaintiffs rely on a straw man by comparing M.M. and M.H.M. to children "who were vaccinated much longer ago." In October and November 2021, when M.M. and M.H.M. are alleged to have contracted COVID-19, no children in their age group had been vaccinated "much longer ago," because the FDA had not approved the vaccine for children ages 5 to 11 until about that same time—October 29, 2021.[12]

---

[12] FDA Authorizes Pfizer-BioNTech COVID-19 Vaccine for Emergency Use in Children 5 through 11 Years of Age, FDA (Oct. 29, 2021), https://www.fda.gov/news-events/press-announcements/fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use-children-5-through-11-years-age; see also CDC Recommends Pediatric COVID-19 Vaccine for Children 5 to 11 Years, CDC (Nov. 2, 2021), https://www.cdc.gov/media/releases/2021/s1102-

It was also rational for defendants to rely on public health experts like the CDC in the

midst of one of the deadliest pandemics in United States history.  In fact, "the CDC has

consistently been cited as an acceptable rationale for government officials during the pandemic."

Doe v. Franklin Square Union Free Sch. Dist., --- F. Supp. 3d ---, No. 2:21-5012, 2021 WL

4957893, at *4 (E.D.N.Y. Oct. 26, 2021) (citing cases).  For example, in Norris v. Stanley, a

court held that it was rational for Michigan State University to rely on the CDC in issuing a

policy that required students and staff to receive the COVID vaccination.  No. 1:21-cv-756, 2022

WL 557306, at *5 (W.D. Mich. Feb. 22, 2022), appeal docketed, No. 22-1200 (6th Cir. Mar. 14,

2022).  Similarly, another court held that it was rational for the city of Chicago to rely on

"federal and state public health recommendations" when creating its vaccination policy, "even if

there might be some scientific disagreement on the issue" of natural immunity versus vaccine-

induced immunity.  Troogstad v. City of Chicago, --- F. Supp. 3d ---, No. 21-c-5600, 2021 WL

5505542, at *7 (N.D. Ill. Nov. 24, 2021).[13]

Accordingly, plaintiffs' argument that it was irrational to "blindly adopt[]" CDC

guidance during a pandemic is baseless.  [Dkt. No. 39] at 15.  It also fails to acknowledge that

defendants are not scientists.  They are in the business of educating students, and any resources

they spend parsing the evolving evidence on natural immunity would mean fewer resources

spent educating children.  For these reasons, relying on the CDC provided defendants a rational

---

PediatricCOVID-19Vaccine.html.  The Court takes judicial notice of this fact because it is a
matter of public record that is not subject to reasonable dispute, and doing so does not convert
the pending Motion into a motion for summary judgment.  See Hall, 385 F.3d at 424 n.3; Long,
451 F. Supp. 3d at 516 n.5.

[13] This district court and many other courts have relied on CDC guidance to formulate policies
concerning vaccination, testing, quarantining, and mask mandates in an effort to continue
operating during this pandemic.  See, e.g., General Order No. 2021-12, supra note 7; Standing
Order 2021-16, No. 1:00-mc-308 (D. Md. Dec. 30, 2021), ECF No. 143; Standing Order No. 21-
83 (D.D.C. Dec. 30, 2021).

basis for requiring unvaccinated students who purportedly had natural immunity as a result of having recently recovered from a COVID-19 infection to quarantine after being exposed to a COVID-positive individual, but not requiring the same of vaccinated children.  Because defendants' quarantine policy survives rational basis review, plaintiffs fail to state an equal protection claim, and Count I will be dismissed.

> 2.   Alleged Violation of State Right to an Education (Count II)

Plaintiffs next allege that the FCPS quarantine policy violated their fundamental right to an education guaranteed by the Virginia Constitution.  Article VIII of the Virginia Constitution provides that "[t]he General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained."  Va. Const. art. VIII, § 1.  Virginia's Bill of Rights similarly emphasizes the importance of "an effective system of education throughout the Commonwealth."  Va. Const. art. I, § 15.

The parties spend much of their memoranda debating whether defendants are the appropriate parties to sue under Article VIII of the Virginia Constitution, but the larger problem is that plaintiffs fail to allege any violation of the state right to an education.  Plaintiffs argue that defendants' policy of "requiring [plaintiffs] to stay home whenever they have 'potential close contacts,' with no valid public health justification," has denied the McArthur children their fundamental right to what they describe as the "ability to receive in-person public elementary and secondary school instruction."  [Dkt. No. 20] at ¶¶ 156, 161.  They contend that learning over Zoom is "far inferior" to "physical presence in the classroom" and "interact[ion] with one's teachers and peers."  Id. at ¶ 169.  Accordingly, they appear to allege both an outright denial of education and unequal quality of education.

21

Neither allegation makes out a violation of the Virginia Constitution because although "education is a fundamental right under the Constitution" of Virginia, the Virginia Supreme Court has held that there is no "requirement for 'substantial equality'" encompassed within the Virginia fundamental right to education.  Scott v. Commonwealth, 443 S.E.2d 138, 142-43 (Va. 1994).  As defendants emphasize and plaintiffs concede, plaintiffs had access to remote education during their mandatory quarantines.  Any difference between remote and in-person education amounts to a difference of quality, and the elimination of any "substantial disparity" in quality is "simply not required by the Constitution."  Id.  Therefore, to the extent plaintiffs allege that they have had an unequal quality of education compared to their vaccinated peers, their claim fails.

To the extent plaintiffs allege an outright denial of their education, there also is no basis in Virginia law supporting that argument on the alleged facts.  The current Virginia Constitution was drafted long before the invention of home computers or widespread use of the internet, and its drafters certainly had not contemplated virtual remote learning or any number of other modern pedagogical practices.  As defendants argue, there is no basis to conclude that the fundamental right to education under Virginia law requires "in-person" classroom learning.

Even assuming that FCPS's remote educational options were so inferior to in-person learning that a day of quarantine effectively did not provide any educational benefit, the facts alleged by plaintiffs are insufficient to show that the few days M.M. and M.H.M missed would equate to an outright denial of education.  Although plaintiffs allege that "of the 25 school days between November 1 and December 13, M.M was quarantined for 14 of them," [Dkt. No. 20] at ¶ 55, M.M. was purportedly sick with COVID-19 symptoms for the majority of those days, and none of plaintiffs' arguments challenge defendants' policy requiring students with active

COVID-19 infections (or any other infection) to stay home.  Plaintiffs solely challenge the policy

that resulted in M.M.'s forced quarantine due to an exposure, and the only absences plausibly

caused by that policy would be M.M.'s six December absences (Friday, December 3, 2021, and

Monday, December 6, through Friday, December 10, 2021).  [Dkt. No. 20] at ¶¶ 35, 55.  M.H.M.

missed even fewer days due to the policy.  Missing six days of in-person education over the

course of several months does not make out a plausible claim of a complete denial of education.

To hold otherwise would mean that educational officials having to close a school due to power

outages, floods, hurricanes, or snow would violate their students' rights simply by dealing with

the vicissitudes of running a school.  For all these reasons, plaintiffs have failed to state a claim

that they were denied any right to an education under the Virginia Constitution, and Count II will

be dismissed.

### 3.  Alleged Violation of Due Process (Count III)

Count III alleges that defendants have violated the McArthur children's due process

rights under the Fourteenth Amendment to the United States Constitution and Article I, § 11 of

the Virginia Constitution, both of which prohibit the government from depriving a person of life,

liberty, or property without due process of law.  "The state and federal due process clauses 'have

[an] almost exact similarity in language' and, therefore, our analysis of the due process issue

applies equally to both state and federal law."  Carter v. Gordon, 502 S.E.2d 697, 702 (Va. 1998)

(quoting Morris v. City of Danville, 579 F. Supp. 900, 901 n.1 (W.D. Va. 1984)).  Plaintiffs

appear to allege violations of procedural due process, substantive due process, and the

unconstitutional conditions doctrine in the same count.  Because the analyses differ, each will be

addressed in turn.

a. Procedural Due Process

A plaintiff alleging a procedural due process violation must allege facts sufficient to show that he or she was deprived of a constitutionally cognizable interest in life, liberty, or property by "some form of state action," and that the procedures employed by the state were constitutionally inadequate. See Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013) (quoting Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 145 (4th Cir. 2009)).

Here, the Complaint alleges that plaintiffs have been deprived of two constitutionally cognizable interests: a property interest in their education, and a liberty interest in their decision whether to be vaccinated. [Dkt. No. 20] at ¶ 179. As to plaintiffs' property interest claim, they rely on Goss v. Lopez, 419 U.S. 565 (1975), to argue that M.M. and M.H.M. being forced to quarantine constituted an unjust deprivation of their property interest in an education. In Goss, where nine students had been suspended for misconduct for up to 10 days without a hearing, the Supreme Court held that a "[s]tate is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." 419 U.S. at 574. Defendants correctly contend that Goss is inapposite because plaintiffs' allegations do not relate to how a school system handled student misconduct. See Haley v. Va. Commonwealth Univ., 948 F. Supp. 573, 581 (E.D. Va. 1996) ("The bottom line of Goss . . . is that a student subject to discipline must be afforded prior notice and a hearing."). Moreover, as previously discussed, neither M.M. nor M.H.M. were deprived of any right to an education. As to plaintiffs' liberty interest claim, "federal courts have consistently held that vaccine mandates do not implicate a fundamental right." See Valdez v. Grisham, 559 F. Supp. 3d 1161, 1173 (D.N.M. 2021), aff'd, No. 21-2105, 2022 WL 2129071 (10th Cir. June

24

14, 2022) (listing cases).  Even if they did, plaintiffs cannot claim that they have been deprived of a liberty interest to decide whether or not to be vaccinated, because plaintiffs had not been vaccinated when the Motion was briefed and have not informed the Court of any subsequent change in vaccination status.[14]

Moreover, it is clear that procedural due process is not implicated here at all, because defendants' quarantine policy applied to all FCPS students.  As the Supreme Court recognized in United States v. Locke, "In altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements."  471 U.S. 84, 108 (1985).  Plaintiffs do not allege that defendants failed to meet these de minimis requirements when executing the quarantine policy.  Although plaintiffs attempt to limit Locke to actions specifically taken by legislatures, plaintiffs do not cite any case supporting that limitation.  To the contrary, several courts have found COVID-19 measures to be laws of general applicability despite having been promulgated by a governmental entity other than the legislature, as the Court finds here.  See, e.g., Hartman v. Acton, 499 F. Supp. 3d 523, 536-37 (S.D. Ohio 2020) (finding

---

[14] As previously mentioned, although plaintiffs assert in their brief a liberty interest in "remaining free from the stigmatization of differential treatment due to their unvaccinated status," that liberty interest is not asserted in the Complaint.  Moreover, there is "no constitutional right to be free from stigma."  Patterson, 566 F.3d at 147; Siegert v. Gilley, 500 U.S. 226, 233 (1991) ("injury to reputation by itself was not a 'liberty' interest protected under the Fourteenth Amendment").  In the rare instance in which a plaintiff is able to make out such a claim, she must demonstrate that the stigma "was accompanied by a state action that 'distinctly altered or extinguished' [her] legal status," such as through the public loss of government employment.  Shirvinski v. U.S. Coast Guard, 673 F.3d 308, 315 (4th Cir. 2012) (quoting Paul v. Davis, 24 U.S. 693, 701 (1976)).  No such allegation has been made here.

that the plaintiffs' procedural due process rights were "not violated nor implicated" by a "Stay at

Home Order" issued by the Director of the Ohio Department of Health); Bauer, --- F. Supp. 3d

---, 2021 WL 4900922, at *6-7 (finding that an Executive Order related to COVID-19 was a law

of general applicability that did not violate procedural due process).

   To the extent plaintiffs argue that the policy was an administrative action, the exigent and

constantly changing circumstances of a global pandemic would still justify "summary

administrative action" under the "emergency situation exception" to due process.  Hodel v. Va.

Surface Mining & Reclamation Ass'n, 452 U.S. 264, 299-301 (1981).  Other courts have come to

similar conclusions.  See Libertas Classical Ass'n v. Whitmer, 498 F. Supp. 3d 961, 976 (W.D.

Mich. 2020) ("Multiple district courts have cited . . . Hodel to deny preliminary injunction

challenges to COVID-19 related procedural due process claims."); World Gym, Inc. v. Baker,

474 F. Supp. 3d 426, 433 (D. Mass. 2020) (finding that the governor's COVID-19 order closing

non-essential businesses without individual hearings did not "offend due process" because "the

Governor acted in response to" an emergency); Benner v. Wolf, 461 F. Supp. 3d 154, 162 (M.D.

Pa. 2020) ("The circumstances surrounding COVID-19 justified the Governor's quick action and

negated the necessity of pre-deprivation due process.").  For these reasons, plaintiffs' procedural

due process claims fail.

      b.  Substantive Due Process

   There are two types of substantive due process claims: those challenging executive action

and those challenging legislative action.  Plaintiffs do not specify which type they challenge.  To

the extent plaintiffs complain that an executive action has violated their substantive due process

rights, they must plead facts sufficient to allege that the government has deprived them of life,

liberty, or property in an arbitrary manner that "shock[s] the contemporary conscience."

Hawkins v. Freeman, 195 F.3d 732, 738-39 (4th Cir. 1999) (quoting Cnty. of Sacramento v.

Lewis, 523 U.S. 833, 847 n.8 (1998)).  Alternatively, if they complain of a legislative substantive

due process violation, the analysis involves two steps, first determining whether the enacted rule

violates a fundamental right, then engaging in the appropriate level of review.  See Glucksberg,

521 U.S. at 720-22.  If the asserted interest is determined to be a fundamental one, the court will

engage in strict scrutiny; otherwise, the court will use only rational basis review.  Hawkins, 195

F.3d at 739.

      As defendants argue, if plaintiffs are challenging an executive action, the facts alleged in

the Complaint fail to show anything "so egregious, so outrageous, that it may fairly be said to

shock the contemporary conscience." Lewis, 523 U.S. at 847 n.8.  As other courts have found, a

COVID-19 quarantine policy that favors vaccination, which is designed to "prevent the spread of

a deadly virus … does not rise to the level of conscience-shocking." Bauer, 2021 WL 4900922,

at *8 (listing cases).  Requiring a person with a documented COVID-19 exposure to quarantine

for a few days is a practice that is widespread, normalized, and regularly used to keep our world

operating during a global pandemic—virtually the opposite of "conscience-shocking." See, e.g.,

Page v. Cuomo, 478 F. Supp. 3d 355, 371 (N.D.N.Y. 2020) (finding "nothing conscience-

shocking" about a policy requiring quarantine upon entry to the state of New York during the

COVID-19 pandemic); Walker v. Sims, No. CV 20-12803, 2022 WL 279853, at *7 (D.N.J. Jan.

31, 2022) ("[I]t does not shock the conscience to place an individual [prisoner] in quarantine for

37 days if he or she was exposed to or had contracted the [COVID-19] virus.").

      On the other hand, if plaintiffs are challenging a legislative enactment, they have failed to

allege sufficient facts to establish that a fundamental right has been implicated.  Plaintiffs urge

the Court to raise the standard of scrutiny beyond rational basis, this time because the policy at

issue is allegedly a "de facto vaccine mandate" similar to forcible medical treatment.  [Dkt. No.

39] at 22.  As previously explained, plaintiffs have not been vaccinated as far as this Court is aware, which means they have not been subject to any forcible medical treatment.  Moreover, to the extent plaintiffs argue that previously infected, unvaccinated students have a fundamental right to in-person education despite having been exposed to someone infected with COVID-19, no court has ever found such a right.  The ability to attend school in-person after a documented exposure to a contagious disease is not a right.  Because no fundamental right has been implicated by the allegations in the Complaint, defendants' quarantine policy is subject to rational basis review.  And because defendants' policy survives rational basis review for the reasons previously discussed, plaintiffs fail to state a substantive due process claim.

c.   Unconstitutional Conditions

Plaintiffs also allege a violation of the unconstitutional conditions doctrine, under which "the government may not deny a benefit to a person because he exercises a constitutional right." Regan v. Tax'n With Representation of Wash., 461 U.S. 540, 545 (1983).  Plaintiffs argue that defendants' quarantine policy unconstitutionally conditioned the minor plaintiffs' receipt of the benefits of in-person public education on their waiver of their right to decline medical treatment (which plaintiffs also characterize as a right to bodily autonomy).  This argument fails because, as previously explained, the educational benefits to which plaintiffs are entitled have not been meaningfully denied.  First, there is no recognized right to an in-person education.  Second, plaintiffs were not denied an education, as they continued to receive an education virtually. Third, the condition imposed, which in this case was being vaccinated, is not unconstitutional because it survives rational basis review.

For all these reasons, Count III will be dismissed.

28

4.   <u>Alleged Violation of the Right to Parent (Count IV)</u>

Count IV alleges that both federal and Virginia law recognize a parent's fundamental right to make decisions concerning the education and care of his or her child, and that defendants have deprived the McArthur parents of this right "[b]y predicating their children's ability to obtain an uninterrupted education . . . upon their receiving . . . a vaccine."[15]  [Dkt. No. 20] at ¶ 203.  The Supreme Court has previously found a constitutionally protected interest in the "liberty of parents and guardians to direct the upbringing and education of children under their control."  <u>Pierce v. Soc'y of Sisters</u>, 268 U.S. 510, 534–35 (1925); <u>see also</u> <u>Troxel v. Granville</u>, 530 U.S. 57, 65 (2000) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.").  The McArthur parents argue that this right extends to choosing whether or not to vaccinate their children; however, as defendants argue, the Supreme Court has already held that the liberty interest of parents in the context of vaccination and contagious disease is not absolute.

> [N]either rights of religion nor rights of parenthood are beyond limitation.  Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. . . .  Thus, [a parent] cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds.  The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.

<u>Prince v. Massachusetts</u>, 321 U.S. 158, 166–67 (1944) (internal footnotes omitted).

---

[15] Plaintiffs also rely on a section of the Virginia Code that states, "A parent has a fundamental right to make decisions concerning the upbringing, education, and care of the parent's child," Va. Code § 1-240.1; however, as defendants contend, § 1-240.1 does not provide for a private cause of action because it does not contain a statutory enforcement provision.  <u>See</u> <u>Cherrie v. Va. Health Servs., Inc.</u>, 787 S.E.2d 855, 858 (Va. 2016) (holding that a private right of action cannot be inferred from a statute unless "the statutory scheme necessarily implies it").

This claim fails for multiple reasons.  First, as the defendants correctly argue, the government has the authority to mandate vaccinations in the interest of promoting public health. See Jacobson v. Massachusetts, 197 U.S. 11, 31-32 (1905).  Second, as previously discussed, the facts alleged in the Complaint show that the McArthur parents' right to determine their children's upbringing has not been infringed at all.  The McArthur children have remained unvaccinated, making all of plaintiff's arguments about the "injection of chemicals into their bodies" inapposite.  [Dkt. No. 39] at 28.  Third, as the overwhelming case authority shows, defendants have acted within the constitutional authority of the state in crafting the FCPS quarantine policy, which rationally relied on CDC guidance to encourage vaccination to reduce the spread of COVID-19 during a global pandemic which has now lasted over two-and-a-half years.

### 5.   Alleged Violation of Emergency Use Authorization Statute (Count V)

Finally, Count V alleges that defendants' quarantine policy is in conflict with, and therefore preempted by, the federal Emergency Use Authorization ("EUA") statute, which provides that recipients of products approved for use under it must be informed of the "option to accept or refuse administration." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii).  This count similarly alleges that defendants' quarantine policy functionally imposed a requirement on the McArthurs to "give their children an unnecessary, possibly harmful, EUA vaccine or else to subject them to potentially endless missed school days, effectively depriving them of the right to the education their peers enjoy." [Dkt. No. 20] at ¶ 205.  But, as explained above, the McArthurs have not been deprived of their so-called-right under the EUA to decline the vaccine, as all of the McArthur children remain unvaccinated, and the quarantine policy has not caused such a loss of education to rise to the level of deprivation.

Even if the Complaint alleged sufficient facts to make out such a claim, as defendants

correctly argue, any proceedings under the Federal Food, Drug, and Cosmetic Act, of which the

EUA is a part, must be brought "by and in the name of the United States," and not as private

actions. 21 U.S.C. § 337(a). Plaintiffs try to avoid this requirement by responding that the

Supremacy Clause gives them a right to seek injunctive relief against state actions preempted by

federal law, see Ex parte Young, 209 U.S. 123, 155-56 (1908); however, injunctive relief is no

longer available in this civil action, as the only claims which are not moot are those for

retroactive, nominal damages and declaratory relief, which are not available through a private

right of action under the Supremacy Clause. See Armstrong v. Exceptional Child Ctr., Inc., 575

U.S. 320, 325-26 (2015). Accordingly, Count V must also be dismissed.

### III. CONCLUSION

For the reasons stated above, defendants' Motion to Dismiss [Dkt. No. 32] will be

GRANTED, and all remaining claims in this civil action will be dismissed by an appropriate

Order to be issued with this Memorandum Opinion.

Entered this 7ᵗʰ day of July, 2022.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

31